**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

StandWithUs Center for Legal Justice,
Katerina Boukin, and Marilyn Meyers,

       Plaintiffs,

v.

Massachusetts Institute of Technology,

       Defendant.

Case No. 24-CV-10577-RGS

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT MASSACHUSETTS INSTITUTE OF TECHNOLOGY'S**
**MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................3

LEGAL STANDARD......................................................................................................5

ARGUMENT ................................................................................................................6

I.       The Complaint Should Be Dismissed For Failure To State A Claim. ..................6

         A.       As The Complaint Concedes, MIT Is Actively Responding To
                  Reports. ...............................................................................................8

         B.       The Complaint Fails To Plausibly Allege Deliberate Indifference By
                  MIT. ..................................................................................................11

         C.       The Complaint Fails To State A Claim For Direct Discrimination. ......................17

II.      The Complaint Should Be Dismissed For Lack Of Subject-Matter
         Jurisdiction..........................................................................................................18

         A.       Plaintiffs Fail To Satisfy The Requirements Of Standing. ...................18

                  1.       All Plaintiffs Lack Standing For Their Sweeping Injunctive
                           Relief...............................................................................19

                  2.       SCLJ Lacks Standing Entirely. ................................................21

         B.       This Challenge Is Not Ripe For Adjudication. ...................................23

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

CASES

*Adams v. Demopolis City School*, 80 F.4th 1259 (11th Cir. 2023)................................................23

*Alexander v. Sandoval*, 532 U.S. 275 (2001)....................................................................................6

*ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989)................................................................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................5

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004).........................................................22

*Barnett v. Johnson City School District*, No. 04-CV-0763, 2005 WL 8178066
    (N.D.N.Y. Feb. 2, 2005) ...........................................................................................................21

*Beaudoin v. Healey*, No. 22-CV-11356, __ F. Supp. 3d __, 2023 WL 7116711 (D.
    Mass. Oct. 27, 2023), *appeal docketed*, No. 23-1989 (1st Cir. Dec. 5, 2023).........................21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................5

*Bingham v. Massachusetts*, 616 F.3d 1 (1st Cir. 2010) ..................................................................19

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018)................................................................6

*Boston Parent Coalition for Academic Excellence Corp. v. School Committee for
    City of Boston*, 89 F.4th 46 (1st Cir. 2023).............................................................................22

*Bray v. Worcester Polytechnic Institute*, 596 F. Supp. 3d 142 (D. Mass. 2022) ......................8, 22

*Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908 (7th Cir. 2007)...................17

*Cannon v. University of Chicago*, 441 U.S. 677 (1979) ....................................................................6

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................................................19, 20

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24 (1st
    Cir. 2000) ....................................................................................................................................5

*Czerwienski v. Harvard University*, 666 F. Supp. 3d 49 (D. Mass. 2023) ....................................25

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629
    (1999)..................................................................................................7, 8, 12, 13, 22, 25

*Demoret v. Zegarelli*, 451 F.3d 140 (2d Cir. 2006) .......................................................................22

*Doe v. Brown University*, 327 F. Supp. 3d 397 (D.R.I. 2018).......................................................25

*Doe v. Brown University*, 43 F.4th 195 (1st Cir. 2022) ...................................................18

*Doe v. Brown University*, 896 F.3d 127 (1st Cir. 2018) ............................................7, 14

*Doe v. Pawtucket School Department*, 969 F.3d 1 (1st Cir. 2020)...........................7-8, 11, 12, 14

*Doe v. Pike School, Inc.*, No. 13-CV-11730, 2014 WL 413207 (D. Mass. Feb. 4, 2014) ...................................................................................................................11

*Doe v. Sacks*, No. 23-CV-1307, __ F. Supp. 3d __, 2024 WL 402945 (S.D.N.Y. Feb. 02, 2024) ...........................................................................................................13

*Doe v. Standard Insurance Co.*, 852 F.3d 118 (1st Cir. 2017) ......................................6

*Doe v. Stonehill College, Inc.*, 55 F.4th 302 (1st Cir. 2022)..........................................24

*Doe v. Town of Stoughton*, 917 F. Supp. 2d 160 (D. Mass. 2013) .................................6

*Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018) .................................18

*Equal Means Equal v. Ferriero*, 3 F.4th 24 (1st Cir. 2021) .........................................20

*Felber v. Yudof*, 851 F. Supp. 2d 1182 (N.D. Cal. 2011) ...................................12, 15, 16

*In re Financial Oversight & Management Board for Puerto Rico*, 60 F.4th 9 (1st Cir. 2013) ......................................................................................................................6

*Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998) .................6, 7, 11, 17

*Gill v. Whitford*, 585 U.S. 48 (2018)..............................................................................20

*Goodman v. Bowdoin College*, 380 F.3d 33 (1st Cir. 2004)..........................................18

*Guckenberger v. Boston University*, 957 F. Supp. 306 (D. Mass. 1997).......................17

*H.B. v. Monroe Woodbury Central School District*, No. 11-CV-5881, 2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012) ...............................................................................16

*Healy v. James*, 408 U.S. 169 (1972) ..............................................................................2

*Ingram v. Kubik*, 30 F.4th 1241 (11th Cir. 2022) .........................................................17

*Jones v. City of Detroit*, 20 F.4th 1117 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 84 (2022)...............................................................................................................................17

*Keskinidis v. University of Massachusetts Boston*, 76 F. Supp. 3d 254 (D. Mass. 2014) ................................................................................................................................8

*L. L. v. Evesham Township Board of Education*, 710 F. App'x 545 (3d Cir. 2017)....................22

iii

*Labor Relations Division of Construction Industries of Massachusetts, Inc. v. Healey*, 844 F.3d 318 (1st Cir. 2016)........................................................................23

*Langadinos v. Appalachian School of Law*, No. 05-CV-00039, 2005 WL 2333460 (W.D. Va. Sept. 25, 2005) .............................................................................17, 18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................................20

*M.L. ex rel. D.L. v. Concord School District*, 86 F.4th 501 (1st Cir. 2023) ............................7, 24

*Mandel v. Board of Trustees of California State University*, No. 17-CV-03511, 2018 WL 5458739 (N.D. Cal. Oct. 29, 2018)....................................................12, 13

*McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63 (1st Cir. 2003) ....................................25

*Oden v. Northern Marianas College*, 440 F.3d 1085 (9th Cir. 2006) ....................................23-24

*Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13 (1st Cir. 2019) .................................................................................................................21

*Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005)......................22

*Pollard v. Georgetown School District*, 132 F. Supp. 3d 208 (D. Mass. 2015) ............8, 14, 15, 22

