# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **StandWithUs Center for Legal Justice, Katerina Boukin, and Marilyn Meyers,** | **Case No. 1:24-cv-10577-RGS** |
| **Plaintiffs,** | |
| **v.** | |
| **Massachusetts Institute of Technology,** | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

## Table of Contents

**PRELIMINARY STATEMENT** ................................................................................................ **1**

**PARTIES** ................................................................................................................................ **6**

**JURISDICTION AND VENUE** ............................................................................................ **7**

**STATEMENT OF FACTS** ................................................................................................... **8**

I.   ANTISEMITISM AND ANTIZIONISM ARE DISCRIMINATORY AND VIOLATE TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000D, *ET SEQ.* ........................................ **8**

II.   MIT, AS A PRIVATE INSTITUTION, HAS THE AUTHORITY TO CONTROL HATEFUL SPEECH AND DISCRIMINATION AGAINST JEWS ON ITS CAMPUS. ......................................... **14**

A.   MIT'S CODE OF CONDUCT. ............................................................................................ 14

B.   MIT'S CHALKING POLICY AND REMOVAL OF POSTERS. .................................................. 18

C.   MIT'S POLICY ON EVENTS, VIGILS, PROTESTS, AND DEMONSTRATIONS. ......................... 19

III.   THE EVOLUTION OF ANTISEMITISM. ......................................................................... **22**

A.   ANTISEMITISM AS RELIGIOUS DISCRIMINATION. ........................................................... 22

B.   ANTISEMITISM MORPHS INTO A POLITICAL, ECONOMIC, AND SOCIAL MOVEMENT .............. 25

IV.   ANTI-ZIONISM IS ANTISEMITISM ............................................................................... **28**

A.   WHAT IS ZIONISM? ....................................................................................................... 28

B.   ZIONISM AND JEWISH IDENTITY. ................................................................................... 29

V.   ANTISEMITIC ACTS HAVE RISEN MORE THAN 337% SINCE THE OCTOBER 7 ATTACKS. . **31**

VI.   ANTISEMITISM ON COLLEGE CAMPUSES WAS PROBLEMATIC EVEN BEFORE OCTOBER 7, 2023. ........................................................................................................................... **32**

VII.   THE PROCESS FOR REGISTERING A STUDENT ORGANIZATION AT MIT. ........................ **34**

VIII.   MIT VIOLATES ITS OWN ANTI-DISCRIMINATION POLICIES AND ALLOWS ITS CAMPUS TO BECOME A HOSTILE ENVIRONMENT FOR JEWISH STUDENTS. ........................................... **35**

A.   MIT APPROVES THE REGISTRATION OF SEVERAL ANTI-ISRAEL AND ANTISEMITIC STUDENT GROUPS ON CAMPUS. ................................................................................................... 35

B.   THE ANTI-ISRAEL AND ANTISEMITIC GROUPS APPROVED BY MIT USE THEIR STATUS TO INTIMIDATE AND HARASS JEWISH STUDENTS ON MIT'S CAMPUS. .................................. 40

C.   THE U.S. DEPARTMENT OF EDUCATION ADDRESSES COLLEGE CAMPUSES' FAILURE TO CURTAIL ANTISEMITISM ON CAMPUSES. ...................................................................... 49

D.   IN SPITE OF ADMONITIONS FROM THE PRESIDENT AND THE DEPARTMENT OF EDUCATION THAT COLLEGES AND UNIVERSITIES HAVE A RESPONSIBILITY TO ADDRESS DISCRIMINATION AGAINST JEWISH STUDENTS, MIT ALLOWED ANTISEMITISM TO FESTER ON CAMPUS. .................. 50

E.   MIT'S LEADERSHIP AND FACULTY, INDIVIDUALLY AND THROUGH UNIVERSITY OFFICES, NOT ONLY FAILED TO PROTECT JEWISH STUDENTS, BUT FURTHERED THE AIMS OF THE ANTI-ISRAEL AND ANTISEMITIC ACTIONS BEING TAKEN AGAINST JEWISH STUDENTS. ......................... 57

F.   MIT'S PRESIDENT IS CALLED TO TESTIFY BEFORE CONGRESS. ...................................... 59

IX.   MIT'S RESPONSE TO THE HARASSMENT AND ASSAULT OF JEWISH STUDENTS ON CAMPUS HAS BEEN INADEQUATE AND INEFFECTIVE AND CONTINUES TO EMBOLDEN ANTISEMITIC ACTS ON CAMPUS. ........................................................................................................ **61**

X.   DISCRIMINATION AGAINST JEWISH AND ISRAELI STUDENTS HAS ONLY WORSENED SINCE PLAINTIFFS FILED THEIR COMPLAINT.................................................................. 67

XI.   MIT'S POLICIES CONCERNING HARASSMENT HAVE BEEN UNEQUALLY AND SELECTIVELY ENFORCED RELATING TO JEWISH STUDENTS AS COMPARED TO OTHER MINORITIES ON CAMPUS.................................................................................. 78

XII.   MIT HAS GONE TO GREAT LENGTHS TO COMBAT DISCRIMINATION FOR OTHER MINORITY GROUPS BUT HAS NOT MADE THE SAME EFFORT FOR JEWS AND ISRAELIS. ......... 83

XIII.   PRESIDENT BIDEN'S REMARKS REITERATE THAT MIT IS VIOLATING THE LAW IN ALLOWING JEWISH AND ISRAELI STUDENTS TO BE DISCRIMINATED AGAINST ON CAMPUS. .. 90

XIV.   MIT'S FAILURE TO ENFORCE ITS ANTI-DISCRIMINATION POLICIES AND KEEP ITS PROMISES TO PROTECT ITS STUDENTS AFFECTS ALL STUDENTS. .............................................. 91

XV.   THE STUDENTS AND OTHERS WHO PARTICIPATED IN THE PROTESTS, DEMONSTRATIONS, AND ENCAMPMENTS VIOLATED 42 U.S.C. § 1985 (THE KU KLUX KLAN ACT). ....................... 92

A.   THE CONSPIRACY ACTS. ...................................................................................... 92

B.   THE CO-CONSPIRATORS. ..................................................................................... 94

A.   MIT HAD THE POWER TO PREVENT VIOLATIONS OF THE KKK ACT BUT NEGLECTED OR REFUSED TO DO SO.............................................................................................. 114

XVI.   PLAINTIFFS' DAMAGES.................................................................................. 115

CLASS ACTION ALLEGATIONS ................................................................................. 121

CLAIMS FOR RELIEF ............................................................................................... 124

JURY TRIAL DEMANDED ......................................................................................... 134

PRAYER FOR RELIEF ............................................................................................... 134

## PRELIMINARY STATEMENT

1.      Antisemitism on college campuses, and specifically at the Massachusetts Institute of Technology ("MIT"), has been on the rise in recent years—even before October 7, 2023—when Hamas terrorists invaded Israel and carried out the deadliest attack against Jews since the Holocaust.

2.      However, the attacks on October 7, 2023, resulted in an unprecedented explosion of antisemitism on college campuses—with MIT being one of those most clearly unreasonable and unfortunately active with a grossly dangerous and ineffective response by the MIT administration. This has resulted in an intentionally discriminatory hostile environment for Jewish students at MIT.

3.      It is MIT's failure over the course of many years to ensure its campus is devoid of discriminatory behavior toward Jews and Israelis and, worse, since October 7, 2023, to take reasonable steps to eliminate the escalating hostile environment for Jewish and Israeli students on campus that ultimately led to the erection of hostile and dangerous encampments in the center of student life. MIT's tolerance of the encampments is one glaring (and pervasive) example of the catastrophic consequences of MIT's inaction that has prevented students from participating in educational programs and campus activities.

4.      MIT was clearly on notice of rising antisemitism *before* October 7, 2023, and its failure to act promptly and effectively in the wake of October 7, 2023, which will go down as one of the darkest times in Jewish history—cannot go without redress. President Biden described the magnitude of the attacks against Israel in a speech on October 10, 2023:

> You know, there are moments in this life — and I mean this literally — when the pure, unadulterated evil is unleashed on this world.

1

The people of Israel lived through one such moment this weekend.  The bloody hands of the terrorist organization Hamas — a group whose stated purpose for being is to kill Jews.

This was an act of sheer evil.

More than 1,000 civilians slaughtered — not just killed, slaughtered — in Israel.  Among them, at least 14 American citizens killed.

Parents butchered using their bodies to try to protect their children.

Stomach-turning reports of being — babies being killed.

Entire families slain.

Young people massacred while attending a musical festival to celebrate peace — to celebrate peace.

Women        raped,        assaulted,        paraded        as        trophies.

Families hid their fear for hours and hours, desperately trying to keep their children quiet        to        avoid        drawing        attention.

And thousands of wounded, alive but carrying with them the bullet holes and the shrapnel    wounds    and    the    memory    of    what    they    endured.

You    all    know    these    traumas    never    go    away.

There are still so many families desperately waiting to hear the fate of their loved ones,    not    knowing    if    they're    alive    or    dead    or    hostages.

Infants in their mothers' arms, grandparents in wheelchairs, Holocaust survivors abducted and held hostage — hostages whom Hamas has now threatened to execute in    violation    of    every    code    of    human    morality.

It's                                                                        abhorrent.

The brutality of Hamas — this bloodthirstiness — brings to mind the worst — the worst                rampages                of                ISIS.

This is terrorism.[1]

---

[1]https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/10/10/remarks-by-president-biden-on-the-terrorist-attacks-in-israel-2/

5. It would be an understatement to say the world changed in the wake of October 7. Unfortunately, and relevant for this suit, students' experiences at MIT radically changed—for the worse—after October 7.

6. Rather than creating a supportive environment for Jewish and Israeli students post-October 7, students, especially Jewish and Israeli students, were bombarded by social media posts across MIT-affiliated platforms, applauding the so-called "resistance" against Israel (a gross attempt to cast the murder, rape and kidnapping of Israelis in the language of social justice, rather than the terrorism that it was). Similarly, on MIT's campus, students, including and especially Jewish students, were soon subjected to in-person demonstrations with participants who engaged in speech and conduct that targeted Jewish students and the very right of existence of the State of Israel. In doing so, they violated both MIT's anti-discrimination and anti-harassment policies, including as reflected in MIT's codes of conduct, and went beyond any alleged protections of free speech.

7. Despite the official and unwavering recognition by President Biden of the terroristic and intolerable acts of violence committed by Hamas on October 7, MIT refused to enforce its anti-discrimination policies when an antizionist and antisemitic response emanated from MIT-recognized student groups, choosing instead to cloak those groups' response in the guise of "free speech." Since that time, as discussed herein, clear legislation and governmental guidance have confirmed that the very conduct MIT continues to allow on its campus is blatant antisemitism. It almost beggars belief that after this many months, MIT continues to tolerate and facilitate discriminatory, harassing speech that—worse yet—it expressly *did not* tolerate in other comparable historic situations.

8.      MIT's glaringly inadequate response is especially shocking given that the school's policies make it clear that MIT will not tolerate impermissible speech and conduct (i.e. speech and conduct that violates MIT's anti-discrimination and anti-harassment policies, including as reflected in MIT's codes of conduct) and that MIT will act to prevent such speech and conduct.

9.      In enabling this discriminatory conduct, MIT has directly and intentionally contributed to a pervasively hostile campus environment in violation of Title VI of the Civil Rights Act of 1964 and breached its duties to Plaintiffs, its other Jewish students, its Israeli students, and, indeed, to the entire MIT campus community.

10.     Make no mistake, MIT's behavior was not passive. Plaintiffs and other students have reported the activities on campus to MIT over and over and over again, and yet MIT's position has remained the same: it has deliberately and repeatedly allowed discrimination against Jewish and Israeli students in violation of its own policies despite multiple reports and cries for help. Refusing to watch idly as their safety and educational experience were threatened, Plaintiffs took significant actions to seek—and even beg—for administrative support from MIT. Worse than simply ignoring Plaintiffs and other complaining students, MIT instead made empty promises followed by inaction. Any alleged "action" taken by MIT in response to discriminatory and harassing speech and conduct was not designed to have any meaningful impact in stopping the spreading wildfire of antisemitism, including antisemitic conduct, and only served to escalate the antisemitic harassment.

11.     As a result of MIT's blatant and intentional disregard for its legal obligations to its students, Plaintiffs and other students suffered injury, including in their educational experience. Jewish and Israeli students at MIT felt unsafe attending classes, deferred graduation dates or

exams, and even some Jewish and Israeli professors left the university.[2] Jewish and Israeli students were warned to avoid going to certain locations on campus during protests because of the hostile environment created by those protests.

12.     MIT must now, finally, be compelled through an order of this Court to implement comprehensive, meaningful remedial measures.

13.     MIT's selective enforcement of its anti-discrimination and anti-harassment policies in the face of antisemitic and antizionist speech and conduct, as well as other instances of MIT allowing misconduct aimed at Jewish and Israeli members of the MIT community, evinces further discriminatory intent towards such Jews and Israelis, as well as discriminatory impact upon them. Plaintiffs seek damages, injunctive relief, and additional remedies as set forth herein. An institution of higher learning such as MIT need not take a public or political stance on the war between Israel and Gaza to comply with its clearly delineated (and federally required) policies requiring that MIT refuse to tolerate rampant antisemitism on its campus and through its media platforms. MIT's blatant civil rights violations, however, have resulted in a hostile educational environment where Plaintiffs and other students who are or are perceived to be Jewish or Israeli, have suffered horrendous acts of hate, discrimination and harassment—all with the sanction of MIT's administration.

14.     MIT violated Title VI of the Civil Rights Act of 1964, breached its own contract with its students, breached its duty of care it owed to Plaintiffs and to Jewish and Israeli students, allowed for violations of the Ku Klux Klan Act to occur, and sanctioned such acts by refusing to enforce its own anti-discrimination and conduct policies—which it has historically not hesitated

_____

[2] The loss of Jewish professors, itself, contributes to and perpetuates the hostile educational environment to which Plaintiffs and SCLJ members are subjected.

to enforce to protect other targets of discrimination. MIT's actions (and inactions) with regard to hateful antisemitic discrimination and harassment targeting its Jewish and Israeli students, demonstrate, at best, a deliberate indifference to protect MIT students from hateful antisemitic discrimination and harassment.

15.     In addition, MIT's failure to manage the abhorrent escalating antisemitism on campus had broader, drastic impact on all students at MIT who did not participate in protests against Israel and/or Jews. MIT's tolerance of unsanctioned protests in the middle of campus prevented all students from moving freely throughout campus—including to and from classes and university-sanctioned activities.

16.     This action seeks redress for MIT's failure to meet its legal obligations, in particular by intentionally, negligently, and effectively discriminating against Jewish and Israeli students (and employees), breaching duties of care owed to Jewish and Israeli students, disrupting all students' ability to participate in campus life as they are contractually permitted, and by permitting violations of the Ku Klux Klan Act to be perpetrated against Jewish and Israeli students.

17.     Because of such selective enforcement and other instances of MIT allowing such discriminatory and harassing conduct, Plaintiffs are also entitled to injunctive relief and attorneys' fees and costs.

**PARTIES**

18.     Plaintiff StandWithUs Center for Legal Justice ("SCLJ") is a tax-exempt membership organization organized under the laws of California that partners with StandWithUs, a nonprofit education organization dedicated to combating antisemitism. Composed of students, professors, and community members, SCLJ enhances StandWithUs's mission through impact

litigation and other legal actions. SCLJ's members include current Jewish and/or Israeli MIT undergraduate and graduate students and alumni.

19.     Plaintiff Marilyn Meyers is a Jewish undergraduate student currently enrolled at MIT. Plaintiff Meyers currently resides in the City of Cambridge in the State of Massachusetts. She is also a member of SCLJ.

20.     Plaintiff Katerina Boukin is a Jewish Israeli graduate student currently enrolled at MIT. Plaintiff Boukin currently resides in the City of Somerville in the State of Massachusetts. She is also a member of SCLJ.

21.     SCLJ Member # 1 is a Jewish undergraduate student currently enrolled at MIT. SCLJ Member #1 resides in the City of Boston in the State of Massachusetts.

22.     SCLJ Member #2 is a Jewish undergraduate student currently enrolled at MIT. SCLJ Member #2 resides in the City of Cambridge in the State of Massachusetts.

23.     SCLJ Member #3 is a Jewish and Israeli undergraduate student at MIT and resides in the City of Boston in the State of Massachusetts.

24.     Defendant Massachusetts Institute of Technology (MIT) is a private not-for-profit university with its principal place of business located at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139. At all times relevant, MIT has and continues to receive federal funding.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over the claims arising under Title VI of the Civil Rights Act of 1964 (Title VI") (42 U.S.C. § 2000d, *et seq*.

26.     This Court has personal jurisdiction over Defendant because it is located and operates in Massachusetts.

27.     Venue is proper pursuant to 28 U.S.C § 1391, because Defendant is registered to conduct business in the District of Massachusetts, has its principal place of business in this District, and a substantial portion of the acts at issue transpired in this District.

## STATEMENT OF FACTS

I.   **Antisemitism and Antizionism are Discriminatory and Violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.**

28.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"), prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance. Title VI protects all students, including Jewish students, from such discrimination in federally funded programs or activities.

29.     Since at least September 2004, it has been the policy of OCR, the agency responsible for enforcing Title VI at educational institutions, to investigate claims related to antisemitism. And in an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools must address antisemitic harassment under Title VI. According to OCR's letter, such harassment violates Title VI when it creates a "hostile environment" in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school" or when the harassment is "encouraged, tolerated, not adequately addressed, or ignored by school employees."[3]

---

[3] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html

30.    OCR has required schools to take "immediate and appropriate action to investigate or otherwise determine what occurred" when responding to harassment claims, and, when such investigations reveal that discriminatory harassment occurred, schools "must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."[4]

31.    Both the Trump and Biden administrations have since confirmed the urgent necessity under Title VI to combat antisemitism.

32.    In December 2019, President Trump issued Executive Order 13899 on Combating Anti-Semitism (the "Executive Order"), directing the executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so required agencies tasked with Title VI enforcement to utilize the International Holocaust Remembrance Alliance ("IHRA") Working Definition of Antisemitism ("IHRA Definition"), which includes the following:

> Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities.[5]

33.    The Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") expressed its commitment to applying the IHRA Definition on January 19, 2021, in a set of questions and answers[6] that OCR issued regarding the executive order. On January 4, 2023, DOE Assistant Secretary for Civil Rights, Catherine Lhamon, publicly reaffirmed OCR's

---

[4] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010_pg2.html
[5] https://www.holocaustremembrance.com/sites/default/files/press_release_document_antisemitism.pdf.
[6] https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf

"commitment to complying with Executive Order 13899" in an email announcing the release of OCR's new fact sheet on "Title VI Protection from Discrimination Based on Shared Ancestry or Ethnic Characteristics."[7] The continued relevance of the fact sheet and question and answer documents was further reiterated in OCR's "Dear Colleague" letters dated May 25, 2023[8] and November 7, 2023[9] (which referred to both of those documents in their lists of resources).

34.     The U.S. Department of State, which also adopted the IHRA Definition, provides additional guidance on what constitutes antisemitism, including the following:

> Contemporary examples of antisemitism in public life, the media, schools, the workplace, and in the religious sphere could, taking into account the overall context, include, but are not limited to:
>
> - Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion.
>
> - Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.
>
> - Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.
>
> - Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust
>
> - Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.
>
> - Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

---

[7] https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-shared-ancestry-202301.pdf
[8] https://www2.ed.gov/about/offices/list/ocr/docs/antisemitism-dcl.pdf
[9] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf

- **Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.**

- **Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.**

- **Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.**

- **Drawing comparisons of contemporary Israeli policy to that of the Nazis.**

- **Holding Jews collectively responsible for actions of the state of Israel.**

**Antisemitic acts are criminal** when they are so defined by law (for example, denial of the Holocaust or distribution of antisemitic materials in some countries).

**Criminal acts are antisemitic** when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews.

**Antisemitic discrimination** is the denial to Jews of opportunities or services available to others and is illegal in many countries.[10]

35.     On January 4, 2023, DOE, citing the "rise in anti-Semitic incidents," released a fact sheet entitled "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which notes that Title VI's protections extend to "students who experience discrimination, including harassment, based on their shared ancestry or ethnic characteristics or citizenship or residency in a country with a dominant religion or distinct religious identity."[11]

36.     On May 25, 2023, President Biden released The U.S. National Strategy to Counter Antisemitism, which his administration described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history,"[12] and DOE launched its

---

[10] https://www.state.gov/defining-antisemitism/ (emphasis added).
[11] https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-shared-ancestry-202301.pdf
[12] https://www.whitehouse.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf

Antisemitism Awareness Campaign.[13] As part of that campaign, OCR released a letter reminding schools of their legal obligations under Title VI to provide all students, including Jewish students, a school environment free from discrimination and to take immediate and appropriate action to respond to harassment that creates a hostile environment. On September 28, 2023, as part of President Biden's National Strategy to Counter Antisemitism, eight federal agencies confirmed again that Title [14] prohibits antisemitic forms of discrimination in federally funded programs and activities.[15]

37.     On November 7, 2023, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under Title VI . . . to provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics."[16] The letter states: "It is your legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or Israeli] . . . in the ways described in this letter."[17]

38.     In a letter dated March 21, 2024, Jason Smith, Chairman of the U.S. House of Representatives Committee of Ways and Means, strongly urged President Sally Kornbluth to take more proactive measures to ensure the safety and inclusion of Jewish students on the MIT

---

[13]https://www.ed.gov/news/press-releases/us-department-education-launches-antisemitism-awareness-campaign

[15]   https://www.whitehouse.gov/briefing-room/statements-releases/2023/09/28/fact-sheet-biden-harris-administration-takes-landmark-step-to-counter-antisemitism/

[16] https://www2.ed.gov/about/offices/list/ocr/sharedancestry.html

[17] *Id.*

campus.[18] Smith reiterated his concerns about the rise of antisemitism on MIT's campus following Hamas's vicious attack on Israeli civilians.[19] Smith questioned the university's efforts to combat antisemitism and their handling of free speech.[20] Smith highlighted specific actions by MIT that are concerning and create a hostile environment for Jewish students, including (1) the university's decision to reverse its disciplinary actions against the student agitators due to visa concerns, (2) the invitation of speaker Dalia Mogahed, who had previously justified Hamas' attack on Israel, and (3) MIT's failure to invite Ambassador Dennis Ross as a speaker.[21] Ms. Mogahed justified Hamas' October 7 attack on Israel.[22] Smith correctly points out that speakers like Mogahed exacerbate antisemitism on campus.[23] Smith's letter emphasizes that MIT's approach to addressing antisemitism on campus "raises serious concerns about whether MIT is willing to fairly and consistently punish students that violate its policies and create a hostile environment for Jewish students on campus."[24]

39.     Smith's letter, at a minimum, demonstrates MIT's failure to take prompt and effective steps to eliminate the hostile environment on campus.