*Porto v. Town of Tewksbury*, 488 F.3d 67 (1st Cir. 2007).........................................................7, 8

*Raso v. Lago*, 958 F. Supp. 686 (D. Mass. 1997), *aff'd on other grounds*, 135 F.3d 11 (1st Cir. 1998) .................................................................................................8

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017).........................................................................6, 23

*Roe v. Healey*, 78 F.4th 11 (1st Cir. 2023) .........................................................................18, 19

*Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78 (1st Cir. 2013) ..............................................................................................................23, 25

*Santiago v. Puerto Rico*, 655 F.3d 61 (1st Cir. 2011)..............................................................7, 12

*Saravanan v. Drexel University*, No. 17-CV-3409, 2017 WL 5659821 (E.D. Pa. Nov. 24, 2017) ............................................................................................................17

*Schatz v. Republican State Leadership Committee*, 669 F.3d 50 (1st Cir. 2012) .......................5, 6

*Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974)................................21

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .........................................................................18, 19

*Spottiswoode v. Son*, 593 F. Supp. 2d 347 (D. Mass. 2009) .........................................................6

iv

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517
   U.S. 544 (1996).................................................................................................21

*W.R. Grace & Co. v. United States EPA*, 959 F.2d 360 (1st Cir. 1992)........................................25

*Warth v. Seldin*, 422 U.S. 490 (1975) ...............................................................22

**STATUTES**

42 U.S.C. § 2000d...............................................................................................6

42 U.S.C. § 2000d-1 ...........................................................................................6

**OTHER AUTHORITIES**

Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter:
   Discrimination, Including Harassment, Based on Shared Ancestry or Ethnic
   Characteristics* (Nov. 7, 2023), https://www2.ed.gov/about/offices/list
   /ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf ....................16

Office for Civil Rights, U.S. Dep't of Educ., *First Amendment: Dear Colleague*
   (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html ........................16

**INTRODUCTION**

The Massachusetts Institute of Technology ("MIT" or "the Institute") fervently believes antisemitism should have no place on the Institute's campus or beyond. Since the brutal terrorist attack that Hamas perpetrated in Israel on October 7, 2023, MIT—like many other institutions of higher education—has been the site of student-led protests involving expression that is deeply offensive to many in the MIT community. MIT is firmly committed to free expression as one of its core principles, but as MIT's President has explained, "there is a difference between what we can say – that is, what we have a right to say – and what we should say," and we must "find a way to express our political views with a basic sense of respect and empathy for other members of our community." That principle is central to MIT's mission as an educational institution and its ongoing and substantial efforts to combat antisemitism.

The Institute has taken broad and decisive action to address antisemitism over the past six months. MIT's leaders have swiftly and repeatedly condemned the October 7 attack and the rising threat of antisemitism. The Institute has taken concrete steps to provide a safe and inclusive environment for students and other community members—including increasing safety patrols, providing supportive resources for students affected by the conflict in the Middle East or related campus activism, and launching educational and community-building efforts, such as the new Standing Together Against Hate initiative. MIT is also working to strengthen certain Institute systems and processes, recognizing the delicate balance that is needed between protecting students from harmful expression and upholding principles of free speech that are essential to academic institutions. Where community members have violated Institute policies, MIT has taken remedial actions including interim suspensions and referrals for additional disciplinary proceedings.

This lawsuit largely ignores those efforts, advancing the extraordinary and unfounded

1

claim that MIT is "deliberately indifferent" to antisemitism and even harbors discriminatory animus against its Jewish and Israeli students. The plaintiffs—a California-based advocacy organization and two MIT students it claims as members—allege that MIT has violated Title VI of the Civil Rights Act of 1964. Based on their single-count Complaint, Plaintiffs claim entitlement to money damages as well as sweeping and unprecedented injunctive relief that would compel MIT to terminate tenured faculty members and staff, expel students, and ban student groups, among many other demands. MIT reaffirms its ongoing commitment to combat antisemitism. But this lawsuit is not the right way to address the concerns Plaintiffs raise here. For the following reasons, the Complaint should be dismissed.

*First*, the Complaint fails to state a claim against MIT for violating Title VI. Students cannot sue educational institutions under the federal statute for the actions of fellow students, faculty, or staff based on vicarious liability. They must plausibly allege an official policy by the institution to discriminate, or a response to known and actionable harassment that is so clearly unreasonable it amounts to an official decision not to remedy the violation. The Complaint does not meet those rigorous legal standards. It fails to allege that either student reported the specific experiences alleged in the Complaint before filing suit, much less that those experiences rise to the level of actionable harassment under Title VI, or that MIT responded to them in a "clearly unreasonable" manner. Courts have repeatedly dismissed deliberate-indifference claims based on more extensive allegations than the five paragraphs of this Complaint detailing these students' experiences, and they have rejected efforts to rely on the experiences of students who are not party to the suit. Critically, courts also recognize "[t]he college classroom with its surrounding environs is peculiarly the marketplace of ideas," *Healy v. James*, 408 U.S. 169, 180 (1972), and that fulfilling Title VI obligations to some students does not require trammeling freedom of expression

for others. While the Complaint tries to circumvent these standards by alleging direct and intentional discrimination by MIT itself, there are no plausible allegations that MIT took an adverse action against any Plaintiff, much less that it acted out of discriminatory animus.

*Second*, the Complaint fails to clearly establish this Court's subject-matter jurisdiction in several respects. Plaintiffs lack standing for the sweeping injunctive relief they seek: they do not plausibly allege they will suffer future harm inflicted by MIT (as opposed to potential harm by other students or student groups), and their requested relief far exceeds what is necessary to address the injuries they claim. In addition, the advocacy group lacks standing altogether: this Title VI claim requires the participation of individuals, defeating associational standing, and an advocacy group cannot pursue damages claims for its members. Even more basic, this challenge is not ripe for adjudication. MIT is actively responding to recent reports alleging antisemitism, meaning that relevant facts—and MIT's response—continue to be developed. Plaintiffs concede this point, noting that disciplinary actions are ongoing and outcomes are "unknown at this time." In light of this concession, the suit is premature. Courts in this Circuit have never required an institution to defend the adequacy of its response while that response is in progress.

## BACKGROUND

Plaintiffs are two MIT students and a California-based advocacy organization, StandWithUs Center for Legal Justice ("SCLJ"). Compl. ¶¶ 14-17. According to the Complaint, SCLJ works to combat antisemitism "through impact litigation and other legal actions," and its "members include current Jewish and/or Israeli MIT undergraduate and graduate students and alumni." *Id.* ¶ 14. The only members named in the Complaint are Plaintiffs Katerina Boukin and Marilyn Meyers, and only a handful of the Complaint's 236 paragraphs describe the experiences of the two students in whose names this action is prosecuted. *Id.* ¶¶ 141, 188, 203, 218-219.