---

[18] H. Comm. on Ways and Means, Letter to President Sally Kornbluth, Massachusetts Institute of Technology, (Mar. 21, 2024), https://gop-waysandmeans.house.gov/wp-content/uploads/2024/03/Antisemitism-Ltr-to-Universities.pdf

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] H. Comm. on Ways and Means, Letter to President Sally Kornbluth, Massachusetts Institute of Technology, (Mar. 21, 2024), https://gop-waysandmeans.house.gov/wp-content/uploads/2024/03/Antisemitism-Ltr-to-Universities.pdf

[23] "…the decision to invite her in this context is one that likely makes the experience for Jewish students on campus worse, not better." H. Comm. on Ways and Means, Letter to President Sally Kornbluth, Massachusetts Institute of Technology, (Mar. 21, 2024), https://gop-waysandmeans.house.gov/wp-content/uploads/2024/03/Antisemitism-Ltr-to-Universities.pdf.

[24] H. Comm. on Ways and Means, Letter to President Sally Kornbluth, Massachusetts Institute of Technology, (Mar. 21, 2024), https://gop-waysandmeans.house.gov/wp-content/uploads/2024/03/Antisemitism-Ltr-to-Universities.pdf

## II.   **MIT, as a Private Institution, Has the Authority to Control Hateful Speech and Discrimination Against Jews on Its Campus.**

40.     MIT is a private university, and as shown in the MIT policies outlined below, has broad power and authority to address antisemitism that impacts its students, faculty, and staff.

### a.   **MIT's Code of Conduct.**

41.     MIT requires compliance with the policies contained in the student handbook.[25] This handbook, called the MIT Mind and Hand Book, is available online and outlines the university's expectations for students.[26]

42.     The handbook contains several provisions that govern student behavior.

43.     Section II(4) governs Assault and Reckless Endangerment and states, "MIT prohibits physical abuse of oneself or others and reckless endangerment of oneself or others. Physical abuse is violence of any nature against any person; fighting; assault; battery; the use of a knife, gun, or other weapons; restraining or transporting someone against their will; or any action that threatens or endangers the physical health or safety of any person or causes reasonable apprehension of such harm. Reckless endangerment is conduct that could reasonably and foreseeably result in physical injury even if no injury actually occurs."

44.     Section II(5) governs Community Well-Being and states, in relevant part, "MIT expects that members of the MIT community will not engage in behavior that…has serious ramifications for their own physical and mental health, safety, welfare, academic well-being, professional obligations, or for that of others. In situations where an individual student's physical

---

[26]https://handbook.mit.edu/sites/default/files/images/2023-2024%20Mind%20And%20Hand%20Book%20PDF%20Copy.pdf

illness or emotional difficulties affect not only the student, but also others in the community, it is the Institute's responsibility to consider the well-being of the community as well as the individuals in care decisions."

45.     Section II(7) of the handbook governs discrimination and discriminatory harassment. The preamble states, in relevant part, "In order to create a respectful, welcoming, and productive community, the Institute is committed to providing a living, working, and learning environment that is free from discrimination and discriminatory harassment."

46.     The preamble further defines the scope and reach of the discrimination policy: "These policies apply to conduct that occurs on MIT property or off-campus, or when an MIT student is representing or acting on behalf of the Institute, conducting Institute business, or attending Institute-funded or Institute-sponsored activities such as a conference. In addition, these policies may apply to conduct that occurs outside the MIT academic environment if that conduct affects the work or educational environment."

47.     MIT's discrimination policy further states, "The standards for finding a violation of law are different from the standards used by MIT in determining whether there has been a violation of MIT's policy."

48.     According to the discrimination policy, "The outcome of disciplinary action can include a warning, probation, suspension, expulsion, or degree revocation."

49.     Section II(5)(b) contains MIT's nondiscrimination policy and specifically indicates that MIT "is committed to the principle of equal opportunity in education and employment. The Institute prohibits discrimination against individuals on the basis of race, color, sex, sexual orientation, gender identity, pregnancy, religion, disability, age, genetic information, veteran status, or national or ethnic origin in the administration of its educational policies, admissions

policies, employment policies, scholarship and loan programs, and other Institute administered programs and activities[.]"

50.     Section II(7)(D)(1) covers harassment based on protected class.  In this section, MIT states, "the Institute is particularly committed to eliminating harassment based on those categories. Harassment that is based on an individual's race, color, sex, sexual orientation, gender identity, pregnancy, religion, disability, age, genetic information, veteran status, or national or ethnic origin is not only a violation of MIT policy but may also violate federal and state law, including Title IX of the Education Amendments of 1972 and Mass. General Laws Chapter 151B."

51.     Section II(13) governs harassment. The policy outlines what does and does not constitute harassment according to MIT:

> Harassment is defined as unwelcome conduct of a verbal, nonverbal or physical nature that is sufficiently severe or pervasive to create a work or academic environment that a reasonable person would consider intimidating, hostile or abusive and that adversely affects an individual's educational, work, or living environment.
>
> In determining whether unwelcome conduct is harassing, the Institute will examine the totality of the circumstances surrounding the conduct, including its frequency, nature and severity, the relationship between the parties and the context in which the conduct occurred. Below is a partial list of examples of conduct that would likely be considered harassing, followed by a partial list of examples that would likely not constitute harassment:
>
> - Examples of possibly harassing conduct: Public and personal tirades; deliberate and repeated humiliation; deliberate interference with the life or work of another person; the use of certain racial epithets; deliberate desecration of religious articles or places; repeated insults about loss of personal and professional competence based on age.
>
> - Examples of conduct that is likely not harassment: Administrative actions like performance reviews (including negative performance reviews) and making work assignments; other work-related decisions like moving work areas or changing work colleagues; and isolated incidents (unless, as noted above, they are very severe, such as the use of certain racial epithets).

52.     MIT maintains broad authority to regulate harassing conduct, even when it does not necessarily violate the harassment policy:

> Conduct that does not rise to the level of harassment may still violate Section 9.2. Even conduct that does not violate an MIT policy may be inappropriate and any inappropriate conduct should be addressed by the supervisor or department head.

53.     While MIT's harassment policy is not limited to harassment based on the protected categories listed in Section 9.3, the Institute is particularly committed to eliminating harassment based on those categories. Harassment that is based on an individual's race, color, sex, sexual orientation, gender identity, pregnancy, religion, disability, age, genetic information, veteran status, or national or ethnic origin is not only a violation of MIT policy but may also violate federal and state law, including Title IX of the Education Amendments of 1972, Title VII of the Civil Rights Act of 1964, and Mass. General Laws Chapter 151B.

54.     Section II(18) governs expectations of student behavior and integrity and states:

> MIT expects that all students come to the Institute for a serious academic purpose and expects them to be responsible individuals who conduct themselves with high standards of honesty, fairness, respect, integrity, and accountability in both their academic and non-academic lives. Students are expected to uphold a high standard of civility and to demonstrate their respect for all members of this diverse community. These expectations are fundamental to the principle of independent learning and professional growth and to the maintenance of a healthy living and learning environment.

55.     Section II(21) covers off-campus misconduct and states that MIT reserves the right to take disciplinary action "if the Institute considers that such alleged misconduct may have violated Institute policy and expectations of civility, integrity, and respect. The Institute will determine, on a case-by-case basis, if it is appropriate to address a complaint of this kind."

56.     Section II(22) prohibits "[m]alicious or unauthorized conduct that attempts to, actually does, or is reasonably likely to damage, deface, or destroy Institute property or property belonging to another."

17

57.     Section II(24) "prohibits threats, intimidation, coercion, and other conduct that can

be reasonably, objectively construed to threaten or endanger the mental or physical health or safety

of any person."

58.     Section II(10) governs freedom of expression. The policy states, in relevant part:

> Freedom of expression is essential to the mission of a university. So is
> freedom from unreasonable and disruptive offense. Members of this
> educational community are encouraged to avoid putting these essential
> elements of our university to a balancing test.
> …
> With respect to materials posted on bulletin boards, it is not appropriate to
> remove or deface signed posters, even if some people find such material
> offensive. If you are offended by a poster signed by a person or group in the
> MIT community, it is appropriate to convey your sense of offense to those
> who created the poster. It is not appropriate to remove or deface the poster.

**b. MIT's Chalking Policy and Removal of Posters.**

59.     MIT has a policy that governs chalking, which states:

> Chalking is permitted by Institute groups on sidewalks and pathways on
> campus to promote their events or activities … Chalking is not allowed on
> buildings, steps, or interior locations. Chalkings must clearly identify the
> group that is responsible for them.
>
> …
>
> In general, large banners or flags may not be displayed at MIT by
> individuals or groups without MIT's permission. Individual residence halls
> may temporarily display banners in accordance with Housing & Residential
> Services ("HRS") policy.
>
> Other temporary displays, such as sandwich boards and similarly sized
> displays, are permitted for limited time periods solely to promote Institute
> events or activities and/or provide directions to campus locations. These
> displays cannot block corridors or access to buildings, streets, paths, or
> sidewalks, and must comply with all of the above requirements, including
> clearly identifying the group that is responsible for them. Institute groups
> may also seek permission from the Division of Student Life or Institute

18

Events for the temporary use of larger displays in locations such as the Stratton Student Center, Lobby 7, or Lobby 10.[27]

60.     Similarly, MIT has a policy concerning the removal of posters:

Posters on Institute Display Spaces are usually removed several times a week by the Department of Facilities. Groups that control their own display spaces should establish a process for the regular removal of posters that are no longer relevant to their community or that do not comply with any rules the group has established for their spaces.

Individuals or groups may not remove posters on Institute Display Spaces on their own, nor may they alter or deface them.  Institute groups may cover posters for events or activities that have already passed, if multiple identical posters are preventing other posters from being put up, or if posters are hung by non-MIT individuals or groups. In addition, an MIT group can remove their own posters. [28]

### c.   MIT's Policy on Events, Vigils, Protests, and Demonstrations.

61.     MIT has a policy that governs events, vigils, protests, and demonstrations ("Events Policy") that is publicly available.[29]

62.     The Events Policy applies to MIT students, faculty, and staff, as well as visitors.

63.     According to the Events Policy, "MIT recognizes that freedom of expression is essential to the Institute's mission as long as it does not unreasonably interfere with or disrupt Institute events, programs, activities, academics, research, or operations (collectively, "Institute Activities")."

---

[27]   https://policies.mit.edu/policies-procedures/120-relations-public-use-mit-name-and-facilities-use/125-use-facilities/1255#:~:text=Chalking%20is%20permitted%20by%20Institute,that%20is%20responsible%20for%20them.

[28]   https://policies.mit.edu/policies-procedures/120-relations-public-use-mit-name-and-facilities-use/125-use-facilities/1255#:~:text=Chalking%20is%20permitted%20by%20Institute,that%20is%20responsible%20for%20them.

[29]   https://studentlife.mit.edu/system/files/2023-11/202031103-mit-guidelines-on-speakers-protests-and-demonstrations-final_1.pdf

64.    The Events Policy further allows for freedom of expression **that does not violate MIT policies**.

65.    The Events Policy dictates that exercising free expression on campus comes with the following general conditions:

a.    "Such expression must not be used for purposes of harassment, discrimination, retaliation, invasion of personal privacy, defamation, threats or violence, targeting of groups or individuals[.]"

b.    "Individuals and groups must comply with the law and all MIT policies, including policies for MIT student groups, Institute Events procedures, MIT's use of facilities policy, and MIT's postering policy."

c.    "Institute Activities may not be unreasonably interfered with or disrupted, and access to an Institute event or facility, including any means of egress, may not be blocked or obstructed."

d.    "Invited speakers are also generally free to express their views, even if controversial. Dissenting members of the community may protest and express disagreement, but they may not unreasonably interfere with or disrupt a speaker's ability to speak or attendees' ability to attend or hear the speaker."

e.    "Institute groups who wish to organize vigils, protests, or demonstrations (including counterprotests) are required to meet with Institute officials in advance and must honor reasonable time, place, and manner restrictions dictated by the Institute, including restrictions on sound amplification."

f.    Safety and security of the MIT community at such events is paramount. In the event that conduct interferes with or disrupts an Institute Activity, a representative of the

Institute may request the conduct to stop or ask the person or group to leave the area or relocate to a more suitable area. If the conduct continues despite a request to stop, MIT reserves the right to take appropriate action, including but not limited to postponing the event, taking disciplinary action, or, where the safety of the community is threatened, taking steps to remove the person or group from campus."

66.    MIT's Events Policy also provides guidance on the use and organization of events:

MIT has preferred locations for vigils, protests, and demonstrations (including counterprotests) (collectively referred to as "demonstrations"). These locations include the Stratton Student Center, the steps of the Dertouzous (Stata) Amphitheater, Kresge Oval, McDermott Court, and Hockfield Court. Demonstrations on the MIT campus may only be organized by Institute groups such as academic departments, administrative offices, and recognized student, faculty, staff, and employee organizations. Those groups must reserve space at least three business days in advance of their demonstrations through Institute Events or Campus Activities Complex. Demonstrations are not permitted to be conducted in faculty or administrative offices, classrooms, libraries, study rooms, or similar locations that would disrupt Institute Activities. Demonstrations must not unreasonably interfere with or disrupt an Institute Activity. Groups organizing demonstrations are required to meet with Institute officials at least three business days in advance of the demonstration, must follow instructions from Institute officials before and during the demonstration, and must honor reasonable time, place, and manner restrictions, including restrictions on sound amplification. Failure to comply with these guidelines may result in MIT requiring individuals or groups to relocate or alter or cease their conduct, and may also lead to disciplinary action.

67.    As detailed herein, despite its clear policies with regard to intolerance of particular discriminatory behavior and conduct, MIT systematically refused to enforce its policies when repeated antisemitic conduct occurred on its campus. It is clear that the conduct described herein constitutes antisemitism, thus giving rise to MIT's liability.

### III. <u>The Evolution of Antisemitism.</u>

68.     Antisemitism is not new. Antisemitism has evolved and has been repackaged over thousands of years. As recognized in the IHRA Working Definition, discussed above, Jews have been victimized for a variety of alleged evils, including killing Jesus Christ, refusing to accept Jesus Christ as the Messiah, being usurers, traitors, an inferior race, and most recently, because their Jewish identity is tied to the modern state of Israel (i.e., for being Zionists).

### a. **Antisemitism as Religious Discrimination.**

69.     Modern antisemitism includes Jews being blamed for the crucifixion of Jesus and then for failing to accept Jesus as the Messiah.[30] Indeed, it was not until the 1960s that the Catholic Church officially repudiated the charge that the Jews had murdered Jesus Christ.[31]

70.     From approximately 300-600 C.E.,[32] Jews were forbidden to marry Christians (399 C.E.), were prohibited from holding positions in government (439 C.E.) and were prevented from appearing as witnesses against Christians in court (531 C.E.).[33]

71.     As Jews were officially being ostracized, certain bizarre fantasies about Jews arose in Northern Europe that foreshadowed the antisemitism of the 20th century. It was around this time that false rumors that Jews had horns and tails and engaged in ritual murder of Christians began to circulate. The latter allegation, referred to as "blood libel," was devised by Thomas of

---

[30]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism
[31]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism
[32] "C.E." or the "Common Era" is the equivalent of "A.D.," which is Latin for "in the year of the Lord," referring to Jesus.
[33] https://www.adl.org/sites/default/files/documents/assets/pdf/education-outreach/Brief-History-on-Anti-Semitism-A.pdf

Monmouth in 1150 to explain the mysterious death of a Christian boy. This theme recurs in English and German myths.[34]

72.     In 1095, Pope Urban II called for the liberation of Jerusalem. Christian crusaders set off to free the Holy Land from the Muslims. The Crusader army swept through Jewish communities looting, raping and massacring Jews as they went. This represented the dawn of the pogrom—the organized massacre of a targeted group of people.[35]

73.     "Throughout the Middle Ages, Christians persecuted Jews. Portrayed as alien, Jews were regarded as usurers. Illustrations depicted Jews as the devil, with horns and cloven feet, and showed them using the blood of Christian children in ritual sacrifices. These lies came to be taken as truth."[36]

74.     For centuries, based in large part on the belief that Jews were evil and unwilling to accept the word of God, Jews were prohibited from owning land and holding public office. Whole professions refused to admit Jews.[37]

75.     Since Jews were not allowed to own land and the Church did not allow Christians to loan money for profit, Jews had few alternatives but to become moneylenders. Once they became associated with the forbidden trade of usury—the practice of lending money and charging high interest—a new set of stereotypes evolved around the Jews as money-hungry and greedy. As

---

[34]  https://www.adl.org/sites/default/files/documents/assets/pdf/education-outreach/Brief-History-on-Anti-Semitism-A.pdf

[35]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism; https://www.adl.org/sites/default/files/documents/assets/pdf/education-outreach/Brief-History-on-Anti-Semitism-A.pdf

[36]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

[37]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

moneylenders, Jews were frequently useful to rulers who used their capital to build cathedrals and outfit armies. So long as the Jews benefited the ruler, either through finance or by serving as convenient scapegoats, they were tolerated. However, this did not stop rulers of various countries from expelling their Jews: Jews were expelled from England in 1290, France in 1394, and Spain in 1492.[38]

76.     During the middle of the 14th century, the Bubonic Plague spread throughout Europe, killing an estimated one-third of the population. In the midst of fear, superstition, and ignorance, people looked for someone to blame, and the Jews were a convenient scapegoat because of the myths and stereotypes that were already believed about them. Though Jews were also dying from the plague, they were accused of poisoning wells and spreading the disease. In Germany and Austria, it is estimated that 100,000 Jews were burned alive for this and other false accusations, including using the blood of Christian boys to make Passover matzoh and for desecrating sacramental wafers. Stereotypes in Christian church art were used to inflame the masses.[39]

77.     "In several countries, secular and religious states forced Jews into segregated districts later called ghettos. England, France, Spain, Portugal, and many German states expelled masses of Jews—most of whom migrated eastward taking with them their religious convictions and traditions."[40]

---

[38] https://www.adl.org/sites/default/files/documents/assets/pdf/education-outreach/Brief-History-on-Anti-Semitism-A.pdf

[39] https://www.adl.org/sites/default/files/documents/assets/pdf/education-outreach/Brief-History-on-Anti-Semitism-A.pdf

[40] https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

b. **Antisemitism Morphs into a Political, Economic, and Social Movement**

78.      "In 1517, Martin Luther attacked the Pope and corruption within his own Roman Catholic Church, beginning the Protestant Reformation. The young Luther hoped that tolerance would persuade Jews to convert. But when Jews adhered to their own religious beliefs and refused to join his new reformed church, Luther's disappointment turned to hatred":

> *What then shall we Christians do with this rejected and condemned people, the Jews? . . .Their synagogues . . .should be set on fire, and what does not burn must be covered over with earth so that no man will ever see stone or cinder of them again. . . .Their houses also should be razed and destroyed. . . . All their prayer books. . .should be taken from them.*[41]

79.      Martin Luther also wrote a pamphlet in 1545, entitled "The Jews and Their Lies," claiming that Jews thirsted for Christian blood. Luther urged his followers to kill Jews. Martin Luther's pamphlet was later reprinted by the Nazis in 1935. Some scholars feel that these scurrilous attacks mark the transition from anti-Judaism (attacks motivated because of the Jews' refusal to accept Christianity) to anti-Semitism (hatred of Jews as a so-called race that would contaminate the purity of another race).[42]

80.      In France in 1894, Captain Alfred Dreyfus, the only Jewish member of the French Army's general staff, was falsely accused and convicted of passing military secrets to Germany. When evidence was discovered that Dreyfus was innocent, it was quickly covered up by French Officers of the General Staff who wanted to blame the crime on a Jew. This event, now known as "the Dreyfus Affair," is emblematic of the antisemitism that pervaded France at the time.[43]

---

[41]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

[42]  https://www.adl.org/sites/default/files/documents/assets/pdf/education-outreach/Brief-History-on-Anti-Semitism-A.pdf

[43]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

81.     Once again, these events show antisemitism as not purely religious discrimination, but also as being a secular, social, and political movement.[44]

82.     Around 1900, Jews were falsely accused of conspiring to dominate the world using their money and intelligence to manipulate trusting Christians. Russian secret police forged a document to support the story of a take-over plot supposedly authored by a conference of Jewish leaders. A proven forgery, *The Protocols of the Elders of Zion* was nevertheless translated into every major language and distributed worldwide. It is circulated even today despite indisputable proof that it is a fake.[45]

83.     To divert popular discontent at appalling living conditions and autocratic control, Russian authorities encouraged antisemitic violence against Russian Jews who were mostly extremely poor; Jews were blamed for the assassination of Czar Alexander II in 1881, as well as any number of smaller problems that occurred in the country. Pogroms, murderous rampages against Jews, erupted in Russia many times during the next three decades."[46]

84.     Between 1917 and 1921, more than 500 Jewish communities in Ukraine were wiped out during pogroms, and approximately 60,000 Jewish men, women, and children were murdered.[47]

---

[44]   *See*   https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

[45]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

[46]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

[47]   https://www.adl.org/sites/default/files/documents/assets/pdf/education-outreach/Brief-History-on-Anti-Semitism-A.pdf

85.     "The second half of the 19th century saw the emergence of yet another kind of antisemitism. At its core was the theory that Jews were not merely a religious group but a separate "race"—Semites—set apart because of genetically inherited characteristics."[48]

86.     By making antisemitism an issue of race, rather than religion, Jews could not escape antisemitism by assimilating into society as some had previously done. Antisemites believed Jews were dangerous and threatening because of their "Jewish blood." Antisemitic racism united pseudoscientific theories with centuries-old anti-Jewish stereotypes. These ideas gained wide acceptance.[49]

87.     "The devastation of World War I, the demeaning peace of Versailles, the hyperinflation of the 1920s, and the depression of 1929 fueled mass discontent. The presence of Jews in German cultural, economic, and political life made them convenient scapegoats for Germany's misfortunes."[50]

88.     Adolf Hitler viewed world history as a racial struggle for survival of the fittest. He saw Jews as the source of all evil: disease, social injustice, cultural decline, both capitalism and all forms of Marxism, especially Communism. Antisemitism became the predominant ideology of the Third Reich.[51]

89.     While the Nazi regime victimized many minorities, the main group targeted by its discrimination and then extermination programs was the Jews. After the Nazis assumed power in

---

[48]     https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

[49]     *See*   https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

[50]     https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

[51]https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism

Germany, anti-Jewish measures were put into effect one after another: Jewish businesses were boycotted, then seized. Jews were defined and then separated from non-Jews. Jews were excluded from professions and studies. Jewish children were barred from schools. Jews were subjected to public humiliation.[52]

90.　　Despite the drastic increase in antisemitism at a societal and government level, most people, including Jews, could not have anticipated what was to come.