3

Plaintiff Boukin, "a Jewish Israeli graduate student," *id*. ¶ 16, alleges three specific experiences. *First*, she contends that she and another student "were required to remove" Israeli flags they displayed on campus, even while "MIT administrators have allowed Palestinian flags to remain on campus." *Id*. ¶¶ 203-204. Plaintiff Boukin does not say who required her to remove the flags, when, or why; nor does she allege that she was subject to any discipline. Moreover, she acknowledges that MIT has a policy regulating the display of banners and flags on campus. *Id*. ¶ 205 & n.110. *Second*, she alleges that she was "subjected to antisemitic chants and violent speech" at campus protests and "prohibited from freely moving through the space" where these protests occurred. *Id.* ¶ 219. She alleges that on one occasion, she and other MIT students were "surrounded" by members of a student group, who shouted the phrase "from the river to the sea," which she "understood to be calling for the elimination of Israel." *Id*. *Third*, she alleges that student groups sent emails with unspecified "antisemitic language," which she received at her MIT email account. *Id*. The Complaint does not allege that Plaintiff Boukin ever complained to an MIT official about any of these experiences, much less how MIT responded to any such complaints.

Plaintiff Meyers, "a Jewish undergraduate student," *id*. ¶ 15, alleges two particular experiences.[1] *First*, she alleges that she was present at a rally during which an unidentified protester—with no alleged connection to the MIT community—"raised the front wheels of his bike at" her and another Jewish student and said, "Your ancestors [(referring to Holocaust victims)] didn't die to kill more people," *id*. ¶ 141. *Second*, she alleges that she "was the recipient of antisemitic comments by other students on campus." *Id*. ¶ 218. According to Plaintiff Meyers, she contacted MIT's Institute Discrimination & Harassment Response Office ("IDHR") and "was

---

[1] The Complaint refers to this student as both "Meyers" (case caption) and "Meyer" (Compl. ¶¶ 15, 141, 188, 218). MIT uses the surname Meyers, as there is no "Marilyn Meyer" currently enrolled.

falsely told that she was not a member of a protected class and, subsequently, that what she experienced is not within the scope of the IDHR." *Id*. Plaintiff Meyers does not allege that she reported the specific incident with the protester to IDHR or other MIT officials.

The Complaint also references "SCLJ Member #1," "a Jewish undergraduate student currently enrolled at MIT." *Id*. ¶ 17. The sole paragraph about him alleges that he received "antisemitic emails" from various student groups and was "subjected to antisemitic rhetoric in various common spaces on MIT's campus." *Id*. ¶ 220. The Complaint does not allege whether this student reported any of this expression to MIT or, if he did, how the Institute responded.

Plaintiffs allege that MIT violated Title VI. *Id*. ¶¶ 222-236. They seek sweeping injunctive relief as well as compensatory and punitive damages. *Id.* at 70-71. Their prayer for relief demands various actions that the Complaint acknowledges MIT has already taken, such as condemning antisemitism and educating the community about it. *Compare id*., *with* Compl. Ex. A at 10-11, 13. But Plaintiffs also seek a host of specific remedial measures, such as firing faculty members, expelling students, and banning student groups. *Id*. at 70-71.

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In assessing plausibility, the court does not credit "mere conclusory statements" or "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557). Beyond well-pleaded factual allegations, the court may consider documents "'integral' to assessing the sufficiency of the allegations in the complaint," *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000), or "fairly incorporated into the complaint," *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55-

56 (1st Cir. 2012). The court may also consider facts "susceptible to judicial notice," *id.*, including information available on public websites, *see, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 60 F.4th 9, 13 (1st Cir. 2013); *Doe v. Standard Ins. Co.*, 852 F.3d 118, 124 (1st Cir. 2017); *Spottiswoode v. Son*, 593 F. Supp. 2d 347, 350 (D. Mass. 2009) (Stearns, J.).

Under Rule 12(b)(1), a court must dismiss any claim or request for relief over which it lacks subject-matter jurisdiction, including where the plaintiff lacks standing to pursue its claims or where the plaintiff's dispute is unripe. *Reddy v. Foster*, 845 F.3d 493, 499-500 (1st Cir. 2017). The court is not limited to the pleadings in evaluating a Rule 12(b)(1) motion. *Boniface v. Viliena*, 338 F. Supp. 3d 50, 60 (D. Mass. 2018) (internal quotation marks omitted).

## ARGUMENT

## I.     The Complaint Should Be Dismissed For Failure To State A Claim.

Plaintiffs bring a single count alleging that MIT violated Title VI, which prohibits discrimination based on race, color, and national origin in programs receiving federal funding. 42 U.S.C. § 2000d. The statute charges federal agencies with enforcing this provision against their funding recipients. *Id.* § 2000d-1. In addition to that primary enforcement mechanism, the Supreme Court has recognized an implied private right of action to obtain injunctive relief and monetary damages. *See Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). But it has limited such claims in several key respects, recognizing that Spending Clause statutes like Title VI and Title IX—which impose conditions on federal funding—are categorically different from Commerce Clause statutes like Title VII that prohibit discrimination outright. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284-89 (1998).[2] A Title VI plaintiff can sue only for *intentional*

---

[2] "Title IX was patterned after Title VI," *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694-95 (1979), and these "statutes have been consistently interpreted interchangeably," *Doe v. Town of Stoughton*, 917 F. Supp. 2d 160, 165 n.3 (D. Mass. 2013) (collecting cases).

discrimination by the funding recipient itself and cannot rely on vicarious liability or constructive notice. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). Liability requires an "official policy of the recipient entity" to discriminate, or, once the recipient is informed of unlawful discrimination, an "official decision by the recipient not to remedy the violation"—a theory of liability known as "deliberate indifference." *Gebser*, 524 U.S. at 290-91.

Deliberate indifference is a "stringent standard of fault." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007). A plaintiff must plausibly allege five elements, each necessary to "eliminate any risk that the recipient [of federal funds] would be liable in damages not for its own official decision but instead for [others'] independent actions." *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011) (quoting *Davis*, 526 U.S. at 643). Those elements are: "(1) '[the plaintiff] was subject to severe, pervasive, and objectively offensive … harassment'; (2) 'the harassment caused the plaintiff to be deprived of education opportunities or benefits'; (3) the funding recipient was aware of such harassment; (4) the harassment occurred 'in [the funding recipient's] programs or activities'; and (5) the funding recipient's response, or lack thereof, to the harassment was 'clearly unreasonable.'" *Doe v. Brown Univ.*, 896 F.3d 127, 130 (1st Cir. 2018) (quoting *Porto*, 488 F.3d at 72-73).