91.　　During World War II, based on the premise that Jews constituted an inferior "race," the Nazis systematically murdered six million Jews.

92.　　After the Holocaust, millions of people around the world proclaimed, "Never Again!" If only that were so.

93.　　Antisemitism did not end with the Holocaust and persists around the world today. Efforts to minimize, deny, or even celebrate the Holocaust are among the many ways antisemitism endures.[53]

94.　　Hatred of Jews is fueled by myths, lies, and conspiracy theories. Some advocates of religious, political, and racial ideologies continue to exploit the hatred of Jews to achieve their own ends.[54]

## IV.  Anti-Zionism is Antisemitism

### a.  What is Zionism?

---

[52] https://www.ushmm.org/antisemitism/what-is-antisemitism/why-the-jews-history-of-antisemitism
[53] https://www.ushmm.org/antisemitism-today
[54] https://www.ushmm.org/antisemitism-today

95.     Zionism, simply put, is the belief that Jews have the right to self-determination in their ancestral homeland of Israel.[55]

96.     The Anti-Defamation League ("ADL") summarized the manner in which Zionism dates back thousands of years for Jews:

> While there has been a continuous Jewish presence in the land of Israel over the millennia, the yearning to return to Zion, the biblical term for both the land of Israel and Jerusalem, has been a cornerstone of Jewish communal life since the Romans violently colonized the land, sending Jews into exile two thousand years ago. An earlier exile by the Babylonians produced perhaps the most well-known lamentation "By the rivers of Babylon, there we wept as we remembered Zion." That connection between Jews and the land, and the hope for repatriation, is deeply embedded in Jewish prayer, ritual, literature and culture.[56]

### b. Zionism and Jewish Identity.

97.     Jewish identity is defined by more than common religious practice. Jews share an ancestral and ethnic heritage that is rooted in the Land of Israel. Most Jews around the world today take pride in this ancestral and ethnic heritage. For them, as for many Jewish students at MIT, Zionism and the historic connection of Jews to the Land of Israel form an integral part of their Jewish identity.

98.     Israel is the birthplace of Jewish ethnic identity, language, culture, traditions, and religion, and Jews have maintained a constant presence there for over 3,000 years. Zionism represents the Jewish people's unbreakable bond with their ancestral home, and the Jews' continuous yearning for self-determination in their ancestral homeland.

99.     For most Jews, therefore, "Zionism" is not a political viewpoint; rather, it is a key component of their Jewish ethnic and ancestral identity.

---

[55] https://www.worldjewishcongress.org/en/anti-zionism
[56] https://www.adl.org/resources/backgrounder/zionism

100.    There are only 15 million Jews on earth today. Nearly half of them live in the State of Israel.

101.    Jews have endured oppression and violence across Europe and the Middle East, including genocide. Anti-Jewish bigotry still threatens Jews worldwide. Israel's existence and well-being are, therefore, vital to the Jewish people's safety, survival, and human rights.

102.    In this context, demanding that Jews who take pride in the Jews' ancestral connection to Israel and care about the survival of the Jewish people deny Israel's right to exist is tantamount to demanding that Jews shed the ethnic component of their Jewish identity. Denying that Jews are "a people" with this shared ancestral and ethnic heritage is "erasive antisemitism."

103.    Similarly, harassing, marginalizing, ostracizing, or discriminating against a Jew because they identify as Zionist is equivalent to targeting a Jew on the basis of the Jews' shared ethnic and ancestral heritage.

104.    While some opponents of the Israeli government or specific Israeli policies call themselves "antizionist," this label is fundamentally incorrect. To be antizionist is to oppose Jewish self-determination in the State of Israel and to support (whether explicitly or tacitly) the destruction of the State of Israel as a Jewish state.

105.    Anti-Zionists frequently use phrases like "criticizing Israel isn't antisemitic" to deflect attention from their opposition to Israel's very existence. But Zionism does not require an endorsement of the Israeli government, nor does it preclude support for Palestinian self-determination or a Palestinian state.

106.    There are many Zionists who have legitimate criticisms of the Israeli government, just as there are many Americans who may have criticisms of their own government.[57] However, when criticism is levied as a critique of the existence of Israel altogether, such criticism ceases to be a policy concern and instead becomes antizionist and antisemitic. In short, anti-Zionism is **a movement against an integral part of Jewish identity**, while criticism of the government of Israel speaks to one's political opinions.

## V.    Antisemitic Acts Have Risen More than 337% Since the October 7 Attacks.

107.    If more evidence is needed concerning the link between antizionism and antisemitism, the October 7 attacks and their aftermath is the perfect case study.

108.    October 7 was the deadliest day for Jews since the Holocaust. Innocents, primarily Jews and Israelis, were kidnapped, raped, burned alive, and slaughtered in the most brutal of ways by members of an internationally recognized terrorist group.

109.    If antizionism and antisemitism were not related, it would be reasonable to expect that the impact on American Jews would have been nonexistent.

110.    However, antisemitic incidents in the U.S. have risen a staggering 337% since the October 7 attacks (as of mid-December 2023).[58] Between October 7 and December 7, 2023, the ADL recorded a total of 2,031 antisemitic incidents, up from 465 incidents during the same period in 2022. This includes 40 incidents of physical assault, 337 incidents of vandalism, 749 incidents of verbal or written harassment and 905 rallies including antisemitic rhetoric, expressions of

---

[57] https://www.adl.org/resources/backgrounder/zionism
[58] A *DL Reports Unprecedented Rise in Antisemitic Incidents Post-Oct. 7,* ADL Press Release, December 11, 2023 (https://www.adl.org/resources/press-release/adl-reports-unprecedented-rise-antisemitic-incidents-post-oct-7).

support for terrorism against the state of Israel and/or anti-Zionism.  On average, during the 61

days between October 7 and December 7, 2023, Jews in America experienced nearly 34 antisemitic

incidents per day. This is no mere coincidence but is directly connected to the October 7 attacks.

111.     The ADL also released campus report cards in January 2024 and awarded MIT a

grade **F**:



<sup></sup>59

## VI.  **Antisemitism on College Campuses Was Problematic Even Before October 7, 2023.**

112.     Antisemitism on college campuses has been a growing epidemic in the years

leading up to the October 7 attacks.[60]

<hr>

[59] https://www.adl.org/campus-antisemitism-report-card; *See also* https://www.adl.org/campus-antisemitism-report-card/massachusetts-institute-technology
[60] *See* https://www.adl.org/resources/report/anti-israel-activism-us-campuses-2021-2022.

113.    On May 25, 2023, OCR issued a "Dear Colleague" letter, which highlighted the

rising antisemitism[61] across the nation, including in schools.[62] This letter placed institutions on

notice that they needed to be on the lookout for antisemitism on their own campuses and that it

should be addressed promptly.

114.    The purpose of this letter was to remind schools and universities that "Title VI

protects all students, including students who are or are perceived to be Jewish, from discrimination

based on race, color, or national origin."

115.    The letter further reminded schools and universities of the following:

> Schools must take immediate and appropriate action to respond to harassment that creates
> a hostile environment.[63] OCR generally finds that a hostile environment exists where there
> is harassing conduct that is sufficiently severe, pervasive, or persistent so as to interfere
> with or limit the ability of an individual to participate in or benefit from the services,
> activities, or privileges provided by a school.[64]

---

[61] *See generally* Federal Bureau of Investigation, Supplemental Hate Crime Statistics, 2021, March 2023; *see also,* Anti-Defamation League, Audit of Antisemitic Incidents 2022, March 2023 (acknowledging rise in reported antisemitic incidents in K-12 schools and institutions of higher education).

[62] https://www2.ed.gov/about/offices/list/ocr/docs/antisemitism-dcl.pdf

[63] *See, e.g., Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 670 n.14 (2d Cir. 2012) (citing school districts' "longstanding legal duty to 'take reasonable steps to eliminate' racial harassment in its schools" (quoting OCR's Racial Incidents and Harassment Against Students at Educational Institutions Investigative Guidance, 59 Fed. Reg. 11448, 11450 (Mar. 10, 1994))). *For additional information, please* see Racial Incidents and Harassment Against Students at Educational Institutions Investigative Guidance (March 1994); U.S. Department of Education Office for Civil Rights, Harassment and Bullying Dear Colleague Letter (October 2010).

[64] *See, e.g., Zeno,* 702 F.3d at 665-66 (2d Cir. 2012) (explaining that harassment is actionable if it is "'severe, pervasive, and objectively offensive' and discriminatory in effect" (quoting *Davis ex rel. LaShona D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 650–51 (1999)), and that discriminatory actions restrict "'an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit' under the school system" (quoting 34 C.F.R. § 100.3(b)(1))); *see also* Racial Incidents and Harassment Against Students at Educational Institutions Investigative Guidance (March 1994); U.S. Department of Education Office for Civil Rights, Harassment and Bullying Dear Colleague Letter (October 2010).

116.    If a hostile environment based on shared ancestry existed, and the school knew or should have known of the hostile environment, OCR will evaluate whether the school met its obligation under Title VI to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent harassment from recurring.[65] In other words, a school violates Title VI when it fails to take adequate steps to address discriminatory harassment, such as antisemitic harassment.[66]

117.    MIT was fairly on warning of the rising antisemitism, thus giving it an opportunity to prepare for a *prompt* response in the face of a crisis such as that ongoing at MIT. Despite being given many months to prepare an appropriate response, MIT has wholly failed its students by tolerating antisemitism in violation of its own policies and past procedures.

## VII.  The Process for Registering a Student Organization at MIT.

118.    Student groups at MIT are approved by the Association of Student Activities ("ASA").

119.    Student groups may be assigned different statuses: ASA Unfunded, ASA Funded, ASA Sponsored, Club Sport, Non-Res FILG, Res FSILG, or Dorm.

120.    Even groups which are unfunded still receive official recognition by the university, can reserve space on campus, and can serve as the basis for a community on campus.[67]

121.    Funded groups are supposed to "promote student life for a significant portion of campus, which are significantly unique from existing groups and have a purpose that cannot be

---

[65] *See* U.S. Department of Education Office for Civil Rights, Harassment and Bullying Dear Colleague Letter (October 2010).

[66] https://www2.ed.gov/about/offices/list/ocr/docs/antisemitism-dcl.pdf

[67] https://asa.mit.edu/group-privileges/fundedunfundedsponsored-groups

fulfilled by other existing student groups, and which have established a track record of excellence. Funded status is harder to obtain, but also gives full access to Student Activities resources."[68]

122.    Both funded and unfunded groups are permitted to use MIT in their names and in event descriptions.[69] Groups are also permitted to create and host websites through the main MIT web server.[70]

123.    All recognized groups on campus must adhere to the MIT Non-Discrimination Clause,[71] which among other things, prohibits discrimination on the basis of race, religion, ancestry, or national or ethnic origin.[72]

124.    The ASA is a joint committee of the Undergraduate Association and the Graduate Student Council. It is responsible for recognizing student groups and activities, allocating student office space, and organizing activities that take place during orientation in August and Campus Preview Weekend each April.

## VIII.   MIT Violates its own Anti-Discrimination Policies and Allows its Campus to Become a Hostile Environment for Jewish Students.

### a.   MIT Approves the Registration of Several Anti-Israel and Antisemitic Student Groups on Campus.

#### i.   MIT Coalition Against Apartheid

---

[68] https://asa.mit.edu/group-privileges/fundedunfundedsponsored-groups
[69] https://asa.mit.edu/group-privileges/compare-privileges
[70] https://asa.mit.edu/group-resources/group-websites
[71] https://asa.mit.edu/group-privileges/fundedunfundedsponsored-groups
[72] https://handbook.mit.edu/nondiscrimination

125.    The MIT Coalition Against Apartheid ("MIT CAA") is a registered student group at MIT.[73]

126.    MIT CAA has multiple faculty representatives who teach and/or advise MIT students, including Plaintiffs and SCLJ Members.

127.    MIT CAA advertises its mission on its MIT website: "Coalition Against Apartheid is a student group at MIT focused on advancing anti-colonial and anti-apartheid organizing on campus. We support the liberation of all peoples, with a focus on the Israeli occupation of Palestine. In addition to working for administrative and institutional change, we hold events on campus that range from social to educational."[74]

128.    Prior to October 7, 2023, and dating back for years, MIT CAA has a history of disrupting and opposing Jewish and pro-Israel events at MIT's campus. By way of example, the group has held protests on Israeli Independence Day, has refused to participate in organized dialogue with Israeli and Jewish student leaders, has called for the opposition of "normalization with the Zionists," and has hosted openly antisemitic speakers on campus. However, MIT CAA's activities escalated significantly after October 7.

129.    As evidenced by MIT CAA's posts on X (formerly Twitter), MIT CAA does not recognize Israel's right to exist. Tweets reposted by MIT CAA include the following:

---

[73] As of the date of filing this Complaint, MIT has provisionally suspended MIT CAA. The permanent outcome of these proceedings is unknown at this time.

[74] https://caa.mit.edu/

 **MIT Coalition Against Apartheid reposted**

Jennine @jennineak · Oct 7

Progressive commentators saying Palestinians have entered 'Israeli territory'… baby, check yourselves. You're part of the problem.



 **MIT Coalition Against Apartheid reposted**

**Mohammed El-Kurd** @m7mdkurd · Oct 7          · · ·

What is happening in occupied Palestine is a response to weeks and months and years of daily Israeli military invasions into Palestinian towns, killings of Palestinians, and the very fact that millions of Palestinians in the Gaza Strip are besieged under Israeli blockade.

130.    Following the October 7 attacks, and as discussed in greater detail herein, MIT CAA has openly endorsed the violent attacks against Jews and Israelis and has continued to call for the genocide of Jews and the elimination of Israel[75] at official group functions on MIT's campus, which it has the authority to host by virtue of being a registered student group at MIT. As an MIT-registered student group, MIT CAA was subject to MIT's nondiscrimination policy, but its conduct constituted a violation of that policy.

_____

[75] By way of example, such calls have come in the form of "from the river to the sea," which is understood to be a call for the elimination of the State of Israel; references to the October 7 attacks as "revolution;" or asserting that Jewish and Israeli members of the MIT community "can't hide." *See*, *e.g.*, *infra* ¶¶ 141, 146, 191.

### ii.  Palestine@MIT

131.    Palestine@MIT's Facebook page states that the group exists to "raise political and cultural awareness regarding the Palestinian people in the MIT community and greater Boston area."[76]

132.    On its Linktree page, Palestine@MIT invites viewers to "Join the MIT Coalition Against Apartheid," thereby endorsing MIT CAA's activities.[77]

133.    Unfortunately, Palestine@MIT has strayed far from its mandate by crossing the line from advocating for Palestinian rights to instead calling for the genocide of Jews, supporting the BDS Movement,[78] and blaming Israel for Hamas' attacks on Israeli civilians:



[79]

---

[76] https://www.facebook.com/palestineatmit
[77] https://linktr.ee/palmit
[78] https://www.facebook.com/BDSNationalCommittee/photos/a.129952410382961/3135299369848235/
[79] https://www.instagram.com/p/CyJ0qtFpwdY/?img_index=1

134.   Both MIT CAA and Palestine@MIT used and continue to use their registered student group status and the MIT name to harass and discriminate against Jewish and Israeli students at MIT.[80]

135.   Even though CAA has been provisionally suspended, members of the organization continue to post on their official "mit_caa" Instagram account, which uses MIT's name, organize events, and harass Jewish and Israeli students on campus:[81] Temporary suspensions without enforcement of the use of MIT's name or the ability to organize on campus has allowed antisemitic discrimination on campus to continue undeterred.



---

[80] https://asa.mit.edu/group-privileges/fundedunfundedsponsored-groups;
[81] *See e.g.*, https://www.instagram.com/p/C6WXFj1gvlY/ and
https://www.instagram.com/p/C6XCMJeLlXP/ (posted on April 29, 2024);

**b. The Anti-Israel and Antisemitic Groups Approved by MIT Use Their Status to Intimidate and Harass Jewish Students on MIT's Campus.**

**i.** *Anti-Israel and Antisemitic Groups Approved by MIT Call for Violence against Jews.*

136.    There are countless examples of MIT tolerating antisemitic conduct by its approved student groups. It is the compilation of all of these incidents that underscores MIT's failure to address escalating antisemitism on its campus.

137.    Dating back to May 17, 2021, Palestine@MIT posted a picture on its Instagram page of students holding signs at an organized event in front of an MIT building on MIT's campus. One sign reads, "From the River to the Sea."[82] Thus, MIT was on notice for years preceding October 7, 2023, that its approved student groups were harassing and intimidating Jewish students on campus.



---

[82] https://www.instagram.com/p/CO_5WzVlv9T/

138.    As the ADL has explained, "From the River to the Sea" is "an antisemitic slogan commonly featured in anti-Israel campaigns and chanted at demonstrations. This rallying cry has long been used by anti-Israel voices, including supporters of terrorist organizations such as Hamas and the PFLP [Popular Front for the Liberation of Palestine], which seek Israel's destruction through violent means. It is fundamentally a call for a Palestinian state extending from the Jordan River to the Mediterranean Sea, territory that includes the State of Israel, which would mean the dismantling of the Jewish state. It is an antisemitic charge denying the Jewish right to self-determination, including through the removal of Jews from their ancestral homeland."[83]

139.    In case there was any confusion, indeed, on April 16, 2024, the United States House of Representatives voted 377 to 44 in favor of House Resolution 883, which states in relevant part, "(1) the slogan 'from the river to the sea, Palestine will be free' is outrightly antisemitic and must be strongly condemned;… (4) this slogan perpetuates hatred against the State of Israel and the Jewish people; and (5) anyone who calls for the eradication of Israel and the Jewish people are antisemitic and must always be condemned."[84]

140.    A year *before* October 7, 2023, on October 22, 2022, MIT CAA hosted an event called "Allyship, Art, and Apartheid," which featured three speakers, one of whom was Mohammed El-Kurd.[85] Upon information and belief, MIT Student Activity Fee money was used to pay for Mr. El-Kurd to speak at this event.

---

[83] https://www.adl.org/resources/backgrounder/allegation-river-sea-palestine-will-be-free
[84] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.congress.gov/118/bills/hres883/BILLS-118hres883ih.pdf
[85] https://www.instagram.com/p/CjqBk8euG-m/?hl=en

141.    Mohammed El-Kurd has falsely accused Israelis of eating the organs of Palestinians and having a particular lust for Palestinian blood. He has compared Israelis to Nazis and has vilified Zionism and Zionists.[86]

142.    A sampling of some of Mohammed El-Kurd's tweets include the following:



[87]

88

[86] https://www.adl.org/resources/backgrounder/mohammed-el-kurd
[87] https://twitter.com/m7mdkurd/status/1393600442853167109
[88] https://twitter.com/m7mdkurd/status/1743975007947010232



89

143.    Nonetheless, El-Kurd's hateful speech did not stop entire departments at MIT from endorsing or even co-sponsoring the Allyship, Art, and Apartheid event. The post announcing the event shows that the event was also co-sponsored by: MIT Department of Women's and Gender Studies, MIT Libraries, MIT Center for International Studies, and MIT Department of Anthropology. The co-sponsorship of this event by multiple academic departments is indicative of the hostile educational environment to which Jewish and Israeli students and graduate students at MIT, including Plaintiffs and SLJC Members, have been subjected—pre-October 7. It is no surprise the harassment of Jewish students escalated post-October 7 given MIT's longstanding tolerance of antisemitism. Academic departments and individual faculty members repeatedly endorse antisemitic positions, using the MIT name to do so, which had (and still has) the effect of making Plaintiffs feel unwelcome at their own institution.

144.    On April 18, 2023, MIT CAA's Instagram featured a post about a Holocaust display on Yom HaShoah. The post showed that the Holocaust memorial had been defaced with "Free Palestine" slogans. The caption on MIT CAA's picture was "Free Palestine." This is a stark demonstration of the connection between antisemitism and antizionism, and the reality that antizionism is not a mere political movement but rather an attack against Jewish identity—a Holocaust memorial has nothing to do with the political status of Palestinians yet everything to do with Jewish history and identity.

---

89 https://twitter.com/m7mdkurd/status/1742358664495640625



### ii. After October 7, 2023, Anti-Israel and Antisemitic Student Groups' Activities Intensified and Created a Hostile and Unsafe Environment for All MIT Students.

145.     On October 8, 2023, only one day after the horrific attacks on Israel, and before the Israeli army had fully launched its defense mission, as noted above, MIT CAA and Palestine@MIT posted on its blog a "Joint Statement on the Current Situation in Palestine." They also sent an email out to all undergraduate students via MIT's Dormspam (i.e. MIT's dormitory email platform) containing the same content.