The "clearly unreasonable" standard precludes a court from second-guessing a school's response unless it rises to the level of an abject institutional failure. The "inquiry is limited to 'whether the school's actions were so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances.'" *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023) (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 175 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009)). "[F]unding recipients are not required to have perfect foresight or manage all student interactions expertly," *Doe v.*

7

*Pawtucket Sch. Dep't*, 969 F.3d 1, 9 (1st Cir. 2020), and "a claim that the [institution] could or should have done more is insufficient to establish deliberate indifference," *Porto*, 488 F.3d at 73. This "is not a mere reasonableness standard" and, consistent with the Supreme Court's directive that it can be decided "as a matter of law," *Davis*, 526 U.S. at 648-49, courts in this district have repeatedly rejected deliberate-indifference claims at the pleadings stage, *see, e.g.*, *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 229-31 (D. Mass. 2015); *Bray v. Worcester Polytechnic Inst.*, 596 F. Supp. 3d 142, 156-57 (D. Mass. 2022); *Raso v. Lago*, 958 F. Supp. 686, 703-04 (D. Mass. 1997), *aff'd on other grounds*, 135 F.3d 11 (1st Cir. 1998); *see also Keskinidis v. Univ. of Mass. Bos.*, 76 F. Supp. 3d 254, 260 & n.3 (D. Mass. 2014) (Stearns, J.).

The Complaint fails to state a claim under these well-established standards. It concedes—but then largely ignores—MIT's extensive engagement with reports of antisemitism, which has included repeatedly condemning antisemitism and some of the rhetoric used on campus, improving safety and security resources on campus, addressing violations of Institute policies through discipline and otherwise, and launching multiple Institute-wide efforts to combat antisemitism. No court has allowed a deliberate-indifference claim in circumstances remotely resembling these, let alone with such sparse allegations as to how the student-plaintiffs' own personal experiences amount to harassment as defined by Title VI. Nor can Plaintiffs circumvent these demanding standards by claiming that MIT itself directly and intentionally discriminated against them.

### A.    As The Complaint Concedes, MIT Is Actively Responding To Reports.

The Complaint downplays MIT's robust and ongoing response to reports of antisemitism on campus, *see, e.g.*, Compl. ¶¶ 162, 165-169, 199, 205-206, but its allegations and exhibit, as well as MIT's public communications, confirm that MIT is fully engaged in responding to these reports.

To start, within days of the atrocities committed by Hamas on October 7, MIT's President

issued a campus-wide statement forcefully condemning antisemitism—the first of several communications from MIT leaders responding to the October 7 attack and its impact on campus. Exs. 1 & 2.[3] At the same time, MIT acknowledged reports of students "feel[ing] unsafe on campus" "because of their Jewish faith, or their ties to Israel," and cautioned that "the rhetoric on our own campus [must] not escalate to the point of personal attacks, harassment or violence." Ex. 1.

Just two days later, MIT again addressed the community and provided "guidelines and policies that enable us to live together in community." Ex. 3. It instructed students how to report concerns about "the content of a poster, chalking, or similar display," and reiterated that "[s]peech or behavior that amounts to harassment and acts (or threats of) violence, against individuals or groups, are against MIT policy." *Id*. In addition, MIT recognized that students might "benefit from support or a listening ear," and provided a host of support resources and safety measures. *Id*.

As student protest activity intensified in October and November, MIT anticipated, prepared for, and responded to incidents in real time. For example, on the eve of a campus protest expected on November 9, MIT issued a community-wide broadcast acknowledging "intense reaction and public activism within our community" and emphasizing "a profound responsibility to protect MIT's ability to advance its mission, and to make sure that no one on campus feels afraid for their safety." Ex. 4; *see also* Compl. ¶ 205. MIT once again condemned antisemitism and highlighted "policies and procedures for keeping our campus safe," which included (1) "enhanced campus security measures and patrols" as well as MIT Police's cooperation "with federal, state, and local officials"; (2) published guidelines on "events, vigils, rallies, postering, flags, and banners"; (3) the creation of an Ad Hoc Complaint Response Team to address reports relating to the Middle East

---

[3] All numbered exhibits are to the Declaration of Jaren D. Wilcoxson filed in conjunction with this Motion to Dismiss.

conflict; (4) clarification about the limits of free expression and the importance of "consider[ing] the impact of our speech on others"; and (5) events and resources across campus to promote "comfort, compassion, patience and goodwill." Ex. 4.

MIT also responded promptly and directly to the November 9 protest itself, which features prominently in the Complaint. *See* Compl. ¶¶ 155-169. In a same-day community-wide statement, MIT explained its efforts to de-escalate the situation as it unfolded and reaffirmed its policy that "the time, place, and manner of protected expression, including organized protests, may be restrained so as not to disrupt the essential activities of the Institute." Ex. 5; *see also* Compl. ¶¶ 167, 169. In February, when the Coalition Against Apartheid ("CAA") continued to violate Institute rules, MIT suspended CAA as a recognized student organization pending a formal disciplinary proceeding. Ex. 6; *see also* Compl. ¶ 113 n.63 ("provisionally suspend[ing]" CAA); Compl. Ex. A at 23 (quoting MIT's announcement). As MIT's President explained, this immediate action barred CAA from reserving space on campus, using MIT facilities, receiving student group funding, and organizing "any further protests or demonstrations anywhere on our campus." Ex. 6. Moreover, while Institute policy and federal law prohibit MIT from divulging the details of individual student disciplinary cases, MIT has taken disciplinary action against individuals who have violated MIT policies and has communicated with its community about its handling of incidents stemming from the Israel/Hamas conflict, including the number of cases in various stages of the complaint-resolution process. Ex. 7 (identifying 36 cases as of April 12, 2024).

MIT has also moved to strengthen its policies, practices, and campus climate to meet this difficult moment. In November, MIT created an Institute-wide initiative called Standing Together Against Hate ("STAH") to "spearhead efforts to combat antisemitism at MIT." Ex. 8; *see also* Compl. Ex. A at 13 (referencing announcement of STAH). STAH's work around education,

10

dialogue, and community-building has included multiple trainings on antisemitism as well as "small group facilitated conversations" in residence halls, online resources for managing sensitive conversations, and new funding for community-building projects. Ex. 9. In January, MIT announced several other "Institute-level actions" to assess how MIT handles complaints of student misconduct, examine how MIT balances principles of free expression with protection from discrimination and harassment, and review how MIT fosters a welcoming environment for all. Ex. 10. MIT has also detailed ongoing efforts aimed at "rebuilding trust and caring for our community," including additional STAH "lectures, discussions, classes and community-building efforts," and the Center for Constructive Communication's facilitated discussion programs. *Id.*

All the while, MIT has been clear: "Antisemitism is real, and it is rising in the world. We cannot let it poison our community." Ex. 8. While it is "legitimate to criticize the policies of any government, including the current government of Israel – as indeed many Israelis do," it is *never* acceptable "to vilify and shun Israeli and Jewish members of our community." Ex. 6.