146.     According to the Instagram post from Palestine@MIT on October 8, 2023, the joint statement also was supported by MIT CAA, Palestine@MIT, MIT Black Graduate Student Association, MIT Reading for Revolution, among others.[90]

147.     The Joint Statement stated, in relevant part:

---

[90] https://www.instagram.com/p/CyJ0qtFpwdY/?img_index=1

Palestine@MIT and the MIT Coalition Against Apartheid hold the Israeli regime responsible for all unfolding violence. We unequivocally denounce the Israeli occupation, its racist apartheid system, and its military rule. Colonization is inherently violent, aimed at erasing and replacing indigenous peoples. We affirm the right of all occupied peoples to resist oppression and colonization.

…

What is happening in occupied Palestine is a response to an ongoing 75 years of occupation. It comes as a response to the settler colonial regime and the systemic oppression against Palestinians.

We are committed to supporting decolonization efforts in Palestine, and we recognize our role to oppose Zionism from within the imperial core.[91]

148.   The letter was signed off, "Until liberation," implying that more violence against Jews was necessary and welcome.[92]

149.   An Instagram posted jointly by MIT CAA and Palestine@MIT also endorsed the October 7 violence, stating that "Colonization is inherently violent," and the groups further endorsed "the right of all occupied peoples to resist oppression and colonization."[93] The "resistance" referred to in the post was the October 7 attacks, which included the brutal murder, rape, torture, and kidnapping of innocents—primarily Jews and Israelis.

150.   On October 10, 2023, Jewish students on campus held a vigil in the wake of the October 7 attacks. Counter-protesting students used chalk to write "Free Palestine" and "Occupation on Gaza" directly outside of the vigil. Even though "Free Palestine" might be read as being limited to Gaza and the West Bank, rather than the entirety of the land, including Israel, "from the [Jordan] River to the [Mediterranean] Sea," and while the phrase "Occupation on Gaza" is also limited in its scope and thus arguably only a political assertion, writing those phrases directly outside of a vigil organized by Jewish students only two days after more than 1,400

---

[91] https://caa.mit.edu/blog/2023/10/8/statement/
[92] https://caa.mit.edu/blog/2023/10/8/statement/
[93] https://www.instagram.com/p/CyJ0qtFpwdY/?img_index=1

innocents, primarily Jews and Israelis were massacred, is clearly antisemitic. The chalking, in violation of MIT policy, was done in an effort to target, harass, and intimidate Jewish students.

151.    On October 17, 2023, a student from MIT CAA sent an email to all student group members at MIT using MIT's email system, falsely stating that "Israel dropped bombs on the al-Ahli Arab Hospital where thousands of Palestinians displaced by the current genocide were seeking shelter and care. Over 500 people and counting were massacred." Claims that Israel bombed the al-Ahli Hospital have been widely discredited by a variety of governmental and independent sources. It became clear that the damage was actually caused by a rocket launched by the Palestinian Islamic Jihad.[94] MIT CAA had the ability to email all student group members using MIT's name because of its status as an MIT student group.[95] MIT knew or should have known that its email system and name was being used to communicate in this manner with the MIT community, including Plaintiffs and SCLJ Members, but chose to do nothing.

152.    Jewish students who responded by sharing information which discredited this rumor were attacked online by their peers. One student encountered such a hostile environment in a study group, that they felt they could no longer participate.

153.    The email from MIT CAA then invited all recipients to a rally that was scheduled for October 19, 2023, outside of the MIT Student Center.

154.    The rally mentioned in the October 17 email (from MIT CAA) took place two days later on campus. At this rally, Jewish and Israeli students were harassed and assaulted.

---

[94] Evidence that the damage was caused by a mid-flight failure of an Islamic Jihad rocket: (NYT, WSJ, CNN, NPR). The Senate Intelligence Committee, as well as President Joe Biden, have confirmed this investigation, with Biden telling Israeli PM Netanyahu that it "appears as though it was done by the other team, not you."

[95] https://asa.mit.edu/group-privileges/compare-privileges

155.    Plaintiffs and SCLJ Members were personally impacted by on-campus protests and rallies held by student groups, including MIT CAA, which Plaintiffs and SCLJ Members personally witnessed and/or attempted to walk by and/or pass through. Rallies and protests, such as the October 19 rally, included antisemitic harassment and abuse directed toward and/or witnessed by Plaintiffs and SCLJ Members which caused them to feel unsafe and/or unwelcome on campus.

156.    Plaintiff Meyers was assaulted by an attendee of the rally. Plaintiff Meyers was standing with another Jewish student when they were approached by the protestor who raised the front wheels of his bike at them and said, "Your ancestors [(referring to Holocaust victims)] didn't die to kill more people."

157.    Attendees, in large numbers, chanted a variety of slogans, many of which directly call for violence against Jews. These included:

- o   "Palestine will be free, from the river to the sea!"[96]

- o   "There is only one solution! Intifada revolution!"[97]

158.    The antisemitic harassment and abuse experienced by Jewish and Israeli students at MIT, including Plaintiffs and SCLJ Members, at rallies and protests was objectively offensive and known to MIT and its administration, through reports, security monitoring of events, and other

---

[96] "From the River to the Sea" refers to the elimination of entire nation of Israel, which exists between the Jordan River and the Mediterranean Sea. *See https://www.adl.org/resources/backgrounder/slogan-river-sea-palestine-will-be-free*. This is a call not for a two-state solution, but instead a cry for a wholesale elimination of the state of Israel in favor of a Palestinian state in its place.

[97] "Intifada" literally translates to "uprising" or "shaking off." The term is used to describe periods of intense Palestinian protest against Israel, mainly in the form of violent terrorism, ranging from single acts of violence to mass suicide bombings. The First Intifada took place from 1987-1990 and the Second Intifada occurred from 2000-2005. *See* https://www.ajc.org/news/what-does-globalize-the-intifada-mean-and-how-can-it-lead-to-targeting-jews-with-violence.

means. The antisemitic harassment and abuse at rallies and protests violated MIT's campus policies, including but not limited to its nondiscrimination and harassment policies; however, there were no repercussions for these policy violations.

159.    On October 23, 2023, MIT CAA staged a walkout and planned disruptions of classes throughout campus. Protestors left classes and interrupted other classes by shouting, unfurling Palestinian flags in classrooms, and using megaphones to broadcast their message. Protestors left classes and interrupted other classes. Protestors also gathered in the vicinity of Lobby 7, which is not an authorized protest area. Indeed, Lobby 7 is a major thoroughfare (the entry to MIT's famous Infinite Corridor) through which many students, including Plaintiffs and SCLJ Members, often must travel in order to attend class or other on-campus events.

160.    On October 30, 2023, in direct contravention of MIT policy, MIT CAA organized a "Die In" in Lobby 7, which, again, is not a permitted protest space. Protesters also taped up posters (in violation of MIT's policies) of Gazans all over lecture halls and campus buildings. By contrast, MIT selectively enforced its policies against Jewish and Israeli students, requiring removal of their banners and posters calling attention to the terrorist attacks of October 7. As with the other MIT CAA protests before it, MIT took no action to stop this MIT CAA Die In, in spite of the fact that it violated MIT policy and disrupted campus activities.

161.    On November 2, 2023, MIT CAA hosted, and its student members participated in, targeted protests outside the offices of Jewish professors and the office of MIT's Israel internship program (MISTI, MIT International Science & Technology Initiatives).

162.    According to one professor, "They insistently rattled the door handles of offices that were closed with staff inside; and they congregated outside of and entered the office that facilitates MISTI's programming in the Middle East, and at least one other office. Their chants

included: 'From the river to the sea…', 'MISTI, MISTI, you can't hide,' and others associating

MISTI with genocide." After the incident, many staff reported feeling alarmed, intimidated and

even afraid during the protest. Some staff members said they felt trapped in their offices, anxious

about the prospect of verbal and/or physical assault. There were, however, no repercussions for

this incident and MIT did not send police.

### c. The U.S. Department of Education Addresses College Campuses' Failure to Curtail Antisemitism on Campuses.

163.   On November 7, 2023, The Biden-Harris administration announced in a press

release that the DOE had issued a Dear Colleague letter, reminding schools of their obligations

under Title VI of the Civil Rights Act of 1964.[98]

164.   The press release specifically stated that Jewish students are covered under the

protections afforded by Title VI and called out the rise in reports of antisemitism on college

campuses.

165.   The press release further reminded colleges that "Schools that receive federal

financial assistance have a responsibility to address discrimination when the discrimination

involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a

student's skin color, physical features, or style of dress that reflects both ethnic and religious

traditions, to name a few characteristics. Likewise, schools have a responsibility to address

discrimination against students based on the region of the world they come from or are perceived

to come from."

---

[98] https://www.ed.gov/news/press-releases/us-department-education-reminds-schools-their-legal-obligation-address-discrimination-including-harassment

166.    MIT is a school that receives federal financial assistance and therefore has an obligation to comply with Title VI and all associated standards.

167.    The Dear Colleague letter that was sent to universities, including MIT, stated in no uncertain terms that universities have a "legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are or are perceived to be Jewish, Israeli, Muslim, Arab, or Palestinian…"[99] In other words, schools may not simply wait for a wave of antisemitism to blow over. They have an affirmative obligation to address the problem.

168.    Indeed, the letter states:

> Harassing conduct can be verbal or physical and need not be directed at a particular individual. OCR interprets Title VI to mean that the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. Schools must take immediate and effective action to respond to harassment that creates a hostile environment.

**d.   In Spite of Admonitions from the President and the Department of Education that Colleges and Universities Have a Responsibility to Address Discrimination against Jewish Students, MIT Allowed Antisemitism to Fester on Campus.**

169.    Rather than heeding the requirements in the Dear Colleague letter sent by the DOE, MIT allowed a large protest to take place only two days later.

170.    On November 9, 2023, MIT CAA and the MIT student group Coalition for Palestine, among others, again protested in Lobby 7 on MIT's campus, again in contravention of

---

[99]https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf

MIT's policies. MIT CAA also invited the general public to the protest, which, according to MIT CAA's Instagram post, was scheduled to last all day—another violation of MIT policy.[100]

171.    As a result of MIT CAA's invite, protestors from all over the city flooded MIT's campus.[101]

172.    MIT was aware that these protests were taking place, but rather than enforcing its own policy to appropriately control the manner of the protests, it instead opted to shift the burden and warn Jewish students that, for their own safety, they should stay away from their own campus while outsiders took over those spaces in contravention on MIT policy. Consequently, MIT Hillel posted the following warning to Jewish students:



173.    MIT Advisory, an official MIT email account, issued a similar warning to all students on campus, warning them to avoid the unauthorized protests and once again opting to

---

[100] https://www.instagram.com/p/CzZLuQROELO/?hl=en
[101]https://www.instagram.com/reel/Czb_tNSO1sq/?utm_source=ig_web_copy_link&igshid=MzRlODBiNWFlZA==

protect the students harassing and discriminating against Jewish and Israeli students, rather than protecting those students and/or enforcing MIT policies:



174.    During the Fall of 2023, MIT professors also warned Jewish and Israeli students, including Plaintiffs and SCLJ Members, to avoid the protests for fear of their safety. This is also difficult to do, because Lobby 7 is a central throughfare on campus. While it is possible to enter campus through other routes, Lobby 7 presents one of the most convenient access points to MIT's campus for students attending classes and other activities.  During the protests, calls for violence against Jews were made on several occasions, which were personally observed by and even directed toward Plaintiffs and SCLJ Members. The language used included calls for "intifada," "from the river to the sea," and "Resistance is justified." To be clear, the "resistance" that began these protests was the October 7 attacks—a Hamas orchestrated murder of innocents, primarily Jewish and Israeli civilians.

175.    Moreover, MIT professors, faculty, and staff participated in the November 9 protest and also harassed Jewish students.

176.    One Jewish student, who was recording the protest on her phone, was shoved by a protestor.

177.    In the early afternoon of November 9, 2023, MIT officials warned the protestors that they needed to leave no later than 12:15 pm., or they could face disciplinary action. However, the protestors remained.

178.    A publicly posted tweet on X from Professor Retsef Levi detailed the experience

of Jewish students, including Plaintiffs and SCLJ Members, on campus that day.[102]

179.    Specifically, Professor Levi wrote,

"Jewish and Israeli MIT students were physically prevented from attending a class by a hostile group of pro-Hamas and anti-Israel MIT students that call themselves the CAA. This is after students from the CAA harassed MIT staff members in their offices for being Jewish and interrupted classes in the past few weeks. All of this has occurred with no clear response from the administration. With each passing day, MIT admin's silence makes Jewish and Israeli students feel unsafe at MIT. Many Jewish students fear leaving their dorm rooms and have stated that they feel MIT is not safe for Jews. This message is compounded by the public and private warnings of Hillel and many faculty that Jewish students should not enter MIT's main lobby today, November 9th, 2023. Instead of dispersing the mob or de-escalating the situation by rerouting all students from Lobby 7, Jewish students specifically were warned not to enter MIT's front entrance due to a risk to their physical safety. The onus to protect Jewish students should not be on the students themselves. MIT administration recently announced guidelines to avoid illegal and unsafe protests on campus. The CAA, which planned the protest, knowingly and proudly violated these requirements, and even invited people from outside of MIT to join them. Their actions inhibit the possibility of safe and peaceful dialogue and endanger Jewish students on campus. The CAA hosted a blockade that not only disregards MIT guidelines, but also obstructs Jewish students from attending classes. Some Jewish students who saw the administration's failure to respond to the targeted harassment of Jews on campus by the CAA came together to support each other and peacefully together stand against this threat to their safety. Four hours after the blockade started, at 12 pm, the MIT administration passed a letter to all students, threatening their suspension if the crowds did not disperse from Lobby 7. Only the Jewish students left immediately. The CAA protesters did not cooperate. Indeed, the CAA proceeded to invite more students and non-MIT protestors to join them in calling for a violent uprising ("Intifada") and justifying the terror attacks of Hamas on Israeli civilians. At 5 pm, all students on campus were warned through MIT's emergency notification system to "avoid Lobby 7" — officially recognizing the danger present to students as a result of this violent protest. No Jewish or Israeli students were present at this point. As of 10:30 tonight MIT has officially decided not to academically suspend CAA students who repeatedly violated the administration's guidelines and threats. They have shown

---

[102]https://twitter.com/RetsefL/status/1722852140245254559?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1722852140245254559%7Ctwgr%5Ee9cb43c4af20bbae3b63778489707751471d37b2%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.dailysignal.com%2F2023%2F12%2F14%2Frenowned-science-engineering-institute-loses-way-woke-leadership-imperiling-jewish-students%2F

that actions against Jews at MIT do not have consequences. Additionally, in an email to DUSP [Department of Urban Studies and Planning] students, the Department Head indicated that he would protect any DUSP students involved in violating MIT's rules today by protesting with the CAA. Not only do Jewish students feel unsafe on campus, but now they also feel excluded from and unsafe in DUSP. Today, on the 9th of November, on the 85th anniversary of Kristallnacht, which marked the beginning of the Holocaust, Jews at MIT were told to enter campus from back entrances and not to stay in Hillel for fear of their physical safety. We are seeing history repeating itself and Jews on MIT's campus are afraid. Signed, The MIT Israel Alliance and its supporters.

180.    Finally, later on November 9, 2023, in a letter signed by MIT President Sally Kornbluth, MIT made a statement *explicitly acknowledging* that the conduct of the protesters violated MIT's policies, as shown in the image below:



181.    However, shortly after the announcement was made, other MIT faculty members, including MIT professors, wrote to students and let them know that if they were disciplined for failing to vacate the Lobby 7, students could approach them for support.

182.     Subsequently on that same day, MIT President Kornbluth sent a letter to members of the MIT community, addressing the protests.[103] The letter acknowledged that the protests were "disruptive, loud and sustained through the morning hours" and that it "was organized and conducted in defiance of those MIT guidelines and policies" to the point where the administration "had serious concerns that it could lead to violence." President Kornbluth's letter further specified that "the administration felt it was essential to take action."

183.     Consequently, students were told they had to vacate Lobby 7 by a certain time, or they would be subject to suspension. While some students left, others remained, despite MIT providing formal notice that doing so was a violation of MIT policy.

184.     However, the MIT administration quickly backtracked on this threat: "Because we later heard serious concerns about collateral consequences for the students, such as visa issues, we have decided, as an interim action, that the students who remained after the deadline will be suspended from non-academic campus activities. The students will remain enrolled at MIT and will be able to attend academic classes and labs. We will refer this interim action to the Ad Hoc Complaint Response Team, which includes the chair of the Committee on Discipline, for final adjudication."[104]

185.     At this time, there is no indication that any actual disciplinary measures, let alone the measures set forth in applicable MIT policies, were taken against the students who violated MIT's polices. In any event, the measures taken by MIT (and not taken by MIT) have been

---

[103] https://president.mit.edu/writing-speeches/todays-protest-and-counterprotest
[104] Plaintiffs do not base their claims on a challenge of the Institute's disciplinary decisions. However, Plaintiffs *do* take issue with the Institute's failure to address and control antisemitism. Through the Institute's failure to follow through on threatened consequences, antisemitic protesters were emboldened.

insufficient to deter the ongoing discrimination and harassment of Jewish and Israeli students on MIT's campus.[105]

186.     Undeterred by MIT's (empty) threats, MIT CAA co-sponsored another rally at MIT, which blocked entrances to campus buildings, including (again) Lobby 7, as well as streets around campus. Once again, protestors called for violence against Jews, chanting, "There is only one solution: Intifada revolution," a single phrase invoking notions of both Hitler's so-called "Final Solution" (i.e. mass extermination) for Jews as well as rebellion against the only Jewish state.

187.     One of the speakers at the protest went even further and gave a speech, which, among other things, told fellow protesters, "It is our duty to fight… history requires trouble… resistance is resistance…it is not enough to exist passively…not enough for us to come out and march…we have to shake history with our own two hands…when we free Palestine the whole damn world is coming with us…resistance requires sacrifice." "Resistance" in the post-October 7 context has consistently been understood, including by Plaintiffs and other members of the campus community, to include the acts of terrorism and violence perpetrated against Israelis. The use of "resistance" in this context has caused Jewish and Israeli students at MIT, including Plaintiffs and SCLJ Members, to feel unwelcome and unsafe on campus and at MIT-connected events.

188.     Other leaders of MIT CAA also spoke at the rally and specifically stated that the MIT leadership had not deterred them from taking action: "Sally Kornbluth is new to MIT; she

---

[105]

https://twitter.com/RetsefL/status/1722852140245254559?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1722852140245254559%7Ctwgr%5Ee9cb43c4af20bbae3b63778489707751471d37b2%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.dailysignal.com%2F2023%2F12%2F14%2Frenowned-science-engineering-institute-loses-way-woke-leadership-imperiling-jewish-students%2F

doesn't know how we operate yet. We won't back down…We stood up to one of the most powerful institutes in the world and got THEM to back down!"

     **e.  MIT's Leadership and Faculty, Individually and through University Offices, Not Only Failed to Protect Jewish Students, but Furthered the Aims of the Anti-Israel and Antisemitic Actions Being Taken against Jewish Students.**

189.    One postdoc[106] associate at MIT tweeted numerous times about his hatred for Zionists, even going as far as to call Zionism a "mental illness" and equating Jews with Nazis. He also falsely claimed in a tweet that "Zionists not only steal our lands, food, and culture, but our dead bodies as well for organ harvesting."



**Afif Aqrabawi** ✓ @AjAqrabawi · 22h    ···
Zionists not only steal our lands, food, and culture, but our dead bodies as well for organ harvesting.

I feel like I've seen this movie before.. sounds like some crazy horror film, no?

190.    After this tweet was posted, concerned students contacted the MIT Diversity, Equity, Inclusion ("DEI") office. The DEI office told the student in an email, "…I would be very cautious before accusing any one of our colleagues, staff, or trainees of hate speech. Can I gently suggest, in the same spirit of working against polarization, that if we believe (as I genuinely do) that it is wrong to accuse Israeli soldiers of harvesting organs, it may also be a little misleading and inflammatory to compare recirculating, in effect, an old and decontextualized but confirmed report, to accusing Jews of murdering Christian children for ritual purposes ('blood libel')?"

---

[106] Postdocs are both students and employees of MIT. They receive a salary from the university.

191.    No part of the organ-harvesting blood libel is "confirmed." According to the ADL, "The 'blood libel' refers to a centuries-old false allegation that Jews murder Christians – especially Christian children – to use their blood for ritual purposes, such as an ingredient in the baking of Passover matzah (unleavened bread). It is also sometimes called the 'ritual murder charge.' The blood libel dates back to the Middle Ages and has persisted despite Jewish denials and official repudiations by the Catholic Church and many secular authorities. Blood libels have frequently led to mob violence and pogroms and have occasionally led to the decimation of entire Jewish communities."[107]

192.    On January 16, 2024, at an interfaith event called "Planetary Health: indigenous Land, People and Bodies," MIT's Interfaith Chaplain and Spiritual Advisor to the Indigenous Community at MIT diverted the conversation from the topic of the event on multiple occasions to proclaim that Palestinians are being "wrongfully subjugated and oppressed by white European colonizers" and made many similar comments.[108]

193.    A non-Jewish student wrote to MIT to express their concern about how Jews seemed targeted and likely felt unsafe at the MIT event and further expressed their own discomfort at how the chaplain had conducted herself at the event:

---

[107] https://www.adl.org/resources/backgrounder/blood-libel-false-incendiary-claim-against-jews

[108] The notion that all Jews are white is patently false. "Approximately 30% of Israeli Jews are Ashkenazi, or the descendants of European Jews." *See https://www.latimes.com/opinion/op-ed/la-oe-mazzig-mizrahi-jews-israel-20190520-story.html*. However, those desiring to frame Jews as colonial occupiers often attempt to frame all Jews as "white."