### B.    The Complaint Fails To Plausibly Allege Deliberate Indifference By MIT.

*First*, the Complaint fails the most basic requirement of a Title VI claim because it does not allege Plaintiffs reported actionable harassment to an appropriate MIT official. Under this cause of action, "constructive knowledge is plainly insufficient." *Pawtucket Sch. Dep't*, 969 F.3d at 7. A plaintiff must allege actual notice to "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Gebser*, 524 U.S. at 290. The Complaint does not allege Plaintiff Boukin made any complaint, which dooms her claim. *See Doe v. Pike Sch., Inc.*, No. 13-CV-11730, 2014 WL 413207, at *3-4 (D. Mass. Feb. 4, 2014) (Stearns, J.). As for Plaintiff Meyers, the Complaint alleges only that she made a general report about antisemitism, Compl. ¶ 188—not what she said, including whether it

encompassed the experiences alleged in the Complaint. "The missing ingredient is whether an appropriate person had actual knowledge of the suspected harassment," and without that ingredient, there can be no violation. *Santiago*, 655 F.3d at 75.

*Second*, even assuming the requisite notice, the Complaint does not plead a "clearly unreasonable" response. Plaintiffs do not and cannot claim that MIT "fail[ed] to take *any* action to stem the tide" of the antisemitism that they allege, *Pawtucket Sch. Dep't*, 969 F.3d at 9-10 (emphasis supplied), so they must plausibly allege that MIT's actions are clearly unreasonable under an objective standard. In cases alleging deliberate indifference to antisemitism, courts have pointed to several factors also present here as precluding liability—including that the university responded to "wrongful conduct otherwise not amounting to protected speech," took action against "disruptive protestors," and "engaged in an ongoing dialogue with the opposing parties in an attempt to ensure that the rights of all persons are respected, and to minimize the potential for violence and unsafe conditions." *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011). Courts have also relied on actions like forming working groups to combat antisemitism and dedicating personnel to address campus climate. *Mandel v. Bd. of Trs. of Cal. State Univ.*, No. 17-CV-03511, 2018 WL 5458739, at *24 (N.D. Cal. Oct. 29, 2018). Plaintiffs do not dispute "that [MIT] has taken steps to address their concerns"; rather, they "contend those steps have been ineffectual." *Id*. Such criticism fails to plausibly allege a "clearly unreasonable" response.

Plaintiffs likewise cannot use Title VI "to make particular remedial demands." *Davis*, 526 U.S. at 648. While the Complaint insists that "Plaintiffs do not base their claims on a challenge of the Institute's disciplinary decisions," Compl. ¶ 169 n.92, it repeatedly criticizes MIT's actions in this regard, *see, e.g.*, *id.* ¶¶ 169-70, 205, 217, and demands extensive punitive actions, from "terminating administrators, professors, or other university employees or staff" to "suspending or

expelling students and/or student groups," *id.* ¶ 11. "Plaintiffs are obviously upset" about their perception that certain members of the MIT community have not faced particular consequences, but MIT cannot short-circuit its disciplinary process to mete out "the precise remedy that [Plaintiffs] would prefer." *Mandel*, 2018 WL 5458739, at *24. Ultimately, their "own allegations show that [MIT] is not ignoring the hostile environment alleged by [P]laintiffs, but at most assert that [MIT]'s responses were not sufficient to satisfy [P]laintiffs and that some of the processes are still ongoing." *Id.* at *25. That does not make out a deliberate-indifference claim. *Id.*

Recent decisions from analogous deliberate-indifference contexts reinforce this result. In *Doe v. Sacks*, for example, a student at New York University was named in a "Blacklist" accusing NYU students of sexual misconduct. No. 23-CV-1307, __F. Supp. 3d__, 2024 WL 402945, at *1 (S.D.N.Y. Feb. 2, 2024). He sued the university, claiming that its response to his complaints about the list was clearly unreasonable. *Id.* at *6. The court acknowledged that while the student "may certainly wish that NYU had gone to greater lengths to identify and discipline the creators of the spreadsheet," the university "took the steps it could to respond to Plaintiff's reports about the spreadsheet," which included supportive resources, academic accommodations, and a public statement, among others. *Id.* Moreover, "had NYU acceded to Plaintiff's demand to identify and to pursue disciplinary action against the students who allegedly created the spreadsheet, the University could find itself in the precarious position of … impermissibly restricting students' speech-protected values." *Id.* at *7. The same reasoning applies here. MIT has indisputably responded to reports of antisemitism. The particular response Plaintiffs demand is not required to satisfy MIT's Title VI obligations and could trammel the rights of other community members. As in *Doe v. Sacks*, "it would be entirely reasonable for [MIT] to refrain from a form of disciplinary action that would expose it to" potential claims from other students. *Davis*, 526 U.S. at 649.

The allegations here are also readily distinguishable from other instances in which deliberate-indifference allegations survived a motion to dismiss. For example, in *Doe v. Pawtucket School Department*, the First Circuit found adequate allegations under Title IX where a thirteen-year-old plaintiff "alleged that she was assaulted in physical education class and then raped two times in the subsequent months." 969 F.3d at 10. School officials "did nothing in response to learning" about the first rape, which made her vulnerable to the second rape. *Id*. at 8. On those allegations, the court found it "plausible that [school] officials disregarded a known or obvious consequence of [their] action or inaction and thus contributed to her likelihood of sexual assault and rape." *Id*. at 10 (internal quotation marks omitted). The egregious institutional failures alleged in *Doe v. Pawtucket School Department* underscore the high bar for pleading deliberate-indifference claims, and they are a far cry from anything Plaintiffs have alleged against MIT.

*Third*, the handful of allegations about Plaintiffs Boukin and Meyers do not meet the statutory standard for actionable harassment. Title VI covers only harassment that is "so severe, pervasive, and objectively offensive" that it "ha[s] the systemic effect" of "den[ying] equal access to the institution's resources and opportunities." *Brown Univ.*, 896 F.3d at 132-33 (quoting *Davis*, 526 U.S. at 650-52). This is a high bar, and courts have repeatedly dismissed deliberate-indifference claims for failing to clear it. This case demands the same result.