109

**f.   MIT's President is Called to Testify Before Congress.**

194.    On November 28, 2023, the U.S. House Committee on Education and the Workforce announced that it would hold a hearing, titled "Holding Campus Leaders Accountable and Confronting Antisemitism."[110]

195.    "Over the past several weeks, we've seen countless examples of antisemitic demonstrations on college campuses. Meanwhile, college administrators have largely stood by, allowing horrific rhetoric to fester and grow," said Chairwoman Virginia Foxx. She continued, "College and university presidents have a responsibility to foster and uphold a safe learning environment for their students and staff. Now is not a time for indecision or milquetoast statements.

---

[109]

https://docs.google.com/document/d/192ATPWbHI5jIqeKLDET1sqZJKBgXD13e7LM56lXEb4Y/edit, p. 16.

[110] https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=409778

By holding this hearing, we are shining the spotlight on these campus leaders and demanding they take the appropriate action to stand strong against antisemitism."[111]

196.    President Kornbluth appeared before Congress along with the presidents of the University of Pennsylvania and Harvard on Tuesday, December 5, 2023.

197.    At the beginning of the hearing, MIT President Kornbluth gave a brief statement, wherein she affirmed, despite the occurrence of the events described above, that "the right to free speech does not extend to harassment, discrimination or incitement to violence in our community. MIT policies are clear on this. To keep the campus functioning, we also have policies to regulate the time, manner and place of demonstrations."[112]

198.    As the hearings progressed, however, Dr. Kornbluth backtracked on this statement. During the course of the congressional hearings, President Kornbluth was asked if the conduct that had taken place toward Jewish students at MIT had violated MIT's Code of Conduct:

> ELISE STEFANIK: Dr. Kornbluth, does — at MIT, does calling for the genocide of Jews violate MITs code of conduct or rules regarding bullying and harassment, yes or no?
>
> SALLY KORNBLUTH: If targeted at individuals, not making public statements.
>
> ELISE STEFANIK: Yes or no, calling for the genocide of Jews does not constitute bullying and harassment?
>
> SALLY KORNBLUTH: I have not heard calling for the genocide for Jews on our campus.

---

[111] https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=409778
[112]       https://rollcall.com/2023/12/13/transcript-what-harvard-mit-and-penn-presidents-said-at-antisemitism-hearing/

ELISE STEFANIK: But you've heard chants for intifada?

SALLY KORNBLUTH: I've heard chants, which can be anti-Semitic depending on the context when calling for the elimination of the Jewish people.

ELISE STEFANIK: So, those would not be according to the — MITs code of conduct or rules?

SALLY KORNBLUTH: That would be investigated as — as harassment, if pervasive and severe.[113]

199.    According to the U.S. Department of Education's website, a Title VI investigation was opened relating to MIT on December 13, 2023.[114]

## IX.   MIT's Response to the Harassment and Assault of Jewish Students on Campus Has Been Inadequate and Ineffective and Continues to Embolden Antisemitic Acts on Campus.

200.    Even after MIT had received two letters from DOE concerning antisemitism on campus, even after MIT had its president invited to testify before Congress, and even after a Title VI investigation was opened against MIT, the MIT administration has deliberately failed to appropriately address antisemitism on campus, and antisemitism on campus continues unabated. Indeed, antisemitism on campus only worsened after the congressional hearing and indeed since the filing of Plaintiffs' original Complaint.

---

[113]    https://rollcall.com/2023/12/13/transcript-what-harvard-mit-and-penn-presidents-said-at-antisemitism-hearing/

[114] https://www2.ed.gov/about/offices/list/ocr/sharedancestry-list.html

201.    On November 14, 2023, MIT announced the formation of its Standing Together Against Hate ("STAH") initiative.[115] According to the video made by President Kornbluth, the task force was supposed to spearhead efforts to combat antisemitism at MIT.[116]

202.    Jewish faculty and staff members were asked to join the task force and did everything they could to advance its mission. Unfortunately, on February 1, 2024, the advisory group was disbanded, as it had been ineffective at curbing antisemitism on campus, as shown in the email below:[117]

203.    In the November/December MIT Faculty Newsletter, Michel DeGraff, a Professor of Linguistics published a piece ironically called, "Standing Together Against Hate: From the River to the Sea, From Gaza to MIT." The letter thanked MIT CAA and the MIT Coalition for Palestine, falsely accused Israel (once again) of bombing a hospital and insinuated that anyone who disagreed with her did so based purely on race and not the substance of their opinions. This MIT professor signed letter with the same slogan as its title, "from the river to the sea, from Gaza to MIT…."[118]

204.    On or around December 6, 2023, MIT CAA and the MIT Coalition for Palestine hosted an event with Miko Peled.[119] During the event, Peled encouraged his audience to go to MIT Hillel and confront MIT's Jewish students there about Gaza. Peled also openly denied many of the atrocities of the October 7 attacks. And during the speech, Peled made a joke about not being able to say, "From the River to the Sea;" students laughed, and some began chanting the phrase.

---

[115] https://president.mit.edu/writing-speeches/video-transcript-tensions-campus
[116] *Id.*
[117] https://twitter.com/RetsefL/status/1753224501305753747
[118]    https://fnl.mit.edu/november-december-2023/standing-together-against-hate-from-the-river-to-the-sea-from-gaza-to-mit/
[119] https://www.youtube.com/watch?v=ABcW7GE3jrw

205.     When students contacted MIT's Institute Discrimination & Harassment Response Office ("IDHR") concerning antisemitic events that occurred on campus, they were informed that the reported contact did not "seem to violate the policies that IDHR has jurisdiction over" and suggested that the student might be confused about the definition of harassment under MIT's policies. Plaintiff Meyers reported concerning antisemitism she and peers had experienced only to be told that Jewish students were not members of a protected class. This is not true. To the contrary, the MIT's policy on harassment based on protected class expressly covers religious minorities, including Jews, and Title VI protects Jews on the basis of their shared ancestry.[120]

206.     In December 2023, the MIT Women and Gender Studies Department co-hosted an event with the MIT Coalition for Palestine and invited students to join its book club, wherein the group would be reading a book by Ahed Tamimi, who posted on X, "Come on settlers, we will slaughter you. We are waiting for you in all cities of the West Bank. What Hitler did to you was a joke. We will drink your blood and eat your skulls. We are waiting for you."[121]

207.     Instead of condemning Tamimi's invitations for more violence against Jews, the Program Manager for the MIT Women and Gender Studies Department invited students to sympathize with her. Events like these were and are extremely isolating to Jewish and Israeli students and make it clear that Jews and Israelis are not welcome—and possibly not physically safe—at these events or in these departments.

---

[120] https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf
[121] https://twitter.com/HillelNeuer/status/1721495003468632266?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1721495003468632266%7Ctwgr%5E1d094c0927506764fe9382acf0975ddf3d53b547%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Funwatch.org%2Famnesty-international-poster-girl-ahed-tamimi-is-hitler-loving-antisemite%2F

208.   On December 13, 2023, Algorithms lecturer Mauricio Karchmer resigned from MIT.[122] His letter stated, in relevant part, "I cannot continue teaching Algorithms to those who lack the most basic critical thinking skills or emotional intelligence. Nor can I teach those who condemn my Jewish identity or my support for Israel's right to exist in peace with its neighbors."[123]

209.   Professor Karchmer's class was one of the most popular classes at MIT, teaching more than sixty-five percent of the undergraduate student body. Explaining his resignation Karchmer wrote publicly about campus events and their impact on himself and other members of the Jewish community:

> "Students chanted "Free Palestine" and "From the river to the sea" with fury and at times glee, like they were reciting catchy songs instead of slogans demanding the erasure of the Jewish people. Even worse, faculty members started endorsing this behavior. One DEI officer at MIT liked an October 17 post on Twitter stating that "Israel doesn't have a right to exist, it's an illegitimate settler-colony like the US." On October 18, a renowned faculty member in the neuroscience department accused Israel of committing "genocide" on Twitter. Then, the next day, she tweeted that her department was seeking a "diverse pool of candidates" for a tenure-track position in her department's "inclusive community." I remember thinking, with bitter irony, that Jewish academics need not apply."[124]

210.   Professor Karchmer further described his disappointment with the one-sidedness of the faculty newsletter articles and lack of support from his non-Jewish peers: "The only voices in the newsletter standing up for Jews were Jewish. But we are too few to fight this battle." And his pain for the young Jewish students on campus:

> "Though I cringed as I read these faculty letters, and shuddered as I walked by protests on campus, nothing has hurt more than watching the Israeli and Jewish students—who comprise fewer than 6 percent of the MIT student body—suffer."[125]

---

[122] https://www.thefp.com/p/resigned-mit-october-7-antisemitism
[123] https://www.thefp.com/p/resigned-mit-october-7-antisemitism
[124] https://www.thefp.com/p/resigned-mit-october-7-antisemitism
[125] https://www.thefp.com/p/resigned-mit-october-7-antisemitism

211.     On December 14, 2023, MIT CAA and Palestine@MIT jointly posted on Instagram that they were undeterred, writing, "We will continue to be loud and be heard and not be deterred away from our fight for Palestine and our fight against MIT's complicity with the occupation. When we return next semester, we will be even stronger and even bigger to make sure that there will be no business as usual at MIT until Palestine is free! From the river to the sea 🏴✊🏿🇵🇸🏴"

212.     On January 22, 2024, the MIT Israel Alliance, of which at least one Plaintiff is a member, sent an email to MIT's administration, expressing their concern that MIT had failed to deter any of the discriminatory and harassing behavior toward Jewish and Israeli students.

213.     The letter pointed out that the events at MIT had made life so difficult for Jewish students that some had even relocated to or chosen to stay in Israel, an active war zone, rather than staying at MIT.

214.     The letter further asked MIT to outline what measures it planned to take to ensure that students could attend MIT in an environment free from discrimination and harassment.

215.     Upon information and belief, on February 26, 2024, CAA affiliates distributed a pamphlet titled "Written Revolution," which included an open letter to President Kornbluth. In this letter, a student recalls a CAA protest held outside of the Institute Discrimination and Harassment Response (IDHR) office. According to the author, following this event <u>IDHR issued no contact orders for all CAA members from the IDHR staff</u>.

216.     The need to protect its own staff from all CAA members is telling. CAA and its members, many of whom are also members of affiliated student organizations that have not been disciplined, suspended, or banned from campus and/or whose activities on campus have not been properly limited, were shielded from MIT's IDHR staff, but not from Jewish or Israeli students on campus. MIT did not obtain no contact orders on behalf of Jewish or Israeli students, or otherwise

take even the barest protective measures to ensure that they remained safe and free from harassment.

217.    On March 8, 2024, the MIT Coalition for Palestine emailed faculty who do research related to Israel, accusing them of being "complicit in their [Israel's] crimes against humanity" and threatened to publicly shame them for their work: "broader MIT community deserves to know about these direct ties between our campus and the Israeli genocide against Palestinians, and we will be publicizing the results of our research on your projects." They also pressured the targeted faculty to "immediately cease these projects and reject all future contracts."[126]

218.    Emails also were sent to students of the targeted faculty, with what many perceived as an implicit threat ("wanted to give you all the opportunity to reflect on this news") accusing them of doing work that instead of trying to "improve the world for all of us" works to "actively harm the most vulnerable among us." They further push the students to take action, e.g. "request to know which entity funds your research" and "reject this funding", which could very well amount to leaving their research group. One impacted professor pointed out that the "*students are using peer pressure to try to tear apart research groups.*" (emphasis added).[127]

219.    In addition to personal emails, targeted faculty were publicly shamed by name on the Graduates for Palestine and MIT_CAA Instagram accounts. The posts highlighted that the students secured information on the faculty funding through access to "an internal [MIT] grant

---

[126]https://docs.google.com/document/d/192ATPWbHI5jIqeKLDET1sqZJKBgXD13e7LM56lXEb4Y/edit, pp. 25-26
[127]https://docs.google.com/document/d/192ATPWbHI5jIqeKLDET1sqZJKBgXD13e7LM56lXEb4Y/edit, pp. 25-26

management tool," which holds private information and is meant only to be available to MIT faculty and staff, not students.[128]

220.    Throughout the spring, MIT continued to allow antisemitic posters like the one below to be displayed on campus. This poster was immediately reported to MIT but was allowed to remain hanging for approximately one month. The aggregation of MIT's tolerance of repeated antisemitism over so many years—and heightened since October 7, 2023, has gravely impacted Plaintiffs and SCLJ members' ability to participate in campus life and fulfill their educational requirements. And that was *before* April 21, 2024, when MIT allowed an antisemitic encampment to be erected in the middle of campus.



[129]

X.    <u>**Discrimination against Jewish and Israeli Students Has Only Worsened Since Plaintiffs Filed Their Complaint.**</u>

---

[128]https://docs.google.com/document/d/192ATPWbHI5jIqeKLDET1sqZJKBgXD13e7LM56lXEb4Y/edit, pp. 25-26.
[129]https://docs.google.com/document/d/192ATPWbHI5jIqeKLDET1sqZJKBgXD13e7LM56lXEb4Y/edit, p. 28.

221.   On or around April 21, 2024, approximately thirty students set up around fifteen tents on the Kresge lawn. While there are numerous green spaces on campus, the students chose the Kresge lawn, which is directly adjacent to Hillel on campus:



[130]

222.   In addition to putting up tents, the protestors also put up signs, many of which are overtly discriminatory and antisemitic:

---

[130] https://whereis.mit.edu/





223.    On April 22, 2024, a graduate student emailed several university administrators including President Kornbluth and Chancellor Melissa Nobles, begging for the administration to address the encampments and to consider the safety of Jewish and Israeli students:

**From:** ██████████ <██████@mit.edu>
**Subject: Will it be any different this time?**
**Date:** April 22, 2024 at 7:07:10 PM EDT
**To:** Sally Kornbluth <sak18@mit.edu>, Mark P Gorenberg <markg@mit.edu>
**Cc:** Melissa Nobles <mnobles@mit.edu>, Cynthia Barnhart <cbarnhar@mit.edu>, Michelle H Fisher <rabbif@mit.edu>, vpradvocate <vpradvocate@mit.edu>, idhr <idhr@mit.edu>, Elizabeth Guttenberg <guttenee@mit.edu>

A brief heads-up:

As students flagrantly break all sorts of MIT rules yet again to spew hatred, harassment, and calls to violence and genocide against Israelis and Jews, and as the administration appears yet again to have failed to preempt, act, or even meaningfully respond, I am writing to ask your help:

There are people in my community watching your apparent inaction who think you will never do anything unless they go and counter-protest.

Others in the community are fully expecting you to "both sides" Jews and Israelis into this regardless of how rule-abiding our community is and are unsure what there even is for us to lose, since we'll be smeared with their crimes anyway.

Can you please help me to assure them on the record that things are going to be different this time?

Or perhaps I should ask: will things be different this time??

I assume you know by now how things have gone at Columbia?  (Jews sent home for their own safety, vilified and attacked, told they should consider completing the semester remotely...).  And I assume you know that the MIT people organized specifically to mirror and catalyze the events at Columbia?  And that MIT Jews have already changed their entire Passover plans out of fear they will likewise be attacked for merely existing.  Some are staying at friends' now so they can focus, study, and sleep.

I've been numb, paralyzed, and dumbfounded since last night when they were allowed to set up camp, struck wordless.  My experience being Jewish at MIT has not been what one might expect in the 21st century to say the least– starkly, fiercely in contrast to my experience here being gay.  Is this the message a soon-to-be MIT alum should be carrying forth into the world– that Jews are neither protected nor supported here; that MIT rules are only enforced to protect others?

How many willful violations are enough before you suspend those who have made campus such a hostile environment that it is nearly impossible for me and my friends to work, study, or keep up with our research commitments?  How many times must students willfully organize for others to break the rules before they are deemed unworthy of our immensely disproportionate tolerance and expelled?

Please let me know what I can tell my friends who feel only they themselves can counter the immense hatred, bullying, calls for violence, and discrimination we are experiencing.  Is it true that only their in-kind reaction to the bigots spurs you to take things seriously?

It has been 24hrs since the encampment was set up, and more since they announced their intent.  What gives?

---

████████
Graduate Student | ████████████████
Massachusetts Institute of Technology
████████████████████████

224.    Rather than responding to the student's concerns or addressing the encampments,

Chancellor Nobles wrote back as follows:

**From:** Chancellor Melissa Nobles <chancellor@mit.edu>
**Sen__ Wednesday, April 24, 2024 5:11 PM
**To:** ████████ <████ @mit.edu>
**Subject:** Re: Will it be any different this time?

Dear ████ ,

We understand your concern and are working to move in a constructive direction with those who are protesting. We ask for your patience and understanding as we do this hard work. And we strongly urge you and your peers not to counterprotest.

Respectfully,
Melissa Nobles
Chancellor

225.    These emails demonstrate MIT's deliberate decision to, instead of enforcing MIT

policies that protect all students (including Jews and Israelis), asking the victims, *i.e.* the Jews and

Israelis who especially suffer the adverse impact of rule-breaking protesters, to hide and to not

stand up for themselves in the form of counter-protests. Imagine the outrage if MIT asked black

students to hide and not counter-protest a rule-breaking KKK rally. At MIT, like at Columbia just

days before, instead of the school administrators acting to stop rule-breaking demonstrations that

made Jewish and Israelis fearful and re-establish safe, rule-compliant demonstrations, MIT administrators explicitly and implicitly communicated to Jewish and Israeli students that they should succumb to their fear.  At MIT, for example, Jewish and Israeli students were told to move their Passover seder (*see* infra ¶ 232), while at Columbia Jewish and Israeli students were told stay inside and take classes online, rather than to venture out on campus to take their classes in-person. MIT was asking that one group not expect MIT to enforce their policies. At a minimum, this email exchange demonstrates a deliberate disregard, including via non-enforcement, for the discrimination against Jewish and Israeli students and their safety.

226.    Nearly a week passed until finally President Kornbluth released a video and a statement about these protests.[131]

227.    In her statement, President Kornbluth stated, "From the start, this encampment has been a clear violation of [MIT's] procedures for registering and reserving space for campus demonstrations…" President Kornbluth further added that many of the chants from protestors at the encampment have called for the elimination of the State of Israel and that there have been other "[m]ore pointed chants have been added that I find quite disturbing."[132]

228.    In other words, these encampments violated MIT's policies from the moment they started, but MIT deliberately chose to allow them to continue.

229.    Nonetheless, in spite of the admission that these encampments violated MIT's policy, President Kornbluth further stated that MIT "has not interfered with the encampment."[133]

---

[131] https://president.mit.edu/writing-speeches/video-transcript-mit-community-message-president-kornbluth

[132] https://president.mit.edu/writing-speeches/video-transcript-mit-community-message-president-kornbluth

[133] https://president.mit.edu/writing-speeches/video-transcript-mit-community-message-president-kornbluth

230.    This decision not to interfere with the encampment was a deliberate decision *not* to abide by MIT's own policies and procedures, in spite of the fact that the space had also been properly reserved by other members of the MIT community.[134]

231.    During each day that these encampments remained active, Plaintiffs, including Jewish and Israeli students, were harassed and discriminated against.

232.    Moreover, the Passover seder that was scheduled to take place at Hillel on April 22, 2024, had to be moved to an alternate location because MIT refused to make the area safe for students planning to attend, thus preventing Plaintiffs and other Jewish students from attending and using their place of worship on campus.

233.    To the extent MIT takes the position that it somehow could not have curtailed or stopped these encampments, that statement is drastically undermined by the fact that (1) MIT is a private institution, and (2) other universities have successfully dealt with these encampments.

234.    Encampments involving discriminatory protests that violated campus policies (like those at MIT) have been dismantled at universities including but not limited to the University of

---

[134] https://president.mit.edu/writing-speeches/video-transcript-mit-community-message-president-kornbluth

Texas Austin,[135] University of Southern California[136], New York University,[137] Yale,[138] University of Connecticut,[139] and The Ohio State University.[140]

235.     The University of Florida demonstrated precisely how a university can and should enforce its rules. In a statement from the university's spokesperson, Steve Orlando, the University stated:



Dear media partners,

In response to the arrests made of protesters this evening at the University of Florida campus, below is a statement that is attributable to UF spokesman Steve Orlando:

"This is not complicated: The University of Florida is not a daycare, and we do not treat protesters like children — they knew the rules, they broke the rules, and they'll face the consequences. For many days, we have patiently told protesters — many of whom are outside agitators — that they were able to exercise their right to free speech and free assembly. And we also told them that clearly prohibited activities would result in a trespassing order from UPD (barring them from all university properties for three years) and an interim suspension from the university. For days UPD patiently and consistently reiterated the rules. Today, individuals who refused to comply were arrested after UPD gave multiple warnings and multiple opportunities to comply."

###

---

[135] https://news.utexas.edu/2024/04/29/university-of-texas-at-austin-statement-regarding-todays-protest-events/; https://www.cbsnews.com/texas/news/encampments-forcibly-dismantled-arrests-made-at-ut-austin/

[136] https://www.nbcnews.com/news/us-news/hundreds-palestinian-protesters-arrested-campuses-universities-crack-e-rcna149705

[137] https://www.timesofisrael.com/dozens-arrested-at-nyu-as-anti-israel-encampments-sweep-across-us-campuses/

[138] https://www.ctinsider.com/news/article/new-haven-protests-yale-palestine-encampment-19430335.php

[139] https://www.ctinsider.com/news/article/new-haven-protests-yale-palestine-encampment-19430335.php

[140] https://www.fox19.com/2024/04/25/osu-joins-other-us-colleges-pro-palestine-encampment-demonstration/

236.    On the weekend of May 3, 2024, as other universities across the country enlisted the help of police to control or close down these encampments, MIT allowed the discriminatory encampments to worsen.