In *Pollard v. Georgetown School District*, the student alleged he was "regularly emotionally, physically, and verbally bullied and abused," including because of his Jewish identity. 132 F. Supp. 3d at 218. His peers mocked him "with snide comments about Jews being massacred and stat[ements] that the Holocaust was unsuccessful because [his] family survived." *Id*. Notwithstanding these disturbing allegations, the court concluded that the complaint lacked "sufficient, non-conclusory factual allegations that the harassment was severe and pervasive." *Id*.

at 230. "Although the comments here were certainly objectively offensive"—and, unlike virtually all of the allegations in this case, were specifically directed at an individual—they did not "meet the high standard of severity or pervasiveness under well-developed case law." *Id.* at 230-31.

Decisions from other courts are in accord. In *Felber v. Yudolf*, the Jewish plaintiffs alleged harassment and intimidation by two pro-Palestinian student groups. 851 F. Supp. 2d at 1184. Those groups orchestrated several disruptive protests and a campus event called "Apartheid Week," during which they "set up 'check points,' at which students dressed as soldiers and carrying 'realistic-looking' simulated 'assault weapons' challenge[d] passing students, demanding them to state whether they are Jewish or not." *Id*. The court found these deeply troubling allegations insufficient to establish that the plaintiffs were denied equal access to resources and opportunities. "[A] very substantial portion of the conduct to which plaintiffs object represents pure political speech and expressive conduct," the court explained, and the plaintiffs "appear[ed] to be attempting to draw an untenable line that would remove from protection signs and publications that are critical of Israel and supportive of Hamas and Hezbollah." *Id*. at 1188. In addition, "a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present," such that it could not "demonstrate that *plaintiffs* suffered severe and pervasive harassment." *Id*. (emphasis supplied). And those plaintiffs had "not alleged facts showing that they were denied access to the University's educational services in any meaningful sense." *Id*.

Here, the Complaint offers far less than the insufficient pleadings in *Pollard* and *Felber*. Plaintiff Boukin alleges that she witnessed "antisemitic chants" and "antisemitic rhetoric" during protests, and that emails from student groups "contained antisemitic language." Compl. ¶ 219. While troubling, these allegations are conclusory, describe experiences that likely involve protected expression, and at any rate do not rise to the level of actionable harassment under Title

VI, particularly where none were alleged to focus on Plaintiff Boukin individually. The same is true for Plaintiff Meyers, whose only specific harassment allegation is a single encounter involving an antisemitic remark by an unidentified individual with no alleged connection to MIT. *Id.* ¶ 141. Isolated incidents like these cannot sustain a claim. *See H.B. v. Monroe Woodbury Cent. Sch. Dist.*, No.11-CV-5881, 2012 WL 4477552, at *15 (S.D.N.Y. Sept. 27, 2012). In addition, like the students in *Felber*, neither Plaintiff plausibly alleges "facts showing that they were denied access to the University's educational services in any meaningful sense." 851 F. Supp. 2d at 1188.

Nor can Plaintiffs base their claims on generalized allegations regarding the experiences of Jewish and/or Israeli students who are not parties here. *See, e.g.*, Compl. ¶¶ 135, 137, 157-158, 160-161, 190. *Felber* rejected a similar effort, and with good reason: Plaintiffs must demonstrate that *they* "suffered severe and pervasive harassment." 851 F. Supp. 2d at 1188. What is more, many of the Complaint's allegations involve "language that [P]laintiffs believe was inflammatory, offensive, or untrue" but that nonetheless constitutes "protected speech." *Id.* The U.S. Department of Education's Office for Civil Rights—the federal agency charged with enforcing Title VI against educational institutions—has repeatedly recognized that Title VI must be interpreted and applied to "comport with First Amendment principles," meaning the statute does not "require recipients to enact or enforce codes that punish the exercise of [free expression] rights."[4] This limitation applies on public and private campuses alike, and it demands "something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive" for actionable harassment.[5]

---

[4] Office for Civil Rights, *Dear Colleague Letter: Discrimination, Including Harassment, Based on Shared Ancestry or Ethnic Characteristics*, U.S. Dep't of Educ. (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf.

[5] Office for Civil Rights, *First Amendment: Dear Colleague*, U.S. Dep't of Educ. (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html.

Plaintiffs' theory belies that federal guidance and would "have serious First Amendment implications." *Guckenberger v. Bos. Univ*., 957 F. Supp. 306, 316 (D. Mass. 1997).

      **C.**      **The Complaint Fails To State A Claim For Direct Discrimination.**

      Having failed to demonstrate deliberate indifference, Plaintiffs also fail to state a violation of Title VI by making the extraordinary claim that MIT directly and intentionally discriminated against them because they are Jewish and/or Israeli. Compl. ¶¶ 228, 230-232. This theory requires students to plausibly allege—among other elements—that a school took some adverse school-related action against them, such as expulsion, *see Saravanan v. Drexel Univ.*, No. 17-CV-3409, 2017 WL 5659821, at *8 (E.D. Pa. Nov. 24, 2017), or being dropped from an academic program, *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007). The Complaint alleges nothing of the sort. While Plaintiff Boukin avers that she was required to remove Israeli flags while other flags remained, Compl. ¶¶ 203-204, she does not allege that she was disciplined in any way that could plausibly constitute an adverse school-related action. Plaintiff Meyers alleges that IDHR told her that her report of antisemitism was not within that office's scope, *id.* ¶ 218, a mistaken understanding of IDHR's guidance that does not fall within the categories of adverse actions either.

      Even more fundamentally, the Complaint fails to allege intent to discriminate *by MIT*. "Vicarious liability is unavailable under Title VI," so a student cannot establish discrimination by pointing to actions or omissions by peers or professors. *Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022); *see also, e.g.*, *Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021). To show intentional discrimination by the funding recipient itself, the student must plausibly allege an official policy of the recipient to discriminate. *Gebser*, 524 U.S. at 290. "In other words, a school faces liability only when it intentionally does something wrong …." *Langadinos v. Appalachian Sch. of L.*, No. 05-CV-00039, 2005 WL 2333460, at *10 (W.D. Va. Sept. 25, 2005). Factual

allegations like those offered here "focus[ing] on the [recipient's alleged] omissions, rather than on any intentional decision to discriminate," cannot state a claim for direct discrimination by MIT. *Id.*; *see* Compl. ¶ 231 (alleging "inaction" in connection with direct-discrimination theory).