237.    The Associated Press posted a video on YouTube of some of the activities on MIT's campus from Saturday, May 4, 2024. Below are just some of what took place:

  a.    Protestors chanted, "From the River to the Sea, Palestine will be free! From the Sea to the River, Palestine will live forever. From the River to the Sea, Palestine is almost free!"[141]

  b.    "Up up with liberation! Down, down with occupation!"

  c.    There were also several chants in Arabic, some of which can be translated as follows[142]:

        i.    "From water to water, Palestine is Arab!"

        ii.    "Palestine is free, Israel out."

        iii.    "Palestine is free, the Zionists out."

        iv.    "We want to talk about the obvious, we don't want to see Zionists"

        v.    "Palestine is free, Zionism out!"

        vi.    "The iron gate of Al Aqsa, open for the martyr!"

        vii.    "From water to water, death to Zionism!"

238.    On May 6, 2024, the encampment continued on MIT's campus. According to a statement made by President Kornbluth, by midday, Student life informed the students at the

---

[141] https://www.youtube.com/watch?v=Fk8RTyHWkv8 at 1:11.
[142] https://www.youtube.com/watch?v=Fk8RTyHWkv8 after

encampment that if they did not leave by 2:30, they would face discipline.[143] But that did not happen.

239.    Instead, the organizers of the protest, including the co-conspirators described herein, put out calls on social media for others to join the encampment, and the encampment only got more out of control. At approximately 6:00 p.m., an individual jumped over the fencing surrounding the tents, causing a surge, and soon the area was breached.[144]

240.    By the evening of May 6, 2024, approximately 150 protesters remained at the encampment, and no arrests had been made.

241.    On May 7, 2024, Hillel was supposed to be hosting its Israel Day celebration just outside its building, where the encampment was instead. Hillel had obtained permission from the University to host the event on the Kresge lawn approximately three months prior to the event, but just before it was scheduled to take place, Hillel was informed that this was no longer possible because the encampment (which did not have permission to be on the Kresge lawn) was still there. The event had to be moved to another location on campus.

242.    On Wednesday, May 8, 2024, things only got worse for Jewish and Israeli students on campus. Protestors, again led in large part by the co-conspirators, physically blocked the entrance and exit to the Stata Center garage. They also took down Israeli and American flags that had been hung, and some are seen defacing and throwing them away on videos.

---

[143] https://orgchart.mit.edu/letters/update-encampment
[144] https://orgchart.mit.edu/letters/update-encampment

243.    On Thursday, May 9, 2024, protestors again blocked the entrance to the Stat garage, preventing MIT community members from entering and exiting, and further requiring that Vassar Street be shut down.[145]

244.    In spite of MIT's admission that the encampments violated MIT's policies from the very moment they began,[146] the encampment was permitted to continue until finally on May 10, 2024, MIT cleared the encampment on the Kresge lawn.[147]

245.    In its press release about clearing the encampments, MIT made clear that free speech was no obstacle to its ability to clear the encampments: "[W]hile freedom of expression protects the ability of community members to express their views about the current situation in the Middle East, it does not protect the continued use of a shared Institute resource in violation of long-established rules."[148]

246.    MIT students also know or, at minimum, have access to MIT's policies. MIT can and indeed has an obligation to enforce those rules and has deliberately chosen not to enforce them when Jewish students are impacted.

## XI.    MIT's Policies Concerning Harassment Have Been Unequally and Selectively Enforced Relating to Jewish Students as Compared to Other Minorities on Campus.

247.    MIT's enforcement of its policies described in Section II of this Complaint were applied in an arbitrary and capricious manner as to Plaintiffs.

---

[145] https://orgchart.mit.edu/letters/actions-encampment
[146] https://orgchart.mit.edu/letters/actions-encampment
[147] https://orgchart.mit.edu/letters/actions-encampment
[148]

248.    In failing to consistently apply its policies to protect Jewish students against hate speech and harassment and intimidation, MIT's actions constituted a substantial departure from academic norms and acceptable professional judgment.

249.    MIT's selective enforcement of its policies predates 2023. By way of example, in 2021 MIT canceled the speech of a prestigious geophysicist, Doran Abbott who had been a vocal critic of certain aspects of affirmative action and diversity programs.[149] Even though Abbott said that the lecture he planned to give at MIT would not have contained any discussions about his views on affirmative action or diversity programs, MIT canceled his speech.

250.    In defending the MIT's decision to cancel Mr. Abbott's lecture, Robert van der Hilst, the head of the department at MIT who canceled the lecture, stated, **"Besides freedom of speech, we have the freedom to pick the speaker who best fits our needs…Words matter and have consequences."[150]**

251.    Following this event, MIT modified its policy on Freedom of Expression, affirming its commitment to freedom of expression on campus.[151] But importantly, the statement also contained critical language which, for the protection of students and their ability to pursue their education at MIT, limits that freedom:

> MIT does not protect direct threats, harassment, plagiarism, or other speech that falls outside the boundaries of the First Amendment. **Moreover, the time, place, and manner of protected expression, including organized protests, may be restrained so as not to disrupt the essential activities of the Institute.**
>
> At the intersection of the ideal of free expression and MIT community values lies the expectation of an affirming, respectful learning and working environment. We

---

[149] https://www.nytimes.com/2021/10/20/us/dorian-abbot-mit.html
[150] https://www.nytimes.com/2021/10/20/us/dorian-abbot-mit.html
[151] https://facultygovernance.mit.edu/sites/default/files/reports/2022-09_Proposed_MIT_Statement_on_Freedom_of_Expression_and_Academic_Freedom.pdf

cannot prohibit speech that some experience as offensive or injurious. At the same time, MIT deeply values civility, mutual respect, and uninhibited, wide-open debate. Controversies over free expression are opportunities for learning rather than occasions for disciplinary action. This applies broadly. For example, when MIT leaders speak on matters of public interest, whether in their own voice or in the name of MIT, this should always be understood as being open to debate by the broader MIT community.

A commitment to free expression includes hearing and hosting speakers, including those whose views or opinions may not be shared by many members of the MIT community and may be harmful to some. **This commitment includes the freedom to criticize and peacefully protest speakers to whom one may object, but it does not extend to suppressing or restricting such speakers from expressing their views.** Debate and deliberation of controversial ideas are hallmarks of the Institute's educational and research missions and are essential to the pursuit of truth, knowledge, equity, and justice.[152]

252.    Although MIT modified its expression policy, MIT still retained the ability to impose restrictions on speech on its campus. Moreover, MIT maintained the provisions in its handbook which banned discriminatory and harassing behavior.

253.    MIT has the tools both under the law and through its own policies to stop the harassment of and discrimination against Jewish and Israeli students, but MIT has failed to use its authority to do this.

254.    In addition to its failures to take action as set forth above, MIT has, in contravention of its policies, selectively enforced its flag policies against Jewish and Israeli students, including Plaintiffs and SCLJ members. By way of example, a Belgian flag has been hanging from an office for approximately three years. However, MIT administrators required students flying Israeli flags to remove them and even threatened to send facilities staff over to remove flags if students would not do it themselves.

---

[152] https://facultygovernance.mit.edu/sites/default/files/reports/2022-09_Proposed_MIT_Statement_on_Freedom_of_Expression_and_Academic_Freedom.pdf (emphasis added).

255.     Specifically, Plaintiff Boukin and another Jewish doctoral student displayed Israeli flags on MIT's campus. One Jewish student also displayed a banner stating, "No excuse for terror." Following the October 7 terrorist attacks in Israel, these students were required to remove their flags and banners. At the same time such flag requirements were *not* applied to students or faculty flying Palestinian flags.

256.     MIT administrators have allowed Palestinian flags to remain on campus, while Jewish and Israeli students have been asked and/or forced to remove their Israeli flags:



257.     On November 8, 2023, MIT announced that large banners and flags were no longer permitted to be displayed. Further, the announcement stated that it is impermissible to disrupt living, working, and learning spaces at MIT.[153] These new policies were wholly inadequate to

---

[153]     https://orgchart.mit.edu/letters/campus-safety-and-policies-around-protests-postering-and-free-expression

address the hostile antisemitic campus environment because MIT refused to actually enforce these new policies against students, including MIT CAA, who engaged in antisemitic harassment or protests. As a result, the announcement of these new policies did nothing to deter MIT CAA and protesters from continuing to disrupt the educational experience of Jewish and Israeli students on campus.

258.    Near the end of the Fall term, President Kornbluth reached out to a group of faculty to serve as advisors on a committee aimed at structuring communication and conversations surrounding antisemitism on campus. Unfortunately, the Jewish and Israeli faculty members who were asked to serve on the committee did not feel that the communications were successful and subsequently resigned because they felt that the group was doing nothing to address antisemitism on campus.

259.    On February 12, 2024, MIT CAA, assisted by MIT faculty and staff members, held yet another unauthorized protest in Lobby 7, where students once again, in contravention of MIT policies, unfurled large flags, took over the lobby of the building, and chanted "From the River to the Sea, Palestine will be free!" This protest violated MIT's time place and manner restrictions, its rule that protests must be registered at least three days in advance, its policy that protests should not be disruptive, and MIT's policy on flags.[154]

260.    Unfortunately, even this failed to serve as a deterrent, and in response to ongoing antisemitism on campus, on February 26, 2024, a group of faculty members published a 32-page report, detailing several antisemitic events on MIT's campus, which is attached as Exhibit A to this Complaint.

---

[154] https://twitter.com/StopAntisemites/status/1757404628591739027

261.    On the week of Passover (April 18, 2024), protesters again swarmed campuses throughout the country, including MIT. If there was ever a question about whether MIT's response to previous incidents had sufficiently deterred additional antisemitic actions against Jews and Israelis on campus, these demonstrations unequivocally established that MIT has entirely failed to deter future actions.

262.    As a result of these protests, Jewish students at MIT had to move their Passover seder from the Hillel building to an off-campus location. Jewish students further had to beg the Institute to broadcast their classes online, as they did not feel safe attending classes on MIT's campus.

263.    MIT has had every opportunity to adhere in a non-discriminatory manner to its legal duty and the duty it assumed under its own policies to address and curb antisemitism on its campus, but it deliberately decided not to do so.

## XII.    MIT Has Gone to Great Lengths to Combat Discrimination for Other Minority Groups but Has Not Made the Same Effort for Jews and Israelis.

264.    MIT has the ability to take a more active role in combatting antisemitism and discrimination against Jews and Israelis on campus. Indeed, MIT has a history of taking actions for other minority groups that extend far beyond what it has done for Jews and Israelis.

265.    By way of example, after George Floyd was murdered by a Minneapolis police officer, the Institute (correctly) took all of the following steps:

          a.    MIT held a Community Vigil[155] on June 2, 2020, that lasted nearly an hour and a half. During this vigil, MIT's President, Rafael Reif, stated unequivocally that

---

[155] https://web.mit.edu/webcast/vigil/.

Black Lives Matter. He called for accountability of anyone who was involved in the killing of George Floyd and discussed the need to address systemic racism and for systemic reform. President Reif also called for MIT's DEI office to implement programs to ensure that systemic racism was addressed at the Institute.

    i. Other speakers at the vigil included the President of the Undergraduate Association, President of the Graduate Student Council, Associate Dean and Director of the MIT office of Minority Education, the Vice President of Human Resources, several graduate and undergraduate students, faculty members from a variety of departments, the Chief Diversity and Inclusion Officer for MIT Lincoln Laboratory, Communications Officer in the Office of Graduate Education

b. MIT's Student Mental Health and Counseling Services created a new workshop series, as well as a new discussion group for students of color who needed assistance processing racial microaggressions and healing from racial incidents.





266.     Numerous centers and departments within MIT made statements in solidarity with students of color, and yet have done nothing to support its Jewish and Israeli students in the wake of October 7, 2023, and unprecedented escalation of antisemitism on campus:

| Department Name | Response to George Floyd | Response to Hamas Attacks on Israel |
|---|---|---|
| Martin Trust Center for MIT Entrepreneurship | "Our wish is to inspire hope and be part of the solution, to bring people together in a sustainable fashion that has impact and is meaningful. It starts with empathy. To our Black students and community, we send a heartfelt message: We see you. We hear you. We will work with you to use our voice and platform for positive change…On June 11, the Trust Center held an online forum called "Now What?" and invited the community to discuss the sustained actions that the center can take to ensure racial equality. This is a first step and this page and statement will be updated as |   157 |

---

157 https://entrepreneurship.mit.edu/?s=antisemitism

| | more plans are put into action."[156] | |
|---|---|---|
| Department of Art, Culture, and Technology | "There is much work to do in the goal of eliminating racism in America. One important way to open past-due dialogues is through self-education via historic, sociological, and literary resources. As we end the week, members of the MIT community are encouraged to delve into free online offerings relating to Black studies and Black history — at MIT and elsewhere — by way of **MIT OpenCourseWare**, the **MIT Press**, and the **MIT Black History Project**, among others."[158] |  No results for antisemitism [159] |
| The Legatum Center | "The Legatum Center denounces the brutal violence and racial injustice that led to the killing of George Floyd in Minneapolis. … Today, we stand in solidarity with all people speaking |  [161] |

[156] https://entrepreneurship.mit.edu/trust-center-statement-on-george-floyd/#:~:text=It%20starts%20with%20empathy.,and%20platform%20for%20positive%20change.

[158] https://act.mit.edu/2020/06/mit-grieves-with-america-resources/

[159] https://act.mit.edu/?s=antisemitism

[161] https://legatum.mit.edu/?s=antisemitism&default_search_form=submitted

| | | |
|---|---|---|
| | against oppression and injustice. We need to break the cycles of complicity that enable injustice to take root in the United States and elsewhere in the world.<br>…<br>The fight for inclusivity and equality is personal as it is political."[160] | |
| MIT Admissions Office | "Of course, today is not a normal day, for MIT, for the country, or for the world. In addition to the ongoing pandemic, the death of George Floyd, at the knee of a Minneapolis police officer, has catalyzed protests there and around the country. Many people, including members of the dispersed MIT community, are struggling with strong feelings: of anger, of injustice, of despair, of solidarity."[162] | No statements after October 7, 2023:<br><br><br>[163] |

---

[160] https://legatum.mit.edu/statement-regarding-george-floyd-our-nation-and-our-community/
[162] https://mitadmissions.org/blogs/entry/a-letter-from-president-reif-regarding-george-floyd-and-minneapolis/
[163] https://mitadmissions.org/?s=antisemitism

267.    MIT also provides proactive discrimination training for many minorities on campus but, upon information and belief, does not provide any proactive training to students on antisemitism.

268.    By way of example, MIT's training called LGBTW+ 101: Education, Allyship and Self-Advocacy. During this training teaches that deadnaming someone (referring to the act of calling a transgender person by their birth name when they have changed their name as part of their gender transition) "is considered a violent act."



<sup></sup>164

---

269.    If deadnaming someone is considered a violent act, but calling for the destruction of the country of Israel and all the people who live there is not, MIT's logic requires some serious mental gymnastics. MIT recognizes the inherent violence of language in one context but, where Jewish and Israeli students are concerned, denies it.

270.    It is clear MIT's response to the unprecedented antisemitism on campus is drastically different to its insistence that discrimination not be tolerated in other circumstances.

271.    The disparate treatment of Jewish and Israeli students in comparison to the way MIT has sprung to action to protect virtually every other minority demonstrates MIT's deliberate disregard for the safety of Jewish and Israeli students and is further evidence that MIT's actions have been intentional.

272.    The disparity has not gone unnoticed, and it violates MIT's own policies, as well as its legal obligations, as set forth in the Causes of Action herein.

## XIII.   President Biden's Remarks Reiterate that MIT is Violating the Law in Allowing Jewish and Israeli Students to Be Discriminated Against on Campus.

273.    On May 2, 2024, President Biden spoke from the White House on recent events at college campuses. He stated, in no uncertain terms, that there is no place for antisemitism on college campuses, but more importantly, that protests that intimidate others are not peaceful or lawful:

> So, let me be clear.  Peaceful protest in America — violent protest is not protected; peaceful protest is.  It's against the law when violence occurs.
>
> Destroying property is not a peaceful protest.  It's against the law.
>
> Vandalism, trespassing, breaking windows, shutting down campuses, forcing the cancellation of classes and graduations — none of this is a peaceful protest.

Threatening people, intimidating people, instilling fear in people is not peaceful protest.                It's                against                the                law.

Dissent is essential to democracy.  But dissent must never lead to disorder or to denying the rights of others so students can finish the semester and their college education.

Look, it's basically a matter of fairness.  It's a matter of what's right.  There's the right to protest        but        not        the        right        to        cause        chaos.

People have the right to get an education, the right to get a degree, the right to walk across the        campus        safely        without        fear        of        being        attacked.

But let's be clear about this as well.  There should be no place on any campus, no place in America for antisemitism or threats of violence against Jewish students.  There is no place for hate speech or violence of any kind, whether it's antisemitism, Islamophobia, or discrimination        against        Arab        Americans        or        Palestinian        Americans.

It's simply wrong.  There is no place for racism in America.  It's all wrong.  It's un-American.

I understand people have strong feelings and deep convictions.  In America, we respect the right and protect the right for them to express that.  But it doesn't mean anything goes.  It needs to be done without violence, without destruction, without hate, and within the law.[165]

## XIV.  **MIT's Failure to Enforce its Anti-Discrimination Policies and Keep its Promises to Protect its Students Affects All Students.**

274.    MIT's failure to enforce and/or selective enforcement of its own anti-discrimination and anti-harassment policies does not just impact Jewish and Israeli students.

275.    Rather, by allowing antisemitism to flourish on campus, MIT has created a hostile environment where incidents of violence and harassment are prevalent.  MIT has thus rendered the campus unsafe for all students and disrupted the ability of all students to learn and participate in campus activities and programs in the ways they were promised when they enrolled at MIT.

---

[165] https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/05/02/remarks-by-president-biden-on-recent-events-on-college-campuses/

276.     Moreover, non-Jewish students can and have been targeted for violence and harassment based on the assumption that they are Jewish.  A survey conducted across several universities by the ADL concluded: "Slightly less than one in five (18.8%) non-Jewish students reported having personally experienced an antisemitic incident. Of the non-Jewish students erroneously assumed to be Jewish, nearly half (47%) stated that they had been targeted based on their assumed Jewishness."

277.     And to repeat, the impact of antisemitism on campus is not limited to those directly targeted by antisemitic harassment or violence. As the ADL found: "The consequences of antisemitic victimization on campus were widespread for both Jewish and non-Jewish students. Jewish and non-Jewish students alike reported suffering serious negative effects as a result of experiencing/witnessing incidents, highlighting the damaging effects of campus antisemitism on overall health and the social, academic, and professional lives of student victims."

278.     Accordingly, all of MIT's students, both Jewish and non-Jewish (Israeli and non-Israeli), are victims of MIT's failure to uphold its policies and curb hateful antisemitic (and antizionist) rhetoric.

### XV.     The Students and Others Who Participated in the Protests, Demonstrations, and Encampments Violated 42 U.S.C. § 1985 (the Ku Klux Klan Act).

#### a.   The Conspiracy Acts.

279.     Plaintiffs have not sued the co-conspirators but are setting forth the conspiracy and its particulars as the basis for the claim against MIT brought pursuant to 42 U.S.C. § 1986, which requires an underlying violation of 42 U.S.C. § 1985 for purposes of the KKK Act.

280.     As detailed above, the co-conspirators had an agreement and understanding to engage in, promote, and incite racial, religious, and ethnicity-based harassment and violence.

281.    The protests, demonstrations, and encampments detailed herein were motivated by a specific class-based, invidiously discriminatory animus, specifically at Jewish and Israeli members of the MIT community.

282.    They did this in order to (a) injure Jewish and Israeli members of the campus community by denying them the equal privileges and immunities of citizenship, and the use, benefits, and privileges of property and/or contractual relationships and (b) further Defendant's cause of recruiting new followers to engage in racial, religious, and ethnically-motivated violence references above both on campus, at the encampments, and in the future.

283.    The co-conspirators, on behalf of themselves or the organizations for which they are agents or officers, planned and coordinated the rallies and protests discussed herein, encouraged attendance, actively organized followers to attend, coordinated logistical support to attendees, promoted the rallies and encampments and encouraged attendees to prepare for and commit discriminatory and harassing acts while concealing their identities.

284.    These co-conspirators have committed numerous overt acts in furtherance of the conspiracy to violate Plaintiffs', as well as Jews' and Israelis' rights to the equal protection of the laws and their rights to the equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, because of their race, nationality, and religion.

285.    The co-conspirators have sought to create an atmosphere of violence against Plaintiffs, and to violate Plaintiffs' equal rights, including those under Title VI and Title VII of the Civil Rights Act, as well as 42 U.S.C. § 1981 and 1982, Thirteenth and Fourteenth Amendment rights to be free from racial violence to the full and equal benefit of the laws and proceedings for

the security of persons, and their right to freely use their houses of worship, including Hillel on campus.

286.    The co-conspirators and organizers (some of whom remain unknown) of these protests plotted, coordinated, and executed a common plan to engage in harassment, discrimination, and intimidation at MIT.

287.    Co-conspirators, repeatedly engaged in campaigns of intimidation, threats, and violence throughout MIT's campus.

### b.  The Co-conspirators.

288.    The coconspirators are comprised of MIT student groups, each of which, together and separately, conspired to organize events, rallies, and protests which were antisemitic and threatening and which created a hostile and discriminatory environment for Jewish and Israeli students at MIT:







289.     This meeting of the minds is evident in the close collaboration among the groups, their overlapping members (of which there are many), and their co-sponsorship of the events at issue in this Complaint. The co-conspirators consist of individual student groups with overlapping members, as well as "collectives" and "coalitions" comprised of varying assortments of coconspirator student groups. By way of example, the Graduate Student Union (GSU) is a student group at MIT and it has overlapping membership with, on information and belief, Palestine@MIT, while the Students Against Genocide Encampment (SAGE) is styled as a "collective" in which student groups such as GSU and Palestine@MIT, as well as their individual members and individuals who are not members, may participate.

290.     As a result of these conspiratorial acts, Plaintiffs, along with other Jews and Israelis on campus were deprived of their constitutional rights, including the right to earn an education and

---

[168] https://www.instagram.com/p/C0axsFzuDE8/

a living pursuant to 42 U.S.C. § 1981, and were subjected to racial and other class-based invidious discrimination.