At bottom, the Complaint is bereft of plausible allegations that MIT was motivated by an intent to discriminate against Jewish and/or Israeli students. *See Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004) (explaining that "direct or circumstantial evidence of racial animus" is "a necessary component" of Title VI claim). The Complaint lacks any direct evidence of the requisite animus, and its allegations are far too vague to permit the inference that Plaintiffs Boukin or Meyers were treated worse than peers who were similarly situated in all relevant respects due to intentional discrimination. *See Doe v. Brown Univ.*, 43 F.4th 195, 207 (1st Cir. 2022) (requiring apples-to-apples comparison to establish such intent). MIT has repeatedly condemned antisemitism and taken concrete steps to address it, rendering implausible any claim that MIT as an institution harbors discriminatory animus against its Jewish or Israeli students. *Cf. Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) ("alleged prejudice" on the part of university officials "must be based on more than mere speculation and tenuous inferences").

## II.     The Complaint Should Be Dismissed For Lack Of Subject-Matter Jurisdiction.

### A.     Plaintiffs Fail To Satisfy The Requirements Of Standing.

Plaintiffs do not and cannot "clearly allege" facts establishing the "irreducible constitutional minimum" of Article III standing: that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs bear this burden "for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Roe v. Healey*, 78 F.4th 11, 20 (1st Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Here, none of the Plaintiffs

demonstrates standing for the extensive injunctive relief demanded, and SCLJ lacks standing altogether because individual participation of SCLJ's members is required for this Title VI claim.

### 1.      All Plaintiffs Lack Standing For Their Sweeping Injunctive Relief.

*First*, Plaintiffs do not allege facts clearly demonstrating future harm. Injunctive relief is an equitable remedy reserved for circumstances where there is a "real or immediate threat that the plaintiff will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Unlike the typical injunctive-relief case, Plaintiffs do not target an allegedly discriminatory policy as the cause of their injury. They claim entitlement to *forward-looking* relief based on *past* incidents of alleged harassment, which took place months ago. But "merely invoking the possibility" that past incidents *could* recur "is not enough to show that they are 'certainly impending' or that there is a 'substantial risk' that they will occur." *Roe v. Healey*, 78 F.4th at 21 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 & n.5 (2013)). In this case, as in *Roe v. Healey*, possible recurrence hinges on a highly speculative chain of hypothetical events about what students will do and how the institution will respond, which is simply "too attenuated" to establish standing. *Id.* at 421. Moreover, MIT's robust and ongoing response to reports of antisemitism on campus makes the allegation of future harm not just speculative but also implausible. *See supra* at 8-11.

Plaintiffs cannot evade their burden by aggregating the purported experiences of students who are not parties here or by pointing to antisemitism throughout history. Compl. ¶¶ 135, 137, 161, 196, 221; *see Bingham v. Massachusetts*, 616 F.3d 1, 7 (1st Cir. 2010). For standing, injury must be "particularized," meaning "it must affect the plaintiff[s] in a personal and individual way." *Spokeo*, 578 U.S. at 339. "[A]ggregating the allegations" of various individuals does not suffice. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). The Court's analysis is therefore limited to the allegations about Plaintiffs Boukin and Meyers, which do not permit the inference of a continuing

campaign of antisemitism directed at them. Accordingly, "it is surely no more than speculation" that they "will again be involved in one of those unfortunate instances." *Lyons*, 461 U.S. at 108. MIT recognizes the real and damaging effects that antisemitic incidents can have on its students and is committed to responding to reports regardless of whether they are likely to recur. But for purposes of litigation, "emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.* at 107 n.8.

*Second*, Plaintiffs do not allege facts clearly demonstrating that *MIT itself* will cause any future harassment or discrimination. Plaintiffs cannot rely on injuries caused by third parties or off-campus events to establish standing for a suit against MIT. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). *Equal Means Equal v. Ferriero* underscores this point. The plaintiffs in that case lacked standing because they sought "relief from the conduct of a defendant who stands well removed from the person who would directly inflict [the] harm" they alleged. 3 F.4th 24, 28 (1st Cir. 2021). The same is true here. In paragraph after paragraph, the Complaint criticizes the words and actions of students and student groups. But MIT is not vicariously liable for their actions; its Title VI responsibility is to respond to actionable harassment in a way that is not clearly unreasonable. *See supra* at 6-8. The Complaint acknowledges MIT's ongoing response, and it is speculative and implausible for Plaintiffs to assert that MIT will not continue its robust response.

*Third*, Plaintiffs do not allege facts clearly demonstrating that the requested relief is necessary to redress their purported injuries. Their demands are not remotely "limited to the inadequacy that produced [any] injur[ies] in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Indeed, while the allegations about Plaintiffs Boukin and Meyers are limited to five paragraphs about particular incidents, the prayer for relief addresses virtually every aspect of MIT's campus and operations—education and training, campus communications, policy formulation and application,

personnel decisions, student-organization management, and student discipline. Compl. at 70-71.

"The desire to obtain sweeping relief cannot be accepted as a substitute for compliance with the

general rule that the complainant must present facts sufficient to show that his individual need

requires the remedy for which he asks." *Schlesinger v. Reservists Comm. to Stop the War*, 418

U.S. 208, 221-22 (1974). Where, as here, plaintiffs request "broad and all-embracing relief" that

is incongruous with their asserted injury, the proper result is dismissal for lack of standing. *See,*

*e.g.*, *Beaudoin v. Healey*, __ F. Supp. 3d __, 2023 WL 7116711, at *3 (D. Mass. Oct. 27, 2023).

### 2. SCLJ Lacks Standing Entirely.

SCLJ does not allege any direct injury suffered as an organization; rather, it stakes its

standing on injury allegedly suffered by its members. For associational standing, an organization

must show that "neither the claim asserted nor the relief requested requires the participation of

individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp.,*

*Inc.*, 517 U.S. 544, 551-53 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S.

333, 343 (1977)). But the Title VI claim alleged here is a paradigmatic example of a claim

requiring individual participation. It demands evidence that a particular student experienced a

hostile educational environment, reported it to an appropriate official at the funding recipient, and

experienced a clearly unreasonable response, among other elements. *See supra* at 6-8, 11-17.

This type of "individualized proof" defeats associational standing. "[A]djudication of the

claims … would turn on facts specific to each student," and "[e]fficient and successful judicial

resolution of the claims would thus require participation and cooperation by numerous students."

*Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 35 (1st Cir. 2019) (rejecting

associational-standing theory in ADA action); *see also, e.g.*, *Barnett v. Johnson City Sch. Dist.*,

No. 04-CV-0763, 2005 WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005) (questioning "how such

claims of intentional discrimination could be prosecuted without the participation of the individual members"). That is why deliberate-indifference claims ordinarily involve a single plaintiff, *see, e.g.*, *Davis*, 526 U.S. 629; *Pollard*, 132 F. Supp. 3d 208; *Bray*, 596 F. Supp. 3d 142, and why, in multi-plaintiff suits, courts parse whether each individual student experienced harassment that was sufficiently severe and pervasive to interfere with access to education, *see, e.g.*, *Demoret v. Zegarelli*, 451 F.3d 140, 145-47 (2d Cir. 2006); *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017). By contrast, where courts allow associational standing in discrimination cases, they rely on circumstances absent here, like a challenge to a broadly applicable policy and uncontested student-specific facts, which make it "unlikely that any of the students would need to do much, if anything, in the lawsuit." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 55 (1st Cir. 2023).

SCLJ's demand for damages exacerbates its standing problem. "[W]hatever injury may have been suffered" by SCLJ's members "is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975). Accordingly, requests for damages are fundamentally different from requests for injunctive relief, for which "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* at 515. Under a straightforward application of *Warth*, associations like SCLJ lack "standing to sue on behalf of [their] members when seeking monetary relief to compensate for [their] members' injuries." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005); *see also, e.g.*, *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) ("We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members."). This black-letter law dooms SCLJ's attempted participation and claimed damages.

**B.      This Challenge Is Not Ripe For Adjudication.**

The Complaint should be dismissed because Plaintiffs fail the most basic Title VI requirement of adequately alleging they complained to an appropriate MIT official about the incidents alleged in their Complaint. *See supra* at 11-12. But even had they made such an allegation, their claim would not be ripe for adjudication because Plaintiffs do not—and cannot— allege that MIT has taken final action on any such complaints, a prerequisite to judicial review.

Plaintiffs "bear the burden of alleging facts sufficient to demonstrate ripeness," *Reddy*, 845 F.3d at 501, but they fail to shoulder that burden here. Ripeness is an Article III jurisdictional requirement that "seeks to prevent the adjudication of claims relating to contingent future events that may not occur as anticipated, or indeed may not occur at all," rendering the court's decision an advisory opinion. *Id.* at 500. To demonstrate ripeness, "the party bringing suit [must] show *both* that the issues raised are fit for judicial decision at the time the suit is filed *and* that the party bringing suit will suffer hardship if 'court consideration' is withheld." *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (emphasis supplied). Fitness turns on "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89-90 (1st Cir. 2013).

Plaintiffs cannot make those showings here. Their Complaint challenges MIT's response to recent events. It does so primarily under a deliberate-indifference theory, which does not impose any fixed deadline for a response and, to the contrary, affords substantial latitude in the timing and nature of the institution's response. *See, e.g.*, *Adams v. Demopolis City Sch.*, 80 F.4th 1259, 1272 (11th Cir. 2023) (eight-month delay reasonable); *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (nine-month delay reasonable). The deliberate-indifference standard recognizes

that the types of actions institutions should take once they receive reports of unlawful harassment—such as providing resources, conducting investigations, pursuing discipline, and reviewing policies—take time. This standard is not meant to disregard "thoughtful consideration of students' rights" or require a headlong "rush to judgment." *M.L. ex rel. D.L.*, 86 F.4th at 512.

The Complaint ignores that reality. To take just one example, Plaintiffs repeatedly criticize MIT for allegedly failing to "discipline students [or] MIT organizations for … MIT policy violations," Compl. ¶ 217, and they demand that MIT "suspend[] or expel[] students and/or student groups," *id*. at 70. This criticism is doubly flawed, even setting aside that it seeks relief based on alleged experiences of other students not parties to this action. *But see supra* at 19-20.  First, as a matter of institutional policy and basic fairness, MIT owes procedural protections to all parties involved in a report and faces potential liability if it short-circuits the requisite process. *See, e.g.*, *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 329-30 (1st Cir. 2022) (allowing claim against college based on alleged failure to follow its own procedures). Second, MIT *has* imposed discipline for policy violations, including suspending CAA, the student group that features most prominently in the Complaint, pending the Committee on Discipline's resolution of a formal complaint against that group. Compl. ¶ 113 n.63. As MIT has reported to its community, there are many cases "in various stages of the complaint resolution process (inclusive of cases that have been resolved)." Ex. 7. Plaintiffs complain that the "permanent outcome" of one particular disciplinary case "is unknown at this time," Compl. ¶ 113 n.63, but that is precisely why their dispute is premature: MIT is indisputably taking action, and it is entitled to complete its response before litigation.

MIT is not aware of *any* case in this Circuit forcing an educational institution to defend the adequacy of its response while that response was underway. Decisions allowing deliberate-indifference claims have involved circumstances where the institution's response culminated in a

disciplinary decision or when the institution expressly decided not to take action. *See Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 90-91 (D. Mass. 2023); *Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 410-11 (D.R.I. 2018). With good reason: "premature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort." *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 366 (1st Cir. 1992). Even if MIT's ongoing response does not eliminate this dispute completely, it could meaningfully narrow the issues requiring judicial resolution, which requires forbearance now. *Roman Cath. Bishop of Springfield*, 724 F.3d at 89.

Against that backdrop, Plaintiffs cannot demonstrate the type of undue "hardship" that ripeness also requires. *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003). Plaintiffs have not demonstrated they will suffer "direct and immediate harm" cognizable under Title VI if this Court withholds consideration of their claims until MIT completes the steps in progress. *Id.* at 73; *see supra* at 8-11. By contrast, MIT is prejudiced if the Court adjudicates this dispute now, which effectively cuts off MIT's response—an outcome flatly inconsistent with the Supreme Court's overriding concern for institutional flexibility. *See Davis*, 526 U.S. at 648.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint in its entirety.

Dated: April 18, 2024                Respectfully submitted,

                                     MASSACHUSETTS INSTITUTE OF
                                     TECHNOLOGY,

                                     */s/ Ishan K. Bhabha*
                                     Ishan K. Bhabha (*pro hac vice*)
                                       IBhabha@jenner.com
                                       202.637.6327
                                     Lauren J. Hartz (*pro hac vice*)
                                       LHartz@jenner.com
                                       202.637.6363

JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001-4412

and

Daryl J. Lapp (BBO No. 554980)
  daryl.lapp@lockelord.com
Elizabeth H. Kelly (BBO No. 672277)
  liz.kelly@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA  02199
617.230.0100

## CERTIFICATE OF SERVICE

I certify that a true copy of this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

on April 18, 2024.

*/s/ Ishan K. Bhabha*
Ishan K. Bhabha

26