### i. *Coalition Against Apartheid*

291.    CAA has worked closely and in coordination with the other co-conspirators or organize events on MIT's campus that created an openly hostile environment for Jewish and Israeli students on campus. Many of these events were held without permission of MIT, and yet MIT chose to allow them to continue.

292.    CAA often posts on behalf of or with other student organizations on its Instagram page, including on behalf of MIT Coalition 4 Palestine.

293.    CAA has been one of the ringleaders in nearly every protest and rally on MIT's campus since October 7th, including from the very beginning:

294.    One of CAA's co-presidents can be heard at a rally held on October 12, 2023, calling for action against Jewish and Israeli students. His statements included, "Sally Kornbluth is new to MIT. She doesn't know how we operate here, and we won't [back] down!"[169]

295.    CAA also played a major role in the November 9 Lobby 7 protests.

296.    Upon information and belief, some of CAA's members were among the students who benefitted from MIT's decision not to suspend students from other countries whose visas could be compromised by an academic suspension.

297.    Moreover, during the Lobby 7 protests, CAA members, including one of its co-presidents, prevented Plaintiff Boukin from entering the area because she was Jewish, even though other students, staff, and faculty were permitted to cross and/or enter the area.

---

[169] https://x.com/GrantSmithEllis/status/1723817521231397345

298.    On November 10, 2023, CAA and MIT Black Graduate Student Association jointly posted a video on Instagram where they promised that they would "not be silenced." They said that they would come back "bigger and stronger" and signed off with, "Until Apartheid falls."



299.    These protests attracted large numbers of students and made it difficult to access classes and the building generally, thus interfering with Plaintiffs' rights to be free from harassment, intimidation, and racial violence in the pursuit of their education and right to earn a living.

---

[170] https://www.instagram.com/p/CzesqnXuef2/

300.    CAA, along with National Students for Justice in Palestine, was one of the primary organizers of the encampment on MIT's campus:



---



301.    During the encampment that took place in April 2024, Plaintiff Boukin attempted to enter the encampment, a public area on campus, and one of CAA's co-presidents prevented Plaintiff Boukin from entering. In a video recording of the encounter, the CAA co-president can be heard stating that the encampment is not a public area, though other students and professors were permitted inside and though Plaintiff Boukin was an MIT student with a right to access common spaces at MIT. Only Jewish students like Plaintiff Boukin were denied entry.

302.    Although CAA was provisionally suspended by MIT on or around November 2023, the group and its organizers repeatedly called for violence against Jews and Israelis and organized protests, which violated MIT's policies and which made MIT a hostile and discriminatory environment for Jewish and Israeli students on campus.

---

[172] https://www.instagram.com/p/C6C2kT3ObA5/?img_index=8

303.   This was also accomplished by hosting many of the academic events described herein, where Israel and Zionists (i.e., Jews) were described as genocidal, apartheidists, murderers, and were given other discriminatory and hateful labels.

304.   Even though CAA was provisionally suspended, its members are also members of several other co-conspirator groups and thus remained active on campus.

305.   Indeed, in April, CAA, in concert with other Coconspirators, organized a walkout of classes:



306.   CAA's activities did not stop with speech, however. CAA, as described herein, has openly called for violence against Jews and Israelis.

---

173 https://www.instagram.com/p/C57TO73Oal5/

307.    These events, especially when compounded, created an environment at MIT which allowed antisemitic rhetoric and behavior flourish on MIT's campus with MIT's blessing.

### ii. Palestine@MIT

308.    Palestine@MIT has worked closely and in coordination with the other co-conspirators or organize events on MIT's campus that created an openly hostile environment for Jewish and Israeli students on campus. Many of these events were held without permission of MIT, and yet MIT chose to allow them to continue.

309.    These events, especially when compounded, created an environment at MIT which allowed antisemitic rhetoric and behavior flourish on MIT's campus with MIT's blessing.

310.    Upon information and belief, there are several overlapping officers and members of Palestine@MIT and CAA.

311.    Palestine@MIT and CAA jointly hosted events and made joint statements which were openly discriminatory, hostile, and called for violence against Jewish and Israelis at MIT:





### iii.   *Scientists against Genocide (SAGE)*

---

[174] https://www.instagram.com/p/CyJ0qtFpwdY/?img_index=1
[175] https://www.instagram.com/p/CygjRM8Jyab/?img_index=1

312.     Scientists against Genocide (SAGE) has worked closely and in coordination with the other co-conspirators or organize events on MIT's campus that created an openly hostile environment for Jewish and Israeli students on campus and specifically the encampment that began on the week of the Jewish holiday, Passover. The encampment was set up without permission from MIT, and yet MIT allowed it to continue for weeks, despite the fact that MIT expressly stated the encampments violated university policy.

313.     SAGE is the group responsible for organizing the encampment on MIT's campus and excluding Jewish and Israeli students from accessing the common space the encampment occupied, which is described in detail in this Complaint.

314.     Upon information and belief, SAGE is not an approved MIT student group and was instead formed by several of the leaders of the other co-conspirators as a mechanism for running the encampment. Nonetheless, SAGE holds itself out as an official organization and maintains a URL and a developed website at https://mitsage.my.canva.site/.

315.     The group's website contains a logo that says, "MIT Coalition for Palestine" and states toward the top of the page, "We are the MIT Scientists Against Genocide activists, a broad collective of student organizations…"[176]

316.     The statement at the top of the group's website, posted after the dismantling of the encampment concludes with, "We will not stop, we will not rest. MIT: disclose, divest." Make no mistake, the protestors have no intention of stopping, and the time to act has long since passed. Antisemitism remains alive and well at MIT, even without the encampment, just as it existed in the weeks and months leading up to it.

---

[176] https://mitsage.my.canva.site/

317.    It did not take long for the rhetoric and calls to action at the encampment to turn violent. As detailed above, footage from the encampments captured students calling for the following on May 4, 2024:

    a.  Protestors chanted, "From the River to the Sea, Palestine will be free! From the Sea to the River, Palestine will live forever. From the River to the Sea, Palestine is almost free!"[177]

    b.  "Up up with liberation! Down, down with occupation!"

    c.  There were also several chants in Arabic, some of which can be translated as follows[178]:

        i.   "From water to water, Palestine is Arab!"

        ii.  "Palestine is free, Israel out."

        iii. "Palestine is free, the Zionists out."

        iv.  "We want to talk about the obvious, we don't want to see Zionists"

        v.   "Palestine is free, Zionism out!"

        vi.  "The iron gate of Al Aqsa, open for the martyr!"

        vii. "From water to water, death to Zionism!"

318.    This encampment resulted in the prevention of Jewish students from entering public locations on campus, the forced relocation of Hillel's Israel Day event which had long been scheduled to take place in the common space later occupied by the encampment, as well as intimidation, harassment, and discrimination toward Jewish and Israeli students on campus.

---

[177] https://www.youtube.com/watch?v=Fk8RTyHWkv8 at 1:11.
[178] https://www.youtube.com/watch?v=Fk8RTyHWkv8

319.    These events, especially when compounded, created an environment at MIT which allowed antisemitic rhetoric and behavior flourish on MIT's campus with MIT's blessing.

### iv.    Graduate Student Union ("GSU") and the Black Graduate Student Association ("BGSA")

320.    The Graduate Student Union ("GSU") and Black Graduate Student Association ("BGSA") worked in conjunction with each other and other co-conspirators including but not limited to MIT CAA and Palestine@MIT with the invidiously discriminatory purpose of depriving Jewish and Israeli students of their rights to be free from racial harassment, intimidation, and violence; to freely worship; to engage with educational services for which they had contracted; and to earn a living.

321.    After October 7, 2023 GSU and BGSA, together and in coordination with other co-conspirators, planned, coordinated, co-sponsored, and participated in events that created an atmosphere of violence, harassment, and intimidation against Jewish and Israeli MIT students, including Plaintiffs.

322.    In an interview with *Black Agenda Report*, one of the members of both the Graduate Student Union and the Black Graduate Student Union stated that the group has worked closely with the other co-conspirators "to support the Palestine solidarity organizing happening on campus and in the area…and supported the Coalition Against Apartheid on building the organizing infrastructure within the grad population here- always while tying a deep connection between Palestinian liberation and Black/African liberation."[179]

---

[179] https://www.blackagendareport.com/black-liberation-and-anti-imperialism-interview-austin-cole

323.    This infrastructure included, co-sponsoring events with GSU, BGSA, and CAA that fostered an environment of antisemitic harassment, intimidation, and violence; physical occupation of common spaces at MIT to the physical exclusion of Jewish and Israeli students; and the adoption of inherently violent, antisemitic rhetoric, including a "pledge" to oppose the existence of Israel until it "falls." For example:



324.    These events, especially when compounded, created an environment at MIT which allowed antisemitic rhetoric and behavior flourish on MIT's campus with MIT's blessing.

325.    In planning, coordinating, and cosponsoring events with each other, and CAA, GSU and BGSA have, on information and belief, also coordinated and sought aid from outside, national organizations including Students for Justice in Palestine (nationalsjp),[181] for example, when establishing the Scientists Against Genocide Encampment (SAGE).

_____

[180] https://www.instagram.com/p/C0fD5IMOm-T/?img_index=1
[181] https://www.instagram.com/p/C6C2kT3ObA5/?img_index=9



182

326.    SGU and BGSA were heavily involved in the Scientists Against Genocide Encampment and coordinated with each other and other coconspirators to expand and grow the encampment, and with it, the extent of antisemitic harassment and violence directed toward Jewish and Israeli students at MIT.

---

[182] https://www.instagram.com/p/C6C2kT3ObA5/?img_index=9



327.    GSU members that planned, participated in, and organized rallies and protests, involving antisemitic harassment and intimidation were members of both GSU and other coconspirator organizations including CAA and Palestine@MIT.

328.    GSU encouraged members of MIT's student body and the public to participate in events that it planned and coordinated along with coconspirators at which antisemitic harassment took place.

329.    GSU collaborated with CAA and other coconspirators, as well as National Students for Justice in Palestine, to pass referenda which called for the Boycott, Divestment, and Sanctioning (BDS) of Israel and calling Israel genocidal in spite of the fact that the International Court of Justice refused to make such a finding:

---

[183] *Id.*



184



---

330.    MIT BGSA together with coconspirator MIT CAA violated the rights of MIT's Jewish and Israeli students to be free from racial violence and intimidation, contracts with MIT, education, and right to earn a living throughout the 2023–2024 school year and threatened that they would continue to interfere with these rights in the subsequent semesters. Specifically, MIT BGSA and MIT CAA promised there would continue to be "no business as usual" on MIT's campus:



###### v. *The Coconspirators Acted with the Intent to Deprive Plaintiffs, as well as other Jewish and Israeli Students, of Their Civil Rights*

331.    The coconspirators have committed numerous overt acts in furtherance of the conspiracy to violate Plaintiffs' rights, which are set forth in the paragraphs above. The coconspirators have sought to create an atmosphere of violence against Plaintiffs, and to violate

---

[185] https://www.instagram.com/p/C00ZfWguyxz/?img_index=1

Plaintiffs' equal rights, including those under Title VI and Title VII of the Civil Rights Act, as well as 42 U.S.C. § 1981 and 1982, Thirteenth and Fourteenth Amendment rights to be free from racial violence to the full and equal benefit of the laws and proceedings for the security of persons, and their right to freely use their houses of worship, including Hillel on campus.

332.    Co-conspirators whose identities are not known committed numerous additional acts in furtherance of the conspiracy to violate Plaintiffs' rights, including those alleged herein.

333.    The illegal activities described were undertaken by the coconspirators, their agents, and co-conspirators as express overt acts pursuant to an unlawful conspiracy, the purpose of which was and is to discriminatorily deprive Jews and Israelis of their rights to the equal protection of the laws and their rights to the equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, because of their race, nationality, and religion.

334.    Specifically, Jewish and Israeli students (and specifically Plaintiffs) have endured chants that are overtly antisemitic, been subjected to walkouts, been doxed, been kicked out of study groups, been prevented from entering public areas of campus while other students were allowed in and were repeatedly ignored by MIT when these concerns were raised.

335.    Plaintiffs, some of whom are members of Hillel, were also prevented from using Hillel for events that would otherwise be held there (including a Passover seder) as a result of the protests and encampments. This treatment all occurred because these students were Jewish and/or Israeli and constitutes discrimination.

336.    Jews and Israelis are a protected class for purposes of the KKK Act.

337.    The organizers of these rallies, demonstrations, and encampments were engaged in a conspiracy not just to demonstrate to help Gaza, but also to engage in racially and ethnically motivated violence against Jews and Israelis.

338.    As a result of the acts set out in the above paragraphs committed in furtherance of this conspiracy, Plaintiffs suffered injuries to their person or property and/or suffered the discriminatory deprivation of one or more of their rights or privileges guaranteed by the Constitution or laws because of one or more of the illegal overt acts of Defendants and their agents. These rights include but are not limited to their rights to be free of the badges and incidents of slavery pursuant to the Thirteenth Amendment, including the rights to be free from racially and/or religiously motivated violence and the right to move through and enjoy public spaces, their rights to the full and equal benefit of the laws and proceedings for the security of persons, and their right to freely use their houses of worship.

339.    Because of the coconspirators' violation of Plaintiffs' rights, Plaintiffs have suffered numerous and various injuries, including injuries to property, lost income, and severe emotional distress.

340.    The protests, demonstrations, and encampments were motivated by a specific class-based, invidiously discriminatory animus, specifically at Jewish and Israeli members of the MIT community.

341.    The organizers of these protests plotted, coordinated, and executed a common plan to engage in violence and intimidation at MIT.

342.    In furtherance of a conspiracy to violate the rights of Plaintiffs and other Jewish and Israeli members of campus and their supporters, the organizers of these protests, in concert

with the leaders of student groups like and including CAA and SAGE, repeatedly engaged in campaigns of intimidation, threats, and violence throughout MIT's campus.

**a. MIT Had the Power to Prevent Violations of The KKK Act but Neglected or Refused to Do So.**

343.    Over and over and over again, Plaintiffs and other Jewish and Israeli students begged and pleaded with MIT to take action. They reported incidents and begged for protection, but MIT expressly declined to help and instead placed the burden on Jewish and Israeli students to keep themselves safe and avoid these unlawful and discriminatory events.

344.    Though MIT had power to intervene and prevent violations of Plaintiffs' civil rights, including the rights to be free from racial harassment and violence and the right to pursue the education for which they had contracted, MIT refused to exercise this power and declined to adequately address the ever-worsening antisemitism on its campus.

345.    MIT made express statements that it would not take steps to stop antisemitic harassment, intimidation, and harassment by the coconspirator groups even though it acknowledged their conduct violated MIT policies. These statements emboldened those attendees the rallies at the encampment and resulted in attendees preventing Jewish students from entering and made the entire campus environment hostile for Plaintiffs and other Jewish and Israeli students on campus such that Plaintiffs, especially Plaintiff Boukin, felt that she had to take responsibility for her own safety because MIT would not.

346.    Plaintiff Boukin was asked by her advisor why she did not just avoid the encampment and why she could not simply walk somewhere else on campus. Rather than keeping Jewish and Israeli students safe, Plaintiff Boukin was instead asked to accommodate those

harassing, intimidating, and discriminating against her, and importantly, preventing her from entering spaces on campus that she was entitled to use as a student.

347.    SCLJ Member #2 was also forced to relocate an event that was supposed to be scheduled at the site of the encampment because MIT refused to honor its agreement to allow Hillel to use the space and to make the space free from discrimination, harassment, and intimidation.

348.    SCLJ Member #2 was forced to avoid the encampment in order to feel safe in classes and further avoided other areas on campus where protestors and members of coconspirator groups rallied.

349.    SCLJ Member #3 was forced to avoid classes and exams in person due to the threats and hostility on campus. SCLJ Member #3 was deprived of her right to both access campus, live peacefully in her dorm room, and of her ability to use her place of worship.

## XVI.    **Plaintiffs' Damages.**

350.    Plaintiffs and the SCLJ Members are, or were at all relevant times, enrolled as students at MIT, and are, or were, damaged, *for example*, by the loss of the college experience for which they were obligated to pay, as well as the harm they endured, and the damages incurred as the result of the necessary actions taken by them in order to avoid the harmful environment created by MIT, including its culpable inaction.

351.    Plaintiffs and SCLJ Members all personally experienced pervasive and objectively offensive harassment by the co-conspirators, school peers, faculty members, staff members, and/or administration at MIT on the basis of their Jewish and/or Israeli identities consisting of antisemitic harassment, prejudice, and abuse which deprived Plaintiffs and SCLJ Members of educational

opportunities or benefits, including but not limited to the use of school facilities and academic buildings, participation in student groups, full participation in academic offerings such as study groups or in-person classes. Plaintiffs also did not receive the benefit of equal application of MIT policies, in that MIT chose not to enforce nondiscrimination and harassment policies to protect Jewish students and selectively enforced other policies against Jewish and Israeli students but not against other students.

352.   All Plaintiffs and SCLJ Members have MIT-issued email addresses and participated in various MIT student groups. Following the October 7 terrorist attacks, MIT student groups, including but not limited to MIT CAA and Palestine@MIT, used the MIT email system to send mass emails to all MIT students who were members of student groups.[186] These emails included antisemitic and anti-Israel rhetoric which, among other things, challenged core elements of Plaintiffs' and SCLJ Members' identities. MIT and its administration knew or should have known, not only that the emails existed and were widely distributed throughout the MIT student body, including to Plaintiffs and SCLJ Members, but also that such content violated MIT's nondiscrimination and harassment policies. MIT's decision to allow its email system to be used to facilitate these communications, which were sent to Plaintiffs and SCLJ Members, in addition to the wider MIT community, was clearly unreasonable.

353.   MIT students and MIT student groups engaged in rallies and protests on MIT's campus in which antisemitic and anti-Israel rhetoric was used and calls for violence against Jewish people, Israelis, or the state of Israel were made. These events were held in common areas on

---

[186]MIT provides all student groups, regardless of funding status, with the privilege of using MIT's name as well as the ability to use MIT's email system to communicate with the entire MIT community at their official MIT email addresses. *See* https://asa.mit.edu/group-privileges/compare-privileges

MIT's campus in which Plaintiffs and SCLJ Members often had to pass through in order to attend class or student activities, and, in doing so, were subjected to antisemitic rhetoric and calls for violence or, alternatively, prevented from passing through spaces by protesters. MIT had actual knowledge of these protests and rallies, but did not take action to enforce time, place, and manner restrictions to ensure that students could comfortably and safely attend class without being subjected to hateful language, assaults, or calls for violence. Nor in most of these instances did MIT discipline students for MIT organizations for the MIT policy violations related to these protests. These deliberate decisions on the part of MIT and its administration are clearly unreasonable and evince deliberate indifference to the experiences of Jewish and Israeli students at MIT confronted with antisemitism. All Plaintiffs and SCLJ Members were subjected to antisemitic rhetoric at protests and rallies on MIT's campus.

354.    Plaintiff Meyers met with IDHR regarding antisemitism she experienced at MIT before and after October 7, 2023. After the October 7, 2023, Plaintiff Meyers was the recipient of antisemitic comments by other students on campus and contacted the IDHR again. She was falsely told that she was not a member of a protected class and, subsequently, that what she experienced is not within the scope of the IDHR. MIT and its administration knew or should have known that Jewish and Israeli students are members of a protected class under both MIT policies and Title VI of the Civil Rights Act. Because of the antisemitism that was allowed to persist on MIT's campus, plaintiff Meyers skipped several classes that she was not comfortable attending. Plaintiff Meyers also avoided going to the lounge for students with her major, because students made it too uncomfortable for her to be there. Plaintiff Meyers continues to avoid other events for students in her major because she has been socially isolated and shunned by approximately half of her peers.

This antisemitism that has been allowed to persist by MIT has kept Plaintiff Meyers from fully participating in both academic and social events.

355.    Plaintiff Boukin was subjected to antisemitic chants and violent speech at the MIT Lobby 7 protest and was prohibited from freely moving through the space. Plaintiff Boukin was similarly subjected to hateful and antisemitic rhetoric during various other protests and rallies on MIT's campus since the October 7, 2023 terrorist attacks. At one point, Plaintiff Boukin and other students were surrounded by MIT CAA members and other students shouting, "from the river to the sea.," which Plaintiff Boukin understood to be calling for the elimination of Israel. For Plaintiff Boukin, this was reminiscent of other periods in history, including Kristallnacht. Plaintiff Boukin was the recipient of emails on her official MIT-issued email address from student groups that contained antisemitic language.

356.    SCLJ Member #1 received antisemitic emails on his MIT-issued email address from various student groups at MIT, including but not limited to MIT CAA and Palestine@MIT. SCLJ Member #1 was also subjected to antisemitic rhetoric in various common spaces on MIT's campus, which were the sites of rallies or protests, including unsanctioned ones, and which involved antisemitic and sometimes violent language to describe Jewish or Israeli people.

357.    SCLJ Member #2 is a member of Hillel and was subjected to antisemitism when a man urinated on Hillel's building after being provoked at an event led by CAA and other groups. He was also involved with the planning of the Israel Day celebration that was supposed to take place on the Kresge lawn, but which had to be moved across campus. SCLJ Member #2 was also subjected to antisemitic rhetoric in various common spaces on MIT's campus, which were the sites of rallies and protests, including unsanctioned ones, and which involved antisemitic and sometimes violent language to describe Jewish or Israeli people. Further, SCLJ Member #2 was approached

by members of the CAA in Lobby 10, while they were tabling (against university policy) after the group had been provisionally suspended. The CAA members singled out SCLJ Member #2 because he was visibly Jewish and heckled him as he walked by.

358.    SCLJ Member #3 is a Jewish and Israeli undergraduate student at MIT and resides in Boston, Massachusetts. SCLJ Member #3 began to experience harassment and antisemitism at MIT almost immediately following October 7th, 2023.

359.    SCLJ Member #3 was a member of a living community on campus, where the whole dorm held a meeting about how they could show support for the CAA after the club had been suspended. SCLJ's colleagues and dormmates knew that SCLJ Member #3 is Jewish and Israeli and shunned her based on this. Many times, when she would walk into a room, the room would go silent. SCLJ Member #3 conveyed her concerns about the dorm taking a stance on the issue to her head of house who, rather than validating her concerns, wished to "let democracy run its course."

360.    By the end of the school year, SCLJ Member #3 had been made by her peers to feel so uncomfortable that she was forced to relocate to the kosher living community and now only socializes with a small group of mostly Jewish and/or Israeli students.

361.    In addition to being forced to move out of her dorm, SCLJ Member #3 also felt so uncomfortable going to classes that during the Lobby 7 protests, she avoided going to her classes.

362.    During the encampments, SCLJ Member #3 was so afraid to go to class that she moved home for a week and was forced to take one of her final exams online. SCLJ Member #3 also went to her family's home off campus nearly every weekend after October 7th, because living on campus was so uncomfortable. She could not study anywhere on campus without hearing chants about Israeli genocide or people calling for the destruction of Israel and posters with similar

messages. It was impossible to concentrate, and studying for classes and exams became exceedingly difficult.

363.    SCLJ Member #3 reported the harassment and discriminatory behavior to several professors, her head of house, her advisor, and to student services, among others.

364.    Finally, SCLJ Member #3 is an active member of Hillel and regularly attended events at Hillel but also avoided going during the protests and the encampment, because she feared that she would not be safe there. In other words, she was prevented from entering and using her place of worship due to the harassment and intimidation by the protests on campus, which MIT failed to prevent or stop.

365.    Other Jewish and Israeli students at MIT have had similar experiences. Another Jewish student personally witnessed calls for violence against Jewish people and Israelis on MIT's campus and in particular at an MIT CAA protest in Lobby 7, which this Jewish student had to pass through in order to attend class. Subsequently, this student stopped attending classes in-person and delayed taking their qualifying examinations until a later date. This Jewish student is a participant in various student groups on MIT's campus, but the other participants in these student groups have endorsed antisemitic and anti-Israel views such that that Jewish student no longer feels welcome. Another Jewish student felt unwelcome to the point of needing to leave her qualifying exam study group after group members told her that the victims of the October 7, 2023 Nova music festival massacre in Israel deserved to die and was forced to remove an Israeli flag and a banner that stated "No excuse for terror" while non-Israeli flags and banners remained up around campus. Multiple Jewish and Israeli students reported the antisemitic harassment they experienced to MIT's administration.

## **CLASS ACTION ALLEGATIONS**

366.    With respect to Count V, Plaintiffs Boukin and Meyers bring this case themselves and, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of the class defined as:

>     All Jewish and/or Israeli students enrolled at MIT after October 7, 2023, who did not participate in the pro-Palestine protests described above (the "Class").

367.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

368.    Plaintiffs Boukin and Meyers reserve the right to modify or amend the definition of the proposed Classes if necessary before this Court determines whether certification is appropriate.

369.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 and other statutes and case law regarding class action litigation.

370.    The Class is so numerous that joinder of all members is impracticable. Although the precise number of Class members is unknown to Plaintiffs, MIT reportedly has a total of more than 4,000 undergraduate and more than 7,000 graduate students were enrolled during the Fall of

2023, with at least a majority of students not participating in the pro-Palestine protests described above.

371.    The names and addresses of all MIT students are known to Defendant and can be identified through MIT's records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

372.    The questions here are ones of common or general interest such that there is a well-defined community of interest among the class members. These questions predominate over questions that may affect only individual members of the classes because Defendant has acted on grounds generally applicable to the classes. Such common legal or factual questions include, but are not limited to:

> a.    Whether Defendant promised to provide Plaintiffs Boukin and Meyers and the Class members with a safe learning environment and to uphold its promises and policies related to free speech, antidiscrimination, harassment, and intimidation, including as reflected in MIT's student handbooks, university bulletins, regulations, codes, policies, and procedures.
>
> b.    Whether Defendant breached their contracts with Plaintiffs Boukin and Meyers and the members of the Class by failing to uphold their promises and policies, including as reflected in MIT's student handbooks, university bulletins, regulations, codes, policies, and procedures, and selectively enforcing such promises and policies;
>
> c.    Whether Defendant's actions created a hostile and unsafe environment for Jewish and/or Israeli students.

373.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs Boukin and Meyers and the members of the Class were deprived of a safe and non-discriminatory learning environment as a result of Defendant's uniform wrongful conduct.

374.    Plaintiffs Boukin and Meyers are more than adequate class representatives. In particular: a) Plaintiffs Boukin and Meyers are committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class action litigation; b) Because their interests do not conflict with the interests of the other Class members who she seeks to represent; c) no difficulty is anticipated in the management of this litigation as a class action; and d) Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

375.    Class members' interests will be fairly and adequately protected by Plaintiffs Boukin and Meyers and their counsel.

376.    This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply and affect members of the Class uniformly and Plaintiffs Boukin and Meyers' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or laws applicable only to Plaintiffs. Plaintiffs Boukin and Meyers and the members of the Class have suffered harms as a result of Defendant's unlawful and wrongful conduct.

377.    This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. A class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

## CLAIMS FOR RELIEF

### Count I
### (Title VI of the Civil Rights Act of 1964)
### (By All Plaintiffs Individually Against Defendant)

378.    Plaintiffs and SCLJ Members repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

379.    MIT receives financial assistance from DOE and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

380.    Discrimination against Jews—including based on actual and/or perceived identity of being Jewish, including as having a shared ancestry, race, ethnic characteristics, and/or national origin—is prohibited under Title VI, including in the written policies of OCR.

381.    Plaintiffs in this Count I, or their members, identify as Jewish and/or Israeli, and their status and identification as being Jewish and/or Israeli brings them within the scope of Title VI's protections.

382.    The acts and omissions of MIT and its administrators have subjected the Plaintiffs in this Count I, or their members, to discrimination on the basis of their actual and/or perceived identity as being Jewish and/or Israeli, including as having a shared ancestry, race, ethnic characteristics, and/or national origin.

383.    MIT and its administrators had actual notice that discrimination and harassment, over which MIT had substantial control and the authority to remediate, was so severe, pervasive, and objectively offensive that it created a hostile environment based on actual and/or perceived identity of being Jewish and/or Israeli that deprived the Plaintiffs in this Count I, or their members, of full access to MIT's educational programs, activities, and opportunities.

384.    MIT and its administrators have intentionally discriminated against Plaintiffs in this Count I, or their members, because of their actual and/or perceived identity of being Jewish and/or Israeli, as exhibited by MIT's deliberate indifference to the antisemitic abuse, harassment, and intimidation of such Plaintiffs, or their members, in violation of Title VI. Specifically, MIT and its administrators' response to the antisemitic abuse, harassment, and intimidation of Plaintiffs, or their members, was clearly unreasonable in that they failed to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against such Plaintiffs, or their members, and the hostile environment that Jewish and/or Israeli students, including such Plaintiffs, or their members, are forced to endure at MIT because of their actual and/or perceived identity of being Jewish and/or Israeli. Further, MIT has failed to take effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring. Such unlawful deliberate indifference caused the Plaintiffs in this Count I, or their members, to be subjected to a hostile educational environment.

385.    The environment at MIT, which has been rendered hostile for the Plaintiffs in this Count I, or their members, as a result of their actual and/or perceived identity as being Jewish and/or Israeli, is sufficiently severe, pervasive, persistent, and offensive such that it has deprived such Plaintiffs, or their members, of equal access to the educational opportunities and benefits that MIT provides to non-Jewish or non-Israeli students.

386.   MIT and its administrators have actively and intentionally engaged in this pattern of severe and/or pervasive discrimination.

387.   MIT and its administrators also directly and intentionally discriminated against the Plaintiffs in this Count I, or their members, with such Plaintiffs', or their members', actual and/or perceived identity being a substantial or motivating factor in MIT's actions, including inaction.

388.   MIT has failed to act or has acted with leniency and/or delay in applying its policies when a known or reported incident involved antisemitism or where actual and/or perceived Jewish students, including the Plaintiffs in this Count I, or their members, were involved. As detailed above, MIT's actions and conduct were, and continue to be, intended to treat students such as Plaintiffs in this Count I, or their members, differently as compared to dealing with incidents involving other, similarly situated students who are not actually or perceived to be Jewish and/or Israeli.

389.   MIT's violations of Title VI were the actual, direct and proximate causes of the injuries of the Plaintiffs in this Count I, or their members.

390.   As a result of the foregoing, Plaintiffs in this Count I, or their members, have suffered, and continue to suffer, substantial damages in an amount to be determined at trial.

391.   Plaintiffs in this Count I, or their members, are also entitled to appropriate injunctive relief and any other form of relief awarded by the Court under Title VI, as MIT had knowledge of, and has been and continues to be deliberately indifferent to, a discriminatory and hostile environment that is severe, persistent, and pervasive.

392.   Plaintiffs in this Count I are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Count II: 42 U.S.C. § 1986**

**(By All Plaintiffs Individually Against Defendant)**

393.    Plaintiffs and SCLJ Members repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

394.    The co-conspirators engaged in an anti-civil rights conspiracy within the meaning of 42 U.S.C. § 1985(c). The co-conspirators plotted, coordinated, and executed a common plan to engage in harassment, threats, violence, and intimidation against Jewish and Israeli members of the MIT community, including Plaintiffs.

395.    In furtherance of a conspiracy to violate the rights of Jewish and Israeli MIT students, including Plaintiffs, as set forth in the paragraphs above, the co-conspirators sought to create an environment of intimidation, harassment, and hostility against Plaintiffs, including those under 42 U.S.C. §§ 1981 and 1982 and to the full and equal benefit of the laws and proceedings for the security of persons. The illegal activities described herein were undertaken pursuant to an unlawful conspiracy for the purpose of depriving Jewish and Israeli MIT students of their rights to the equal protection of the laws and their equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution of laws, because of their national origin, race, and/or religion.

396.    The actions of the Coconspirators violated 42 U.S.C. § 1985(3). Defendant possessed actual knowledge of the Section 1985(3) anti-civil rights conspiracy described in this Complaint that was planned and then underway against the class of Jews and Israelis on campus as described- including the Plaintiffs named herein.

397.    This knowledge came through multiple reports by students, including Plaintiffs, staff, and faculty to MIT's administration. Moreover, the co-conspirators announced their plans for their rallies, protests, and encampments on social media and through other publicly available

means, such that MIT had advanced knowledge that each would and did occur. On information and belief, this information also came through direct observation by MIT's administration including in person and through online media.

398.    That MIT had knowledge of the Section 1985 violations is evident through the multiple emails to students and publicly released statements from MIT about the protests, rallies, and encampments. MIT had actual notice that students were feeling unsafe, that protests had escalated to become violent and/or threatening, and that action was needed to address it.

399.    MIT has direct oversight and disciplinary power over the students and student groups who committed the Section 1985 violations. MIT further has its own police force and had the ability to work with the local police department to either stop or at a minimum contain the protests, rallies, and encampments, including by arresting or trespassing individuals who engage in unlawful conduct such as violence, threats, or harassment. Indeed, that MIT ultimately did call in the police to take down the encampment only serves as further proof that MIT had both the ability and the authority to do this sooner than it did.

400.    MIT failed and refused to take any steps to attempt to stop this conspiracy or any of the overt acts committed in furtherance of the conspiracy so as to stop the injuries that occurred to Plaintiffs or to other members of the class of citizens (Jews and Israelis) targeted by the anti-civil rights conspiracy described.

401.    MIT's failure to take any steps to aid in preventing the actions described herein, by informing the lawful authorities or otherwise, violated the command of 42 U.S.C. § 1986.

402.    Plaintiffs suffered their injuries as a result of MIT's failure to stop the described conspiracy.

**Count III: Negligence**

**(By All Plaintiffs Individually Against Defendant)**

403.    Plaintiffs and SCLJ Members repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

404.    MIT owed and undertook a duty to provide "a learning environment that is free from discrimination and discriminatory harassment" to the benefit of Plaintiffs.

405.    MIT owed and undertook a duty to Plaintiffs to accurately and truthfully represent the quality, nature, and characteristics of its learning environment.

406.    MIT further owed Plaintiffs a duty of care as set forth by Title VI, 42 U.S.C. § 1986, as well as MIT's own policies and procedures.

407.    Defendant owed Plaintiffs duties to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing knowledge that universities are obligated under Title VI to both recognize and address antisemitism on college campuses.

408.    Defendant owed Plaintiffs a duty to exercise reasonable care in the direct oversight of student organized events to ensure events, event organizers, and attendees comply with all applicable laws, including applicable federal and state laws, as well as MIT's own policies and procedures as set forth in this Complaint.

409.    Defendant owed Plaintiffs a duty to exercise due and proper care in providing "a learning environment that is free from discrimination and discriminatory harassment" to the public.

410.    Especially after October 7, 2024, it was highly foreseeable that antisemitism on college campuses would rise and that MIT's decision not to address it and not to enforce its policies would lead to an openly hostile, discriminatory, and unsafe environment for Jewish and Israeli students, including Plaintiffs.

411.    MIT had both actual and constructive notice of the antisemitism that was rising on campus, and which ultimately resulted in the openly discriminatory and hostile environment towards Jewish and Israeli students, including Plaintiffs.

412.    MIT breached its duty to Plaintiffs when it made the decision not to equally enforce its policies set forth in this Complaint as they applied to Jewish and Israeli students.

413.    MIT breached its duty to Plaintiffs by failing to take any proactive approaches to addressing antisemitism on campus and for allowing antisemitism to grow unchecked on MIT's campus.

414.    MIT breached its duty of care to Plaintiffs when it failed to take appropriate reactive measures to curb the rising antisemitism and discrimination on campus.

415.    MIT breached its duty of care to Plaintiffs when it made the deliberate choice to allow campus protests, rallies, and encampments to continue in direct violation of MIT's own policies, as well as in violation of federal and state laws.

416.    Through the conduct described in this Complaint, Defendant breached its duties to Plaintiffs.

417.    Defendant knew, or should have known, that, due to its failure to use reasonable care, Plaintiffs suffered discriminatory treatment, harassment, and hostility.

418.    As a direct and proximate cause of MIT's negligence, Plaintiffs sustained damages.

**Count IV: Breach of Contract**

**(By Plaintiffs Boukin and Meyers, Individually, And On Behalf of the Class (for Injunctive Relief Only) Against Defendant)**

419.    Plaintiffs Boukin and Meyers repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

420.    Massachusetts law recognizes that the relationship between a student and a college is contractual in nature, and that, *inter alia*, the terms of student handbooks, university bulletins, regulations, codes, policies, and procedures can become part of that contract.

421.    At all relevant times, a contractual relationship existed between MIT and Plaintiffs Boukin and Meyers by virtue of their enrollment at MIT and their provision of consideration to MIT for such enrollment.

422.    Despite its stated promises, including as reflected in student handbooks, university bulletins, regulations, codes, policies, and procedures, MIT has failed to maintain a safe learning environment and/or abide by its own contractually binding promises. The ongoing incidents of violence and harassment on campus violate the university's commitments to providing a safe, secure, and inclusive space for all students, including as reflected in student handbooks, university bulletins, regulations, codes, policies, and procedures.

423.    For example, MIT's Mind and Hand Book, which contains the Institute's student code of conduct, promises students that the Institute will ensure their physical safety and well-being and promises that the Institute is committed to providing a welcoming community free from discrimination and discriminatory harassment, particularly discrimination based on race, ethnicity, religion and sexual orientation.

424.    Similarly, the Events Policy assures students that events that promote or involve harassment, discrimination, retaliation, threats of violence, or targeting of particular groups or

individuals will not be permitted and that the safety and security of MIT students is paramount during campus events and gatherings.

425.    Additionally, these policies prohibit disruptive behavior that interferes with the academic mission, and these policies authorize the university to take necessary steps to address any disruption of the university's functioning.

426.    Campus safety was an essential term, , including as reflected in student handbooks, university bulletins, regulations, codes, policies, and procedures, of the contract between MIT and the Class Members, including Plaintiffs Boukin and Meyers. Students take commitments to campus safety seriously when deciding whether to enroll and attend (i.e., contract with) a university, and universities, incluing MIT, appeal to prospective students by emphasizing safety and security on campus, including as reflected in student handbooks, university bulletins, regulations, codes, policies, and procedures.

427.    MIT specifically highlights its commitment to creating a safe and inclusive environment in its promotional materials, including in student handbooks, university bulletins, regulations, codes, policies, and procedures. This emphasis on safety indicates that both parties intended campus safety to be an essential term of the student-university contract.

428.    By choosing MIT, Plaintiffs Boukin and Meyers, as well as Class Members, bargained for a safe learning environment (including in accordance with MIT's student handbooks, university bulletins, regulations, codes, policies, and procedures)) where they could pursue their studies safely and without fear of harassment or violence on campus.

429.     By allowing the above described hateful, menacing, and violent behavior, and failing to enforce these policies, MIT has failed to provide a safe educational environment and therefore breached its contractual obligations.

430.    MIT retains the ability to impose restrictions on speech on its campus. Moreover, MIT maintains the provisions in its handbook which ban discriminatory and harassing behavior, and which constitute material terms of the contract between MIT and its students.

431.    As described herein, MIT chose not to enforce nondiscrimination and harassment policies to protect Jewish and Israeli students and selectively enforced other policies, including its policies regarding flyers, posters and flags, against Jewish and Israeli students but not against other students, thereby breaching its contract.

432.    MIT has the tools both under the law and through its own policies to stop the harassment of and discrimination against Jewish and Israeli students, but MIT has failed to invoke the law and enforce its policies, or MIT has selectively invoked and enforced to the detriment of Jewish and Israeli students.

433.    It would have been material to Plaintiffs Boukin and Meyers and the Class Members when making an admissions decision to know that MIT would not abide by their stated policies or would selectively enforce them and the law against Jewish and Israeli students and would not provide an educational environment free of harassment.

434.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiffs Boukin and Meyers and the Class Members have been damaged and continue to sustain substantial damage in amounts to be determined at trial.

435.    Accordingly, Plaintiffs Boukin and Meyers on behalf of themselves and the Class demand that MIT take immediate steps to restore safety and security on campus,  by enforcing its promises, in particular as reflected in to MIT's student handbooks, university bulletins, regulations, codes, policies, and procedures, and restoring the safe educational environment promised under the terms of the contract, including with classes and events slated to be conducted

in-person and/or in specific locations not being conducted in an alternate manner and/or at alternate locations due to MIT failing to enforce its promises.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury for all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray and request that a judgment be entered in each of their favor and against Defendant, as follows, including for injunctive, mandatory and/or specific performance relief:

1. Injunctive relief enjoining Defendant and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, or protocols that penalize or discriminate against Jewish students, including Plaintiffs, or their members, in any way and ordering Defendant to take all necessary and appropriate remedial and preventative measures including, but not limited to: (i) terminating administrators, professors, or other university employees or staff responsible for the antisemitic abuse permeating the school, whether because they engaged in it or permitted it, and (ii) suspending or expelling students and/or student groups who engage in such conduct;

2. An injunction preliminarily and permanently requiring Defendant to enforce its policies cited in Section II of this Complaint on an evenhanded basis, ensuring that Jewish members of the MIT community are protected, with respect to their physical safety and otherwise, from discrimination and harassment on the basis of their Jewish identity, including those for whom Zionism is an integral part of that identity.

3. An injunction preliminarily and permanently enjoining Defendant from (i) permitting registered student organizations from discriminating against and/or harassing Jews; (ii) funding any student organization that discriminates against or harasses Jews; and (iii) granting official recognition or funding to any student organization that discriminates against and/or harasses Jews;

4. An injunction preliminarily and permanently mandating that Defendant take action to end the hostile environment on campus by (i) communicating to the entire MIT community by broadcast email or a similar medium, that MIT will condemn, investigate, and punish any conduct that harasses members of the Jewish community, or others on the basis of their ethnic or ancestral background; (ii) providing education about antisemitism, including by conducting mandatory training for administrators and professors; (iii) instituting strict review and approval policies to ensure that the administration does not conduct, or finance, programs that will result in the harassment of or discrimination against Jewish students of the MIT community, including those for whom Zionism is an integral part of their identity;

5. Compensatory and punitive damages in amounts to be determined at trial;

6. Reasonable attorneys' fees, the costs of suit, and expenses;

7. Pre-judgment interest and post-judgment interest and the maximum allowable rate permitted by law; and

8. Any such further relief as the Court deems just and proper.


Dated: May 17, 2024

Respectfully submitted,

*/s/ Marlene J. Goldenberg*
Marlene J. Goldenberg *(pro hac vice)*
**NIGH GOLDENBERG RASO &
VAUGHN PLLC**
14 Ridge Square NW, Third Floor
Washington DC 20016
Telephone: (202) 792-7927
Fax: (202) 792-7927
mgoldenberg@nighgoldenberg.com

Melissa S. Weiner *(pro hac vice)*
**PEARSON WARSHAW, LLP**
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Tel: 612-389-0600
Fax: 612-389-0610
mweiner@pwfirm.com

Jason P. Sultzer *(pro hac vice)*
Jeremy Francis *(pro hac vice forthcoming)*
**SULTZER & LIPARI, PLLC**
85 Civic Center Plaza, Ste 200
Poughkeepsie, NY 12601
Telephone: 845-244-5595
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
jfrancis@thesultzerlawgroup.com

Neil Swartzberg *(pro hac vice)*
**PEARSON WARSHAW, LLP**
555 Montgomery St., Suite 1205
San Francisco, CA 94111
Telephone: 415-433-9000
nswartzberg@pwfirm.com

Janet Varnell *(pro hac vice)*
**VARNELL & WARWICK, P.A.**
400 N Ashley Drive, Suite 1900
Tampa, FL 33602
Telephone: 352-753-8600
jvarnell@vandwlaw.com

David Abrams (Mass BBO  639250)
**DAVID ABRAMS, ATTORNEY AT
LAW**
PO Box 3353 Church Street Station
New York, NY 10008
Telephone: (212) 897-5821
Fax: (212) 897-5811
dnabrams@wjlf.org

**Counsel for Plaintiffs**