**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| |
|---|
| StandWithUs Center for Legal Justice, Katerina Boukin, and Marilyn Meyers, |
| Plaintiffs, |
| v. |
| Massachusetts Institute of Technology, |
| Defendant. |

Case No. 24-CV-10577-RGS

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT MASSACHUSETTS INSTITUTE OF TECHNOLOGY'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

     A.     Plaintiffs' Allegations Regarding Their Experiences At MIT ............................ 4

     B.     MIT's Ongoing Response To Alleged Antisemitism ...................................... 5

LEGAL STANDARD ....................................................................................................... 9

ARGUMENT .................................................................................................................. 9

I.     Count I For Violations Of Title VI Should Be Dismissed ..................................... 9

     A.     The Amended Complaint Fails To Plausibly Allege Deliberate Indifference ................................................................................................. 12

     B.     The Amended Complaint Fails To State A Claim For Direct Discrimination .......................................................................................... 18

     C.     At A Minimum, The Title VI Claim Is Unripe ........................................... 19

II.     Count II Should Be Dismissed For Failing To State A Violation Of Section 1986 .................................................................................................................. 22

III.     Counts III And IV Under Massachusetts Common Law Should Be Dismissed ............... 27

     A.     The Contract-Based Claim Is Inadequately Pleaded ................................... 28

     B.     The Negligence-Based Claim Fails As A Matter Of Law ............................. 30

IV.     Plaintiffs Lack Standing .................................................................................. 31

     A.     SCLJ Lacks Standing To Participate In This Litigation ............................... 32

     B.     No Plaintiff Has Standing For The Sweeping Injunctive Relief Sought .............. 33

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Demopolis City School*, 80 F.4th 1259 (11th Cir. 2023)...............................................20

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...............................................................................10

*Alston v. Spiegel*, 988 F.3d 564 (1st Cir. 2021) ...........................................................................25

*ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989)..............................................................................34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................................9

*Aulson v. Blanchard*, 83 F.3d 1 (1st Cir. 1996) .....................................................................22, 25

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004) .........................................................33

*Barkhordar v. President & Fellows of Harvard College*, 544 F. Supp. 3d 203 (D.
    Mass. 2021)...............................................................................................................................28

*Barnett v. Johnson City School District*, No. 3:04-CV-0763, 2005 WL 8178066
    (N.D.N.Y. Feb. 2, 2005) ...........................................................................................................32

*Beaudoin v. Healey*, No. 22-CV-11356, __ F. Supp. 3d __, 2023 WL 7116711 (D.
    Mass. Oct. 27, 2023), *appeal docketed*, No. 23-1989 (1st Cir. Dec. 5, 2023).......................35

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................9

*Bingham v. Massachusetts*, 616 F.3d 1 (1st Cir. 2010) .................................................................34

*Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15 (D.D.C. 2021), *aff'd sub
    nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023) ........................................................25

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018)...............................................................9

*Boston Parent Coalition for Academy Excellence Corp. v. School Committee for
    City of Boston*, 89 F.4th 46 (1st Cir. 2023), *petition for cert. filed*, 92 U.S.L.W.
    3285 (U.S. Apr. 19, 2024) (No. 23-1137)................................................................................33

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993).........................................23, 26

*Bray v. Worcester Polytechnic Institute*, 596 F. Supp. 3d 142 (D. Mass. 2022) ..........................11

*Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908 (7th Cir. 2007)....................18

*Brown v. Philip Morris Inc.*, 250 F.3d 789 (3d Cir. 2001) ...........................................................24

*Brown v. Suffolk University*, No. 19-CV-40062, 2021 WL 2785047 (D. Mass. Mar. 31, 2021) ...............................................................................................28

*Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600 (1979) ....................................22

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .................................................................33, 34

*Clorox Co. Puetro Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24 (1st Cir. 2000) ........................................................................................................................9

*Creative Environments, Inc. v. Estabrook*, 680 F.2d 822 (1st Cir. 1982).............................22, 27

*Czerwienski v. Harvard University*, 666 F. Supp. 3d 49 (D. Mass. 2023) ...................................21

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999)...................................................................................................10, 11, 13, 14, 21

*Demoret v. Zegarelli*, 451 F.3d 140 (2d Cir. 2006) ....................................................................32

*Doe v. Amherst College*, 238 F. Supp. 3d 195 (D. Mass. 2017)..................................................30

*Doe v. Brown University*, 327 F. Supp. 3d 397 (D.R.I. 2018).....................................................21

*Doe v. Brown University*, 43 F.4th 195 (1st Cir. 2022) ...............................................................19

*Doe v. Brown University*, 896 F.3d 127 (1st Cir. 2018) ........................................................11, 15

*Doe v. Pawtucket School Department*, 969 F.3d 1 (1st Cir. 2020)....................................11, 12, 14

*Doe v. Pike School, Inc.*, No. 13-CV-11730, 2014 WL 413207 (D. Mass. Feb. 4, 2014) .............................................................................................................................12

*Doe v. Sacks*, No. 23-CV-1307, __F. Supp. 3d__, 2024 WL 402945 (S.D.N.Y. Feb. 2, 2024) ....................................................................................................................13, 14

*Doe v. Standard Insurance Co.*, 852 F.3d 118 (1st Cir. 2017) .......................................................9

*Doe v. Stonehill College, Inc.*, 55 F.4th 302 (1st Cir. 2022)........................................................20

*Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018) .......................................19, 29, 31

*Doherty v. Emerson College*, No. 1:14-CV-13281, 2017 WL 4364406 (D. Mass. Sept. 29, 2017) ....................................................................................................................31

*Equal Means Equal v. Ferriero*, 3 F.4th 24 (1st Cir. 2021) .......................................................34

*Felber v. Yudof*, 851 F. Supp. 2d 1182 (N.D. Cal. 2011) ...........................................13, 15, 16, 17

*In re Financial Oversight & Management Board for Puerto Rico*, 60 F.4th 9 (1st Cir. 2023) .......................................................................................................9

*G. v. Fay School*, 931 F.3d 1 (1st Cir. 2019) ..........................................28, 29

*Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002) ....................................24

*Gattineri v. Town of Lynnfield*, 58 F.4th 512 (1st Cir. 2023) ........................22

*Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998) .........................10, 12, 18

*Gill v. Whitford*, 585 U.S. 48 (2018)............................................................35

*Goodman v. Bowdoin College*, 380 F.3d 33 (1st Cir. 2004)..........................19

*Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979) .....................24

*Griffin v. Breckenridge*, 403 U.S. 88 (1971)..........................................22, 23

*Guckenberger v. Boston University*, 957 F. Supp. 306 (D. Mass. 1997)...........................17, 18, 29

*H.B. v. Monroe Woodbury Central School District*, No.11-CV-5881, 2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012)...........................................................16

*Hammond v. Kmart Corp.*, 733 F.3d 360 (1st Cir. 2013) ...............................24

*Healy v. James*, 408 U.S. 169 (1972) ............................................................2

*Helfman v. Northeastern University*, 149 N.E.3d 758 (Mass. 2020)...............30

*Ingram v. Kubik*, 30 F.4th 1241 (11th Cir. 2022) ........................................18

*Jimenez v. Wellstar Health System*, 596 F.3d 1304 (11th Cir. 2010) ............24

*Jones v. City of Detroit*, 20 F.4th 1117 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 84 (2022) ............................................................................................18

*Keskinidis v. University of Massachusetts Boston*, 76 F. Supp. 3d 254 (D. Mass. 2014) ...............................................................................................11

*Koumantaros v. City University of New York*, No. 03-CV-10170, 2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) ..................................................................18

*L. L. v. Evesham Township Board of Education*, 710 F. App'x 545 (3d Cir. 2017)....................32

*Labor Relations Division of Construction Industries of Massachusetts, Inc. v. Healey*, 844 F.3d 318 (1st Cir. 2016).......................................................20

*Langadinos v. Appalachian School of Law*, No. 1:05-CV-00039, 2005 WL 2333460
(W.D. Va. Sept. 25, 2005) ................................................................................. 18-19

*Leavitt v. Brockton Hospital, Inc.*, 907 N.E.2d 213 (Mass. 2009)................................30

*Libertad v. Welch*, 53 F.3d 428 (1st Cir. 1995), *abrogated on other grounds*, *Salinas
v. United States*, 552 U.S. 52 (1997)....................................................22, 23, 24

*LSI Design & Integration Corp. v. Tesaro, Inc.*, No. 18-12352, 2020 WL 1027773
(D. Mass. Mar. 3, 2020)....................................................................................35

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................34

*Mandel v. Board of Trustees of California State University*, No. 17-CV-03511,
2018 WL 5458739 (N.D. Cal. Oct. 29, 2018)............................................................13

*Maymi v. Puerto Rico Ports Authority*, 515 F.3d 20 (1st Cir. 2008) ................................ 22, 25-26

*McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63 (1st Cir. 2003) ....................................21

*M.L. ex rel. D.L. v. Concord School District*, 86 F.4th 501 (1st Cir. 2023) ............................11, 20

*Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978)....................22

*Mullins v. Pine Manor College*, 449 N.E.2d 331 (Mass. 1983) ............................................... 30-31

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983) ............................24

*Nguyen v. MIT*, 96 N.E.3d 128 (Mass. 2018) ..............................................................30

*Oberg v. City of Taunton*, 972 F. Supp. 2d 174 (D. Mass. 2013)............................................24, 27

*Oden v. Northern Marianas College*, 440 F.3d 1085 (9th Cir. 2006) ..........................................20

*Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13 (1st Cir.
2019) ..........................................................................................................32

*Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005).......................33

*Pollard v. Georgetown School District*, 132 F. Supp. 3d 208 (D. Mass. 2015) ...............11, 15, 24

*Porto v. Town of Tewksbury*, 488 F.3d 67 (1st Cir. 2007)....................................................10, 11

*Raso v. Lago*, 958 F. Supp. 686 (D. Mass. 1997), *aff'd on other grounds*, 135 F.3d
11 (1st Cir. 1998) ..........................................................................................11

*Rectrix Aerodome Centers, Inc. v. Barnstable Municipal Airport Commission*, 632
F. Supp. 2d 120 (D. Mass. 2009), *aff'd*, 610 F.3d 8 (1st Cir. 2010)........................................28

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017) .......................................................... 9, 19

*Roe v. Healey*, 78 F.4th 11 (1st Cir. 2023) ..................................................... 31, 33, 34

*Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78 (1st Cir. 2013) .................................................................................................................. 20, 21

*Santiago v. Puerto Rico*, 655 F.3d 61 (1st Cir. 2011) .................................................. 10

*Saravanan v. Drexel University*, No. 17-CV-3409, 2017 WL 5659821 (E.D. Pa. Nov. 24, 2017) ..................................................................................................... 18

*Schaefer v. Fu*, 272 F. Supp. 3d 285 (D. Mass. 2017) .............................................. 30

*Schaer v. Brandeis University*, 735 N.E.2d 373 (Mass. 2000) ..................................... 28

*Schatz v. Republican State Leadership Committee*, 669 F.3d 50 (1st Cir. 2012) ........... 9

*Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974) ................ 35

*Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018) .............................. 23, 25, 26

*Sonoiki v. Harvard University*, 37 F.4th 691 (1st Cir. 2022) ..................................... 29

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ....................................................... 31, 34

*Spottiswoode v. Son*, 593 F. Supp. 2d 347 (D. Mass. 2009) ........................................ 9

*Tapalian v. Beal*, No. 02-CV-12216, 2006 WL 2795819 (D. Mass. Sept. 27, 2006) ......... 23

*United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott*, 463 U.S. 825 (1983) .................................................................................................. 23

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996) .................................................................................................. 32

*W.R. Grace & Co. v. EPA*, 959 F.2d 360 (1st Cir. 1992) .......................................... 21

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................................... 33

*Wu v. Ma*, No. 22-CV-30033, 2023 WL 6318831 (D. Mass. Sept. 28, 2023) ............. 29

**STATUTES**

42 U.S.C. § 1981 ........................................................................................................ 24

42 U.S.C. § 1982 ........................................................................................................ 24

42 U.S.C. § 1985 ................................................................................. 22, 23, 24, 25, 27

42 U.S.C. § 1986 ................................................................................................22, 25, 27

42 U.S.C. § 2000d ..............................................................................................................9

42 U.S.C. § 2000d-1 .........................................................................................................9

**OTHER AUTHORITIES**

Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter* (May 7, 2024),
https://bit.ly/3z1ySeg ..............................................................................................17

Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter:
Discrimination, Including Harassment, Based on Shared Ancestry or Ethnic
Characteristics* (Nov. 7, 2023), https://bit.ly/3yXqigp.....................................10, 17

Office for Civil Rights, U.S. Dep't of Educ., *First Amendment: Dear Colleague*
(July 28, 2003), https://bit.ly/4bY9Zid ..................................................................17

## INTRODUCTION

As the Massachusetts Institute of Technology ("MIT" or "the Institute") has made clear, "Antisemitism is real, and it is rising in the world. We cannot let it poison our community." Since the brutal terrorist attack that Hamas perpetrated in Israel on October 7, MIT—like universities across the country—has been the site of student-led protests involving expression that is deeply offensive to many in its community. MIT is firmly committed to free expression as one of its core principles, but as MIT's President has explained, "there is a difference between what we can say – that is, what we have a right to say – and what we should say," and we must "find a way to express our political views with a basic sense of respect and empathy for other members of our community." That principle is central to MIT's mission and its substantial and ongoing efforts to combat antisemitism, and the Institute has taken broad and decisive action toward that end.

MIT's leaders have swiftly and repeatedly condemned the October 7 attack and the rising threat of antisemitism. The Institute has taken concrete steps to provide a safe and inclusive environment for all community members—including increasing safety patrols; providing supportive resources for students affected by the conflict in the Middle East or related campus activism; and launching educational and community-building efforts, such as the new Standing Together Against Hate initiative. Where community members have violated Institute policies, MIT has taken remedial actions including imposing interim suspensions on individual students, suspending a student group, and conducting formal disciplinary proceedings.

The Amended Complaint largely ignores those efforts, advancing the extraordinary and unfounded claim that MIT is "deliberately indifferent" to antisemitism and even harbors discriminatory animus against Jewish and Israeli students. The plaintiffs—a California-based advocacy organization and two MIT students it claims as members—allege that MIT has violated

Title VI of the Civil Rights Act of 1964 and tolerated a conspiracy against civil rights in contravention of the Ku Klux Klan Act of 1871. They also assert common law claims for breach of contract and negligence. Plaintiffs demand money damages as well as sweeping and unprecedented injunctive relief that, among other actions, would compel MIT to terminate tenured faculty members and staff, expel students, and ban student groups. MIT reaffirms its unwavering commitment to combat antisemitism. But this lawsuit is not the right way to address Plaintiffs' concerns. For the following reasons, each of their claims should be dismissed.

*First*, students cannot sue educational institutions under Title VI for the actions of fellow students, faculty, or staff based on vicarious liability. They must plausibly allege an official policy by the institution to discriminate, or a response to known and actionable harassment that is so clearly unreasonable it amounts to an official decision not to remedy the violation. Plaintiffs do not meet those rigorous legal standards. Critically, courts and regulators recognize that "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,'" *Healy v. James*, 408 U.S. 169, 180 (1972), and that fulfilling Title VI obligations does not require trammeling freedom of expression on campus, even when that expression is offensive or hurtful. Nor can Plaintiffs circumvent these standards by alleging intentional discrimination by MIT itself: there are no plausible allegations MIT took an adverse action, much less with discriminatory animus. At a minimum, the claim is unripe for adjudication since MIT's response is ongoing.

*Second*, the Amended Complaint fails to state a claim against MIT under 42 U.S.C. § 1986 for allegedly neglecting to prevent a conspiracy against civil rights. Attempting an end-run around Title VI's rejection of vicarious liability, Plaintiffs claim MIT should be held responsible for the actions of student groups that engaged in protest activity that purportedly denied Jewish and/or Israeli students their civil rights. Yet Plaintiffs do not plausibly allege a meeting of the minds

among the student groups, a conspiratorial purpose to impair civil rights (as opposed to expression of political disagreement), or an intent to act with discriminatory animus—all required elements.

**Third**, the Amended Complaint fails to state a claim under Massachusetts law for breach of contract or negligence. The Court need not reach the viability of these claims, since they are pendent to the federal claims that cannot survive dismissal. But even beyond those jurisdictional defects, courts have repeatedly rejected efforts like this one to evade the rigorous pleading standards under statutory antidiscrimination law by resorting to common law claims. Plaintiffs do not (and cannot) identify any language in MIT policies to ground their breach-of-contract claim, and their theories of a tort duty fail as a matter of law.

**Finally**, the Amended Complaint fails to establish this Court's subject-matter jurisdiction in two key respects. The advocacy group lacks standing to participate in this litigation because its claims require individuals' participation, which defeats associational standing, and an advocacy group cannot pursue damages claims for its members. In addition, Plaintiffs lack standing for the sweeping injunctive relief they seek: they do not plausibly allege they will suffer future harm inflicted by MIT (as opposed to potential harm by other students or student groups), and their requested relief far exceeds what is necessary to address even the alleged injuries they claim.

## BACKGROUND

Plaintiffs are two MIT students and a California-based advocacy organization, StandWithUs Center for Legal Justice ("SCLJ"). Am. Compl., ECF No. 40 ("AC") ¶¶ 18-20. Their Amended Complaint describes expressive activity at MIT since October 7, including statements, rallies, walkouts, protests, and encampments. *E.g.*, *id.* ¶¶ 6, 159, 221. According to the Amended Complaint, two student groups—MIT Coalition Against Apartheid ("CAA") and Palestine@MIT—have organized and carried out many of these events and engaged in expression

that Plaintiffs find offensive, like "denounc[ing] the Israeli occupation" in Palestine and using phrases like "[f]rom the river to the sea" and "intifada revolution." *Id.* ¶¶ 147, 186. The Amended Complaint asserts that these groups—along with Scientists Against Genocide, the Graduate Student Union, and the Black Graduate Student Association—conspired together to "organize events on MIT's campus that created an openly hostile environment for Jewish and Israeli students on campus" and deprived them of their civil rights. *Id.* ¶ 291. Plaintiffs allege MIT had knowledge of this conspiracy but failed to prevent it. *Id.* ¶¶ 396-401.

> **A.**   **Plaintiffs' Allegations Regarding Their Experiences At MIT.**

The only MIT students named in the Amended Complaint are Plaintiffs Katerina Boukin and Marilyn Meyers, and only a handful of the pleading's 435 paragraphs describe their alleged experiences of antisemitism at MIT. *See* AC ¶¶ 156, 205, 255-256, 297, 301, 345-346, 354-355.

Plaintiff Boukin, "a Jewish Israeli graduate student," *id.* ¶ 20, alleges she was "subjected to antisemitic chants and violent speech" at campus protests, including the phrase "from the river to the sea," and "prohibited from freely moving through the space" where these protests occurred. *Id.* ¶ 355. According to Plaintiff Boukin, she also saw unspecified "antisemitic language" in messages from student groups sent to MIT email accounts. *Id.* In addition, Plaintiff Boukin contends that she and another student "were required to remove" Israeli flags they displayed on campus, even while "MIT administrators have allowed Palestinian flags to remain on campus." *Id.* ¶¶ 255-256. Plaintiff Boukin does not say who required her to remove the flags, when, or why; nor does she allege she was subject to any discipline. Moreover, she acknowledges MIT has a policy regulating the display of banners and flags on campus. *Id.* ¶ 259 & n.154. Plaintiff Boukin does not allege making any reports to any MIT officials at any time.

Plaintiff Meyers, "a Jewish undergraduate student," *id.* ¶ 19, alleges she "was the recipient

of antisemitic comments by other students on campus," *id*. ¶ 354. In particular, she contends that, during an outdoor rally, an unidentified protester—with no alleged connection to MIT—"raised the front wheels of his bike at" her and another Jewish student and said, "[y]our ancestors [(referring to Holocaust victims)] didn't die to kill more people." *Id*. ¶ 156. According to Plaintiff Meyers, she contacted MIT's Institute Discrimination & Harassment Response Office ("IDHR") at one point and "was falsely told that she was not a member of a protected class and, subsequently, that what she experienced is not within the scope of the IDHR." *Id*. ¶ 354. Plaintiff Meyers does not allege she reported the specific incident with the protester to IDHR or other MIT officials, nor that she alerted MIT officials about "skipp[ing] several classes" and "avoid[ing]" her peers because she felt "socially isolated and shunned by approximately half of [them]." *Id*.

The Amended Complaint also references three anonymous members of SCLJ who purport to be MIT students. *Id*. ¶¶ 21-23. These individuals claim they avoided areas of campus and/or relocated events due to the encampment and unspecified "threats and hostility on campus," *id*. ¶¶ 347-349, 356-364; they witnessed "antisemitic emails" and "antisemitic rhetoric," including in one case being "heckled" by members of CAA, and in another instance seeing an individual with no alleged MIT affiliation urinate on Hillel's building, *id*. ¶¶ 356-357; and that one of them moved her housing due to social isolation, *id*. ¶¶ 358-364. Only one of these individuals allegedly reported her concerns to MIT, though she does not allege what she shared or how MIT responded. *Id*. ¶ 363. Finally, the Amended Complaint alludes to experiences by "[o]ther Jewish and Israeli students at MIT" who are not plaintiffs or even alleged SCLJ members. *Id*. ¶ 365.

### B.     MIT's Ongoing Response To Alleged Antisemitism.

The Amended Complaint acknowledges—even as it downplays—MIT's multi-faceted response to the Israel/Hamas conflict and its impact on campus since October 7. The pleading and

its exhibit, together with MIT's public communications, underscore MIT's active engagement.

To start, within days of the atrocities committed by Hamas on October 7, MIT's President issued a campus-wide statement forcefully condemning antisemitism—the first of several communications from MIT leaders responding to the October 7 attack and its impact on campus. Exs. 1 & 2.[1] At the same time, MIT acknowledged reports of students "feel[ing] unsafe" on campus "because of their Jewish faith, or their ties to Israel," and cautioned that "the rhetoric on our own campus [must] not escalate to the point of personal attacks, harassment or violence." Ex. 1.

Two days later, MIT again addressed the community and provided "guidelines and policies that enable us to live together in community," as well as a host of support resources and safety measures. Ex. 3. It instructed students how to report concerns about "the content of a poster, chalking, or similar display," and reiterated that "[s]peech or behavior that amounts to harassment and acts (or threats of) violence, against individuals or groups, are against MIT policy." *Id.*

As student protest activity intensified, MIT anticipated, prepared for, and responded to incidents in real time. For example, on the eve of a campus protest expected on November 9, MIT issued a broadcast acknowledging "intense reaction and public activism within our community" and emphasizing "a profound responsibility to protect MIT's ability to advance its mission, and to make sure that no one on campus feels afraid for their safety." Ex. 4. MIT again condemned antisemitism and highlighted "policies and procedures for keeping our campus safe," including (1) "enhanced campus security measures and patrols" as well as MIT Police's cooperation "with federal, state, and local officials"; (2) published guidelines on "events, vigils, rallies, postering, flags, and banners"; (3) an Ad Hoc Complaint Response Team to address reports relating to the Middle East conflict; (4) clarification about the limits of free expression and the importance of

---

[1] All numbered exhibits are to the Declaration of Jaren D. Wilcoxson filed with this Motion.

"consider[ing] the impact of our speech on others"; and (5) events and resources across campus to promote "comfort, compassion, patience and goodwill." *Id.*

MIT also responded to specific protest activity described in the Amended Complaint. For example, after the November 9 protest, MIT issued a same-day community-wide statement explaining its efforts to de-escalate the situation as it unfolded and reaffirming its policy that "the time, place, and manner of protected expression, including organized protests, may be restrained so as not to disrupt the essential activities of the Institute." Ex. 5; *see also* AC ¶¶ 182, 184. In February, when CAA continued to violate Institute rules, MIT suspended CAA as a recognized student organization pending a formal disciplinary proceeding. Ex. 6; *see also* AC ¶ 125 n.73; *id.* Ex. A at 23. As MIT's President explained, this action barred CAA from reserving space on campus, using MIT facilities, receiving student group funding, and organizing "any further protests or demonstrations anywhere on our campus." Ex. 6.

Similarly, MIT took numerous steps to address and ultimately clear the pro-Palestine encampment at the end of the spring semester. In frequent communications with the MIT community, its leaders explained how they were "working closely and constantly with our Student Life team, the faculty members who are advising the students, and our own campus police," who were present at the scene 24 hours per day. Ex. 7. MIT's leaders were clear that "violence and threats of violence on our campus are utterly unacceptable" and students who violated policies would face repercussions. *Id.* Although many in the community "fe[lt] strongly that the encampment should be allowed to continue indefinitely," MIT's leaders directed students to leave the encampment and announced consequences for students who did not comply. Exs. 8 & 9. As MIT's President explained after ordering the encampment cleared, "my responsibility is to the whole community: to make sure that the campus is physically safe and functioning for everyone,

that our shared spaces and resources are available for everyone, and that everyone feels free to express their views and do the work they came here to do." Ex. 9.

MIT has also pursued disciplinary action and even effectuated arrests. To the extent permitted by Institute policy and federal law, MIT has communicated with its community about its handling of those cases. For example, a tracker identifies that 66 cases are in various stages of the complaint-resolution process as of June 6, 2024. Ex. 10. After clearing the encampment, MIT announced that "dozens of interim suspensions and referrals to the Committee on Discipline are now in process" and that ten individuals had been arrested by MIT police. Ex. 11.

At the same time, MIT has moved to strengthen its policies, practices, and campus climate. In November, MIT created an Institute-wide initiative called Standing Together Against Hate ("STAH") to "spearhead efforts to combat antisemitism at MIT." Ex. 12; *see also* AC Ex. A at 13. STAH's work has included multiple trainings on antisemitism as well as "small group facilitated conversations" in residence halls, online resources for managing sensitive conversations, new funding for community-building projects, and a series of "Dialogues Across Difference" talks. Ex. 13-18. In January, MIT announced several other "Institute-level actions" to assess how MIT handles complaints of student misconduct, balances principles of free expression with protection from discrimination and harassment, and fosters a welcoming environment for all. Ex. 19. MIT has also detailed ongoing efforts aimed at "rebuilding trust and caring for our community," including additional STAH "lectures, discussions, classes and community-building efforts," and the Center for Constructive Communication's facilitated discussion programs. *Id*.

All the while, MIT has been clear: while it is "legitimate to criticize the policies of any government, including the current government of Israel – as indeed many Israelis do," it is *never* acceptable "to vilify and shun Israeli and Jewish members of our community." Ex. 6.

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In assessing plausibility, the court does not credit "mere conclusory statements" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557). Beyond well-pleaded factual allegations, the court may consider documents "'integral' to assessing the sufficiency of the allegations in the complaint," *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000), or "fairly incorporated into the complaint," *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55-56 (1st Cir. 2012). The court may also consider facts "susceptible to judicial notice," *id.*, including information available on public websites, *see, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 60 F.4th 9, 13 (1st Cir. 2023); *Doe v. Standard Ins. Co.*, 852 F.3d 118, 124 (1st Cir. 2017); *Spottiswoode v. Son*, 593 F. Supp. 2d 347, 350 (D. Mass. 2009) (Stearns, J.).

Under Rule 12(b)(1), a court must dismiss any claim or request for relief over which it lacks subject-matter jurisdiction, including where the plaintiff lacks standing to pursue its claims or where the plaintiff's dispute is unripe. *Reddy v. Foster*, 845 F.3d 493, 499-500 (1st Cir. 2017). The court is not limited to the pleadings in evaluating a Rule 12(b)(1) motion. *Boniface v. Viliena*, 338 F. Supp. 3d 50, 60 (D. Mass. 2018).

## ARGUMENT

### I.    Count I For Violations Of Title VI Should Be Dismissed.

Plaintiffs allege MIT violated Title VI, which prohibits discrimination based on race, color, and national origin in programs receiving federal funding. 42 U.S.C. § 2000d. The statute charges federal agencies with enforcing this provision against their funding recipients. *Id.* § 2000d-1. In

addition to that primary enforcement mechanism, the Supreme Court has recognized an implied private right of action to obtain injunctive relief and monetary damages. *See Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). But it has limited such claims in several key respects, recognizing that Spending Clause statutes like Title VI and Title IX—which impose conditions on federal funding—are categorically different from Commerce Clause statutes like Title VII that prohibit discrimination outright. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284-89 (1998).[2] A Title VI plaintiff can sue only for *intentional* discrimination by the funding recipient itself and cannot rely on vicarious liability or constructive notice. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). Liability requires an "official policy of the recipient entity" to discriminate, or, once the recipient is informed of unlawful discrimination, an "official decision by the recipient not to remedy the violation"—a theory of liability known as "deliberate indifference." *Gebser*, 524 U.S. at 290-91.

Deliberate indifference is a "stringent standard of fault." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007). A plaintiff must plausibly allege five elements, each of which is necessary to "eliminate any risk that the recipient [of federal funds] would be liable in damages not for its own official decision but instead for [others'] independent actions." *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011) (quoting *Davis*, 526 U.S. at 643). Those elements are: "(1) '[the plaintiff] was subject to severe, pervasive, and objectively offensive … harassment'; (2) 'the harassment caused the plaintiff to be deprived of educational opportunities or benefits'; (3) the funding recipient was aware of such harassment; (4) the harassment occurred 'in [the funding recipient's] programs or activities'; and (5) the funding recipient's response, or lack

---

[2] Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter: Discrimination, Including Harassment, Based on Shared Ancestry or Ethnic Characteristics* (Nov. 7, 2023) [hereinafter November 2023 Dear Colleague Letter], https://bit.ly/3yXqigp.

thereof, to the harassment was 'clearly unreasonable.'" *Doe v. Brown Univ.*, 896 F.3d 127, 130 (1st Cir. 2018) (quoting *Porto*, 488 F.3d at 72-73).

The "clearly unreasonable" standard precludes a court from second-guessing a school's response unless it rises to the level of an abject institutional failure. The "inquiry is limited to whether the school's actions were so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023). "[F]unding recipients are not required to have perfect foresight or manage all student interactions expertly," *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 9 (1st Cir. 2020), and "a claim that the [institution] could or should have done more is insufficient to establish deliberate indifference," *Porto*, 488 F.3d at 73. This "is not a mere reasonableness standard" and, consistent with the Supreme Court's directive that it can be decided "as a matter of law," *Davis*, 526 U.S. at 648-49, courts in this district have repeatedly rejected deliberate-indifference claims at the pleadings stage, *see, e.g.*, *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 229-31 (D. Mass. 2015); *Bray v. Worcester Polytechnic Inst.*, 596 F. Supp. 3d 142, 156-57 (D. Mass. 2022); *Raso v. Lago*, 958 F. Supp. 686, 703-04 (D. Mass. 1997), *aff'd on other grounds*, 135 F.3d 11 (1st Cir. 1998); *see also Keskinidis v. Univ. of Mass. Bos.*, 76 F. Supp. 3d 254, 260 & n.3 (D. Mass. 2014) (Stearns, J.).

The Amended Complaint fails to state a claim under these well-established standards. It concedes—but then largely ignores—MIT's extensive action to combat antisemitism. *See supra* at 5-8. No court has allowed a deliberate-indifference claim in circumstances resembling these, let alone with such sparse allegations as to how the student-plaintiffs' personal experiences amount to harassment as defined by Title VI. Nor can Plaintiffs circumvent these demanding standards by claiming that MIT itself directly and intentionally discriminated against them. And, at a minimum,

this Title VI claim is not ripe for adjudication now because MIT's response is ongoing.

### A.     The Amended Complaint Fails To Plausibly Allege Deliberate Indifference.

*First*, the Complaint fails the most basic requirement of a Title VI claim because it does not allege Plaintiffs reported actionable harassment to an appropriate MIT official. Under this cause of action, "constructive knowledge is plainly insufficient." *Pawtucket Sch. Dep't*, 969 F.3d at 7. A plaintiff must allege actual notice to "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Gebser*, 524 U.S. at 290. The Amended Complaint does not allege Plaintiff Boukin made any complaint, which dooms her claim. *See Doe v. Pike Sch., Inc.*, No. 13-CV-11730, 2014 WL 413207, at *3-4 (D. Mass. Feb. 4, 2014) (Stearns, J.). As for Plaintiff Meyers, the Complaint alleges only that she made a general report about antisemitism, AC ¶ 354—not what she said, including whether it encompassed the experiences alleged in the pleading. MIT raised these deficiencies in its original Motion to Dismiss, *see* ECF 33 at 11-12, and despite various revisions to their pleading, Plaintiffs Boukin and Meyers *still* do not allege reporting their experiences to MIT officials—much less that MIT officials failed to act in response to their reports. That silence speaks volumes.

*Second*, even assuming the requisite notice, the Amended Complaint does not plead a "clearly unreasonable" response. Plaintiffs do not and cannot claim that MIT "fail[ed] to take *any* action to stem the tide" of the antisemitism that they allege, *Pawtucket Sch. Dep't*, 969 F.3d at 9-10 (emphasis supplied), so they must plausibly allege that MIT's actions are clearly unreasonable under an objective standard. In cases alleging deliberate indifference to antisemitism, courts have pointed to several factors also present here as *precluding* liability—including that the university responded to "wrongful conduct otherwise not amounting to protected speech," took action against "disruptive protestors," and "engaged in an ongoing dialogue with the opposing parties in an

attempt to ensure that the rights of all persons are respected, and to minimize the potential for violence and unsafe conditions." *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011). Courts have also relied on actions like forming working groups to combat antisemitism and dedicating personnel to address campus climate. *Mandel v. Bd. of Trs. of Cal. State Univ.*, No. 17-CV-03511, 2018 WL 5458739, at *24 (N.D. Cal. Oct. 29, 2018). Plaintiffs do not dispute "that [MIT] has taken steps to address their concerns"; rather, they "contend those steps have been ineffectual." *Id*. Such criticism fails to plausibly allege a "clearly unreasonable" response.

Plaintiffs likewise cannot use Title VI "to make particular remedial demands." *Davis*, 526 U.S. at 648. While the Amended Complaint insists "Plaintiffs do not base their claims on a challenge of the Institute's disciplinary decisions," AC ¶ 184 n.104, it repeatedly criticizes MIT's actions in this regard, *see, e.g.*, *id.* ¶¶ 183-185, 216, 353, 399, and demands extensive punitive actions, from "terminating administrators, professors, or other university employees or staff" to "suspending or expelling students and/or student groups," *id.* ¶ 134. "Plaintiffs are obviously upset" about their perception that certain members of the MIT community have not faced particular consequences, but MIT cannot short-circuit its disciplinary process to mete out "the precise remedy that [Plaintiffs] would prefer." *Mandel*, 2018 WL 5458739, at *24. Ultimately, their "own allegations show that [MIT] is not ignoring the hostile environment alleged by [P]laintiffs, but at most assert that [MIT]'s responses were not sufficient to satisfy [P]laintiffs and that some of the processes are still ongoing." *Id*. at *25. That does not make out a deliberate-indifference claim. *Id*.

Recent decisions from analogous deliberate-indifference contexts reinforce this result. In *Doe v. Sacks*, for example, a student at New York University was named in a "Blacklist" accusing NYU students of sexual misconduct. No. 23-CV-1307, __F. Supp. 3d__, 2024 WL 402945, at *1 (S.D.N.Y. Feb. 2, 2024). He sued the university, claiming that its response to his complaints about

the list was clearly unreasonable. *Id.* at *6. The court acknowledged that while the student "may certainly wish that NYU had gone to greater lengths to identify and discipline the creators of the spreadsheet," the university "took the steps it could to respond to Plaintiff's reports about the spreadsheet," which included supportive resources, academic accommodations, and a public statement, among others. *Id.* Moreover, "had NYU acceded to Plaintiff's demand to identify and to pursue disciplinary action against the students who allegedly created the spreadsheet, the University could find itself in the precarious position of … impermissibly restricting students' speech-protected values." *Id.* at *7. The same reasoning applies here. MIT has indisputably responded to reports of antisemitism. The particular response Plaintiffs demand is not required to satisfy MIT's Title VI obligations and could trammel the rights of other community members. As in *Doe v. Sacks*, "it would be entirely reasonable for [MIT] to refrain from a form of disciplinary action that would expose it to" potential claims from other students. *Davis*, 526 U.S. at 649.

The allegations here are also readily distinguishable from other instances in which deliberate-indifference allegations survived a motion to dismiss. For example, in *Doe v. Pawtucket School Department*, the First Circuit found adequate allegations under Title IX where a thirteen-year-old plaintiff "alleged that she was assaulted in physical education class and then raped two times in the subsequent months." 969 F.3d at 10. School officials "did nothing in response to learning" about the first rape, which made her vulnerable to the second rape. *Id.* at 8. On those allegations, the court found it "plausible that [school] officials disregarded a known or obvious consequence of [their] action or inaction and thus contributed to her likelihood of sexual assault and rape." *Id.* at 10. The egregious institutional failures alleged in *Doe v. Pawtucket School Department* underscore the high bar for pleading deliberate-indifference claims, and they are a far cry from anything Plaintiffs have alleged against MIT.

**Third**, the sparse allegations about Plaintiffs Boukin and Meyers do not meet the statutory standard for harassment that deprived them of their education. Title VI covers only harassment that is "so severe, pervasive, and objectively offensive" that it "ha[s] the systemic effect" of "den[ying] equal access to [the] institution's resources and opportunities." *Brown Univ.*, 896 F.3d at 132-33 (quoting *Davis*, 526 U.S. at 650-52). This is a high bar, and courts have repeatedly dismissed deliberate-indifference claims for failing to clear it. This case demands the same result.

In *Pollard v. Georgetown School District*, a student alleged he was "regularly emotionally, physically, and verbally bullied and abused," including because of his Jewish identity. 132 F. Supp. 3d at 218. His peers mocked him "with snide comments about Jews being massacred and stat[ements] that the Holocaust was unsuccessful because [his] family survived." *Id*. Notwithstanding these disturbing allegations, the court concluded the complaint lacked "sufficient, non-conclusory factual allegations that the harassment was severe and pervasive." *Id*. at 230. "Although the comments here were certainly objectively offensive"—and, unlike virtually all of the allegations in this case, were specifically directed at an individual—they did not "meet the high standard of severity or pervasiveness under well-developed case law." *Id.* at 230-31.

Decisions from other courts are in accord. In *Felber v. Yudof*, the Jewish plaintiffs alleged harassment and intimidation by two pro-Palestinian student groups. 851 F. Supp. 2d at 1184. Those groups orchestrated several disruptive protests and a campus event called "Apartheid Week," during which they "set up 'check points,' at which students dressed as soldiers and carrying 'realistic-looking' simulated 'assault weapons' challenge[d] passing students, demanding them to state whether they are Jewish or not." *Id*. The court found these deeply troubling allegations insufficient to establish that the plaintiffs were denied equal access to resources and opportunities. "[A] very substantial portion of the conduct to which plaintiffs object represents pure political

speech and expressive conduct," the court explained, and the plaintiffs "appear[ed] to be attempting to draw an untenable line that would remove from protection signs and publications that are critical of Israel." *Id.* at 1188. In addition, "a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present," such that it could not "demonstrate that *plaintiffs* suffered severe and pervasive harassment." *Id.* (emphasis supplied). And those plaintiffs had "not alleged facts showing that they were denied access to the University's educational services in any meaningful sense." *Id.*

Here, the Complaint offers far less than even the insufficient pleadings in *Pollard* and *Felber*. Plaintiff Boukin alleges she witnessed "antisemitic chants" and "antisemitic rhetoric" during protests, where her movement was restricted, and that emails from student groups "contained antisemitic language." AC ¶ 355. While troubling if true, these allegations are conclusory, describe experiences that generally involve protected expression, and do not rise to the level of actionable harassment under Title VI, particularly where little if any of the conduct was alleged to focus on Plaintiff Boukin individually. The same is true for Plaintiff Meyers, whose only specific harassment allegation is a single encounter with an unidentified individual. *Id.* ¶ 156. Isolated incidents like these cannot sustain a claim. *See H.B. v. Monroe Woodbury Cent. Sch. Dist.*, No.11-CV-5881, 2012 WL 4477552, at *15 (S.D.N.Y. Sept. 27, 2012). In addition, like the students in *Felber*, neither Plaintiff plausibly alleges "facts showing that they were denied access to the University's educational services in any meaningful sense." 851 F. Supp. 2d at 1188.

Nor can Plaintiffs base their claims on generalized allegations regarding Jewish and/or Israeli students who are not parties here (and, in many cases, not even members of SCLJ). *See supra* at 4-5. *Felber* rejected a similar effort, and with good reason: Plaintiffs must demonstrate *they* "suffered severe and pervasive harassment." 851 F. Supp. 2d at 1188. That is because, as

*Felber* explained, allegations about conduct "occurr[ing] at times and in places where plaintiffs were not present," even if the plaintiffs were "aware of it," would have "extremely marginal relevance to [the] plaintiffs' contention that they perceived a hostile environment." *Id.*; *see also Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 315 (D. Mass. 1997) (finding inadequate allegations of a hostile educational environment where statements criticizing the disability-rights movement were "not focused or addressed to particular … students").

**Finally**, many of the Amended Complaint's allegations involve "language that [P]laintiffs believe was inflammatory, offensive, or untrue" but that nonetheless constitutes "protected speech." *Felber*, 851 F. Supp. 2d at 1188. The U.S. Department of Education's Office for Civil Rights has repeatedly recognized that Title VI must be interpreted and applied to "comport with First Amendment principles," meaning the statute does not "require recipients to enact or enforce codes that punish the exercise of [free expression] rights."[3] This limitation applies on public and private campuses alike, and it demands "something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive" for actionable harassment.[4] As OCR reaffirmed in guidance issued just last month, an institution may thus "be constrained or limited in how it responds" to a hostile environment based on speech, because its response must "not restrict any rights protected by the First Amendment."[5] OCR identified steps an institution can take in such circumstances,[6] and MIT has taken each of those steps, among many others. *See supra* at 5-

---

[3] November 2023 Dear Colleague Letter.

[4] Office for Civil Rights, U.S. Dep't of Educ., *First Amendment: Dear Colleague* (July 28, 2003), https://bit.ly/4bY9Zid.

[5] Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter (May 7, 2024), https://bit.ly/3z1ySeg.

[6] *Id.* at 3 ("To meet its obligation, a university can, among other steps, communicate its opposition to stereotypical, derogatory opinions; provide counseling and support for students affected by harassment; or take steps to establish a welcoming and respectful school campus....").

8. Plaintiffs' position—which would treat protected speech as harassment and require MIT to chill or even punish that speech—would contradict federal guidance and "have serious First Amendment implications." *Guckenberger*, 957 F. Supp. at 316.

### B.    The Amended Complaint Fails To State A Claim For Direct Discrimination.

Plaintiffs also fail to state a violation of Title VI through their extraordinary claim that MIT directly and intentionally discriminated against them because they are Jewish and/or Israeli. AC ¶¶ 387-388. This theory requires students to plausibly allege—among other elements—that a school took some adverse school-related action against them, such as expulsion, *see Saravanan v. Drexel Univ.*, No. 17-CV-3409, 2017 WL 5659821, at *8 (E.D. Pa. Nov. 24, 2017), dismissal, *see Koumantaros v. City Univ. of N.Y.*, No. 03-CV-10170, 2007 WL 840115, at *3 (S.D.N.Y. Mar. 19, 2007), or dropping them from an academic program, *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007). The Complaint alleges nothing of the sort. Plaintiff Boukin avers she was required to remove Israeli flags while other flags remained, AC ¶ 255, but she does not allege that she was disciplined in any way that could plausibly constitute an adverse school-related action. Plaintiff Meyers alleges IDHR told her that her report was not within that office's scope, *id.* ¶ 354, a mistaken understanding of IDHR's guidance that does not constitute an adverse action.

Even more fundamental, the Amended Complaint fails to allege intent to discriminate *by MIT*. "Vicarious liability is unavailable under Title VI," so a student cannot establish discrimination by pointing to actions or omissions by peers or professors. *Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022); *see also, e.g.*, *Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021). To show intentional discrimination, the student must plausibly allege an official policy of the funding recipient to discriminate. *Gebser*, 524 U.S. at 290. "In other words, a school faces liability only when it intentionally does something wrong …." *Langadinos v. Appalachian Sch. of*

*L.*, No. 1:05-CV-00039, 2005 WL 2333460, at *10 (W.D. Va. Sept. 25, 2005). Factual allegations like those offered here "focus[ing] on the [recipient's alleged] omissions, rather than on any intentional decision to discriminate," cannot state a claim against MIT. *Id.*; *see* AC ¶ 387 (alleging "inaction" in connection with direct-discrimination theory).

At bottom, the Amended Complaint is bereft of plausible allegations that MIT was motivated by an intent to discriminate against Jewish and/or Israeli students. *See Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004) (explaining that "direct or circumstantial evidence of racial animus" is "a necessary component" of Title VI claim). It lacks any direct evidence of the requisite animus, and its allegations are far too vague to permit the inference that Plaintiffs Boukin or Meyers were treated worse than peers who were similarly situated in all relevant respects due to intentional discrimination. *See Doe v. Brown Univ.*, 43 F.4th 195, 207 (1st Cir. 2022) (requiring apples-to-apples comparison to establish such intent). MIT has repeatedly condemned antisemitism and taken concrete steps to address it, rendering implausible any claim that MIT as an institution harbors discriminatory animus against its Jewish or Israeli students. *Cf. Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) ("alleged prejudice … must be based on more than mere speculation and tenuous inferences").

### C.    At A Minimum, The Title VI Claim Is Unripe.

Plaintiffs "bear the burden of alleging facts sufficient to demonstrate ripeness." *Reddy*, 845 F.3d at 501. This Article III jurisdictional requirement "seeks to prevent the adjudication of claims relating to contingent future events that may not occur as anticipated, or indeed may not occur at all," rendering the court's decision advisory. *Id.* at 500. To demonstrate ripeness, "the party bringing suit [must] show *both* that the issues raised are fit for judicial decision at the time the suit is filed *and* that the party bringing suit will suffer hardship if 'court consideration' is withheld."

*Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (emphasis supplied). Fitness turns on "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89-90 (1st Cir. 2013).

Plaintiffs cannot make those showings. They challenge MIT's response to recent events, primarily under a deliberate-indifference theory. Title VI does not impose any fixed deadline for an institution's response and, to the contrary, affords substantial latitude in the timing and nature of that response. *See, e.g.*, *Adams v. Demopolis City Sch.*, 80 F.4th 1259, 1272 (11th Cir. 2023) (eight-month response reasonable); *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (nine-month response reasonable). This standard recognizes that the types of actions institutions should take once they receive reports of unlawful harassment—such as providing resources, conducting investigations, pursuing discipline, and reviewing policies—take time. It promotes "thoughtful consideration of students' rights" and eschews a headlong "rush to judgment." *M.L. ex rel. D.L.*, 86 F.4th at 512.

The Amended Complaint ignores that law. To take just one example, Plaintiffs repeatedly criticize MIT for allegedly failing to "discipline students [or] MIT organizations for … MIT policy violations," AC ¶ 353, and they demand MIT "suspend[] or expel[] students and/or student groups," *id.* at 134. But as a matter of institutional policy and basic fairness, MIT owes procedural protections to all parties to a report and faces potential liability if it short-circuits the requisite process. *See, e.g.*, *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 329-30 (1st Cir. 2022) (allowing claim against college for failure to follow its own procedures). Moreover, MIT *has* invoked its disciplinary process, including (1) suspending CAA, one of the student groups featured in the Amended Complaint, AC ¶ 125 n.73; and (2) imposing interim suspensions on, and initiating

disciplinary proceedings against, individuals who remained in the encampment after a series of warnings. Ex. 9. There are many cases "in various stages of the complaint resolution process." Ex. 10. Plaintiffs complain that the "permanent outcome" of one disciplinary case is forthcoming, AC ¶ 125 n.73, but that is exactly why their dispute is premature: MIT is indisputably taking action, and it is entitled to complete its response before litigating the adequacy of that response.

MIT is not aware of *any* case in this Circuit forcing an educational institution to defend the adequacy of its response while that response was underway. Decisions allowing deliberate-indifference claims have only involved circumstances where the institution's response culminated in a disciplinary decision or when the institution expressly decided not to take action. *See Czerwienski v. Harv. Univ.*, 666 F. Supp. 3d 49, 90-91 (D. Mass. 2023); *Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 410-11 (D.R.I. 2018). With good reason: "premature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort." *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 366 (1st Cir. 1992). Even if MIT's ongoing response does not eliminate this dispute, it could meaningfully narrow the issues requiring judicial resolution. *Roman Cath. Bishop of Springfield*, 724 F.3d at 89.

Against this backdrop, Plaintiffs also cannot demonstrate the type of undue "hardship" that ripeness requires. *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003). Plaintiffs have not demonstrated they will suffer "direct and immediate harm" cognizable under Title VI if this Court withholds consideration of this claim until MIT completes the steps in progress. *Id.* at 73; *see supra* at 5-8. By contrast, MIT is prejudiced if the Court adjudicates this dispute now, which effectively cuts off MIT's response—an outcome flatly inconsistent with the Supreme Court's overriding concern for institutional flexibility. *See Davis*, 526 U.S. at 648.

## II.     Count II Should Be Dismissed For Failing To State A Violation Of Section 1986.

Plaintiffs newly assert that MIT knowingly failed to prevent a conspiracy against their civil rights, on the theory that various "MIT student groups" organized "events, rallies, and protests" that were allegedly hostile to Jewish and Israeli students. AC ¶ 288. Enacted as part of the Ku Klux Klan Act of 1871, Section 1985 "provides a civil remedy in damages to a person damaged as a result of conspiracies to deprive one of certain civil rights." *Chapman v. Hous. Welfare Rts. Org*., 441 U.S. 600, 619 n.37 (1979) (citation omitted). The statute was "primarily motivated by the mob violence directed at the newly emancipated slaves in the Reconstruction era." *Libertad v. Welch*, 53 F.3d 428, 448 (1st Cir. 1995). Section 1986, in turn, was enacted to impose liability on "those who, having the power to intervene against Ku Klux Klan violence, neglected or refused so to do." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 n.57 (1978) (alterations omitted).

The Section 1986 claim alleged here requires Plaintiffs to plead several essential elements, including most basically an underlying conspiracy in violation of Section 1985. *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 834 n.14 (1st Cir. 1982). "[A]bsent a showing of conspiracy, [a plaintiff] has no claim under § 1986, which extends liability to those who knowingly failed to prevent conspiracies under § 1985." *Maymi v. P.R. Ports Auth*., 515 F.3d 20, 31 (1st Cir. 2008); *see also, e.g.*, *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 516 (1st Cir. 2023). Here, Plaintiffs rely on Section 1985(3), which requires them to plausibly allege: "the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). What is more, "a plaintiff may recover [under section 1985(3)] only when the conspiratorial conduct of which he complains

is propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Id.* (quoting *Griffin*, 403 U.S. at 102).

As a threshold matter, Plaintiffs fail to allege a conspiratorial purpose to deprive them of equal rights under the Constitution. "Section 1985(3) does not provide any substantive rights itself," so "[t]he rights, privileges, and immunities that § 1985 vindicates must therefore be found elsewhere, presumably in the Constitution." *Libertad*, 53 F.3d at 449 (citing *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 833 (1983)); *see* AC ¶¶ 285, 331. Yet the only two constitutional grounds invoked by Plaintiffs, the Thirteenth and Fourteenth Amendments, cannot apply. Plaintiffs allege a purely private conspiracy among MIT student groups and other unnamed individuals; without government action, the Fourteenth Amendment is not a valid predicate for a Section 1985 claim. *Scott*, 463 U.S. at 832-33 (citing *Griffin*, 403 U.S. at 97). As for the Thirteenth Amendment, Plaintiffs are limited to "rights constitutionally protected against private, as well as official, encroachment," *i.e.*, to be free from involuntary servitude and to travel interstate. *Id.* at 833 (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993)). The allegations—namely that the co-conspirators engaged in pro-Palestinian protest activity on campus—come nowhere close to pleading a conspiratorial purpose based on either of these rights. *See Tapalian v. Beal*, No. 02-CV-12216, 2006 WL 2795819, at *3 (D. Mass. Sept. 27, 2006) (Stearns, J.). Nor can Plaintiffs rely on the Thirteenth Amendment's regulation of "the badges and the incidents of slavery." AC ¶ 338. At most, this theory supplies the right to be free from serious racial violence—like dragging the plaintiffs from a bus and beating them with deadly weapons, or driving a car into a crowd—which the Amended Complaint does not allege. *See Sines v. Kessler*, 324 F. Supp. 3d 765, 781-82 (W.D. Va. 2018) (discussing *Griffin*, 403 U.S. at 105).

Plaintiffs also rely on a host of alleged statutory rights, but courts have repeatedly rejected

federal statutes as a basis for a Section 1985(3) conspiracy. *See Libertad*, 53 F.3d at 449-50; *Oberg v. City of Taunton*, 972 F. Supp. 2d 174, 202 (D. Mass. 2013) (requiring "a constitutionally protected right or privilege").[7] Even apart from that fatal threshold problem, none of the cited statutes applies here. First, Title VI applies only to institutional recipients of federal funding, so students and student groups cannot violate or conspire to violate the statute. *See Pollard*, 132 F. Supp. 3d at 230 ("[I]ndividuals cannot be held liable under Title VI."). Second, Title VII "applies only to discrimination in employment," *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983), and at any rate the Supreme Court has squarely held that the statute "cannot be the basis for a cause of action under § 1985(3)," *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). And third, Sections 1981 and 1982 of the Civil Rights Act of 1866 have been repeatedly rejected as a basis for a Section 1985(3) conspiracy. *See, e.g.*, *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805-06 (3d Cir. 2001) (Sections 1981 and 1982); *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (Section 1981). In any event, neither statute applies here. For Section 1981, Plaintiffs fail to allege how the supposed conspirators' actions blocked them from making or enforcing contracts in violation of their civil rights. *Hammond v. Kmart Corp.*, 733 F.3d 360, 364 (1st Cir. 2013). For Section 1982, which "prohibits racial discrimination in the purchase of property," *Garrett v. Tandy Corp.*, 295 F.3d 94, 103 (1st Cir. 2002), the pleading nowhere alleges that the conspirators interfered with the rights of Plaintiffs to "inherit, purchase, lease, sell, hold, and convey real and personal property" free from racial discrimination, 42 U.S.C. § 1982.

---

[7] *See also, e.g.*, *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (concluding that statutory rights cannot be vindicated under Section 1985(3)); *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001) (same); *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 379 (1979) (Powell, J., concurring) (same).

The conspiracy allegations also fall short in several other respects. ***First,*** Plaintiffs fail to adequately allege a conspiracy at all. *Aulson*, 83 F.3d at 3. This essential element requires allegations "indicating *an agreement* among the conspirators to deprive the plaintiff of [his] civil rights." *Alston v. Spiegel*, 988 F.3d 564, 577-78 (1st Cir. 2021) (emphasis added). "[B]ald claims that certain defendants 'conspired' with one another" are insufficient, as are "[v]ague and conclusory allegations about persons working together, with scant specifics as to the nature of their joint effort or the formation of their agreement." *Id.* at 578 (quoting *Slotnick v. Garfinkle*, 632 F.2d 163, 166 (1st Cir. 1980)). Allegations that the conspirators "were communicating with each other" do not suffice either. *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 38-40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023).

Here, the Amended Complaint fails to offer any non-conclusory allegations of the requisite "meeting of the minds." *Sines*, 324 F. Supp. 3d at 783-84. Plaintiffs' allegations that the groups "close[ly] collaborat[e]" in their protest activities and have "overlapping members," AC ¶ 289, are plainly insufficient, as they do not plausibly suggest that these groups entered into a conspiracy for the purpose of depriving Plaintiffs of their civil rights. With respect to specific incidents described in the Amended Complaint, like the alleged exclusion of Plaintiff Boukin from a pro-Palestine encampment by unidentified individuals, AC ¶ 301, there are no non-conclusory allegations that the individuals involved intended, much less agreed, to violate the civil rights of Jewish and/or Israeli students.[8]

***Second***, Plaintiffs fail to meet their burden of alleging that any conspiracy was "motivated by some 'racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Maymi*,

---

[8] At any rate, this alleged exclusion would not constitute a predicate offense that could support a Section 1985(3) conspiracy and, in turn, a Section 1986 claim against MIT. *See supra* at 23-25.

515 F.3d at 30-31 (quoting *Bray*, 506 U.S. at 268). It is not enough for a protected right to be "incidentally affected"; the conspiracy must be "*aimed at*" that right, in that "its impairment must be a conscious objective of the enterprise." *Bray*, 506 U.S. at 275 (quoting *Scott*, 463 U.S. at 833). Again, the Amended Complaint falls short here. It asserts that "MIT student groups" organized "events, rallies, and protests which were antisemitic and threatening," but in support, it points to social media posts that advertise events and stake political positions related to Israel and Palestine. *See* AC ¶¶ 288, 300, 305, 311 ("No Science for Genocide"; "We will NOT REST until MIT cuts research ties with the Israeli military"; "We unequivocally denounce the Israeli occupation."; "Speak out to defend Palestine!"). None of these statements raises a reasonable inference that the "conscious objective" went beyond denouncing the Israeli government or advocating for Palestine to encompass targeting students based on their shared ancestry. *Bray*, 506 U.S. at 275.

    *Sines v. Kessler* underscores why the allegations here fall short. In *Sines*, Charlottesville residents brought suit based on the deadly white supremacist rally in 2017, and on a motion to dismiss, the court concluded that the plaintiffs adequately alleged a "meeting of the minds." 324 F. Supp. 3d at 783-84. Individual defendants were alleged to have "invited white supremacist groups" to attend the rally; directed "the intimidation of minority residents and those who advocate for equal rights of minority citizens"; and made explicit, violent, and racially motivated threats, like proclaiming that "a lot more people are going to die before we're done here, frankly." *Id.* at 785-91. The complaint further alleged the defendants worked together closely to carry out the rally, including "coordinat[ing] marching and shield tactics," gathering intelligence on counter-protestors, and instructing participants to bring weapons. *Id.* at 785-88. Based on these specifics, the court found the complaint "adequately alleged that [the d]efendants formed a conspiracy to hurt black and Jewish individuals, and their supporters, because of their race." *Id.* at 797-98.

The allegations here are readily distinguishable. Here, for example, Plaintiffs allege the "protests attracted large numbers of students," AC ¶ 299, who chanted slogans such as "Palestine is free, Zionism out!," *id.* ¶ 317. These allegations resemble ones that the *Sines* court *rejected* as insufficient to state a claim. 324 F. Supp. 3d at 784. As the court explained in dismissing certain theories of the conspiracy and certain defendants, it is not enough for plaintiffs to assert that "all rally attendees who disagreed with them were part of one overarching conspiracy," and allegations about individuals who shouted or posted antisemitic slogans are insufficient to demonstrate they "entered an agreement to engage in racial violence at the events." *Id.* at 784, 794. So too here. Plaintiffs' failure to allege a valid conspiracy claim under Section 1985(3) dooms their Section 1986 claim against MIT. *Oberg*, 972 F. Supp. 2d at 201.

Finally, even beyond the deficiencies with the underlying Section 1985(c) conspiracy, Plaintiffs do not and cannot allege other required elements of their Section 1986 claim. The statute requires that a defendant "knows of a conspiracy which would violate section 1985, has the power to prevent it, and fails to do so." *Creative Env'ts*, 680 F.2d at 834 n.14. Here, Plaintiffs assert MIT's knowledge because "the co-conspirators announced their plans for their rallies, protests, and encampments on social media and through other publicly available means." AC ¶ 397. But knowledge of anticipated student expression is not knowledge of an unlawful conspiracy. Similarly, the allegation that MIT "fail[ed] to take any steps to aid in preventing" those rallies, protests, and encampments, AC ¶ 401, is belied by the Amended Complaint's own allegations, which demonstrate MIT was actively engaged in responding to reports. *See supra* at 5-8.

## III.   Counts III And IV Under Massachusetts Common Law Should Be Dismissed.

Without a federal claim to supply subject-matter jurisdiction, the pendent state law claims should be dismissed under Rule 12(b)(1). *See* AC ¶ 245 (citing 28 U.S.C. §§ 1331, 1343); *see also*

*Rectrix Aerodome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n*, 632 F. Supp. 2d 120, 132 (D. Mass. 2009) (Stearns, J.), *aff'd*, 620 F.3d 8 (1st Cir. 2010). These claims also fail under Rule 12(b)(6) based on a straightforward application of Massachusetts law. Courts reject attempts like these to circumvent statutory standards by repackaging meritless claims with common law labels.

### A.       The Contract-Based Claim Is Inadequately Pleaded.

Massachusetts law recognizes a contractual relationship between a private university and its students, but not every student grievance rises to the level of a contractual breach. Courts are wary about interfering with academic and disciplinary decisions made by private universities, *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 381 (Mass. 2000), and breach-of-contract claims are correspondingly limited to circumstances in which students pinpoint a "particular document, handbook, or manual that includes definite and certain promises about the university's environment or services," *Brown v. Suffolk Univ.*, No. 19-CV-40062, 2021 WL 2785047, at *6 (D. Mass. Mar. 31, 2021). "Vague and generalized representations are not contractually enforceable" and thus cannot sustain a claim. *G. v. Fay Sch.*, 931 F.3d 1, 12 (1st Cir. 2019).

Plaintiffs Boukin and Meyers's claim that MIT breached its contractual requirement to "provid[e] a safe, secure, and inclusive space for all students," AC ¶ 422, fails for several reasons. Most basically, the allegations underlying this cause of action do not point to any language whatsoever in any MIT document. *See id.* ¶¶ 420-435. Courts have repeatedly dismissed claims like this one that merely gesture at university handbooks or policies while neglecting to identify specific language allegedly giving rise to a contractual obligation. *Compare, e.g.*, *Brown*, 2021 WL 2785047, at *6 ("[Plaintiff did] not refer to any particular document, handbook, or manual that includes definite and certain promises about the university's environment or services."), and *Barkhordar v. Pres. & Fellows of Harv. Coll.*, 544 F. Supp. 3d 203, 212 (D. Mass. 2021)

("Plaintiffs have not identified the specific terms that their university should have reasonably expected students to understand [as a contractual promise]."), *with* AC ¶ 422 (referring generally to "student handbooks, university bulletins, regulations, codes, policies, and procedures"). That is because a student's "reasonable expectations" must be grounded in "the express terms of the contract." *Sonoiki v. Harv. Univ.*, 37 F.4th 691, 709 (1st Cir. 2022). In the two instances where Plaintiffs name actual MIT documents—the Mind and Hand Book and the Events Policy—they fail to identify any language within those documents that supports a reasonable expectation of the promise they allege. AC ¶¶ 423-424. The reason is simple: even if the Court were to scour the Amended Complaint's 435 paragraphs or indeed the underlying documents, it would not find language to that effect. At best, it would uncover the type of "generalized, aspirational statements that are insufficiently definite" to establish enforceable terms. *Fay Sch.*, 931 F.3d at 12.

Courts have good reason for rejecting claims like these. All institutions of higher education seek to promote "a welcoming community free from discrimination and discriminatory harassment" and "a safe, secure, and inclusive space for all students," AC ¶¶ 422-423—and make statements in their handbooks to that effect. Treating those policy statements as binding contractual commitments would open the floodgates to student claims and circumvent the well-established statutory standards for addressing discrimination and harassment under federal and state law. Courts would be inundated with impossible questions like what it means to "breach" a promise of a "welcoming" or "inclusive" environment. *Cf. Wu v. Ma*, No. 22-CV-30033, 2023 WL 6318831, at *9 (D. Mass. Sept. 28, 2023). To avoid this morass, courts have limited breach-of-contract claims to definite and certain promises about matters like adherence to disciplinary procedures or provision of specified services. *See, e.g.*, *Doe v. Trs. of Bos. Coll.*, 892 F.3d at 80-87; *Guckenberger*, 957 F. Supp. at 317. Nor can Plaintiffs stake their claim on breach of an ill-defined

promise of safety based on their perception of how MIT addressed supposed policy violations by other students. *Wu*, 2023 WL 6318831, at *9 (rejecting similar claim because the relevant policies "provide[d] important information about the [university's] expectations regarding student behavior without making any specific promises about how [it] would respond if a student did not meet expectations").

### B.    The Negligence-Based Claim Fails As A Matter Of Law.

Plaintiffs fare no better in alleging that MIT was negligent in addressing antisemitism. AC ¶¶ 403-418. This claim impermissibly duplicates the civil rights and breach-of-contract claims, and it seeks to impose duties that are contrary to Massachusetts law and public policy.

Negligence is not a catch-all for student grievances. To the contrary, Massachusetts law holds that universities do not stand *in loco parentis* and are "not responsible for monitoring and controlling all aspects of their students' lives." *Nguyen v. MIT*, 96 N.E.3d 128, 141 (Mass. 2018). Students must adequately allege each element of negligence to state a claim, "including the existence of a duty arising under Massachusetts tort law." *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 228 (D. Mass. 2017). "Whether a duty of care exists is a question of law and an appropriate subject of a motion to dismiss pursuant to Rule 12(b)(6)." *Leavitt v. Brockton Hosp., Inc.*, 907 N.E.2d 213, 215-16 (Mass. 2009) (citation omitted). In the postsecondary context, duties of care are limited to specific circumstances not present here, such as when an institution has actual knowledge that a specific student poses a risk of serious bodily harm to himself or others, *see Nguyen*, 96 N.E.3d at 142-43 (suicide); *Schaefer v. Fu*, 272 F. Supp. 3d 285, 288-89 (D. Mass. Aug. 10, 2017) (stalking and physical assault); *Helfman v. Northeastern Univ.*, 149 N.E.3d 758, 771-72 (Mass. 2020) (alcohol abuse); or when an institution has voluntarily undertaken a specific service like providing dorm security to resident students, *Mullins v. Pine Manor Coll.*, 449 N.E.2d

331, 336 (Mass. 1983). None of the duties alleged in the Amended Complaint—like the duty to provide a learning environment free from discrimination and harassment or to ensure all individuals comply with MIT's policies—is recognized under state tort law, AC ¶¶ 404-409, and each would undermine Massachusetts' rejection of *in loco parentis* liability.

Nor is negligence law a tool to enforce statutes or policies. The Amended Complaint alleges duties arising from MIT's obligation to comply with "applicable federal and state laws, as well as MIT's own policies and procedures." *Id.* ¶ 343. Any failure to comply with federal or state laws must be addressed through claims under those laws, not transparent efforts like this one to evade Title VI's rigorous standards. *See Doherty v. Emerson Coll.*, No. 1:14-CV-13281, 2017 WL 4364406, at *10 (D. Mass. Sept. 29, 2017). Indeed, "a negligence claim framed in this manner, with the duty itself arising from a federal law, likely would raise federal preemption concerns." *Id*. And policy violations are actionable only when they meet the breach-of-contract elements discussed above—not as independent tort duties. *See, e.g.*, *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67.

## IV.    Plaintiffs Lack Standing.

Plaintiffs do not and cannot "clearly allege" facts establishing the "irreducible constitutional minimum" of Article III standing: that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs bear this burden "for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Roe v. Healey*, 78 F.4th 11, 20 (1st Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Here, SCLJ lacks standing altogether, and no Plaintiff has standing for the extensive injunctive relief demanded.

### A.        SCLJ Lacks Standing To Participate In This Litigation.

SCLJ does not allege any direct injury suffered as an organization; rather, it stakes its standing on injury allegedly suffered by its members. For associational standing, an organization must show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551-53 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). But the claims alleged here plainly require individual participation: to show under Title VI that a particular student experienced a hostile educational environment, reported it to an appropriate official at the funding recipient, and experienced a clearly unreasonable response, among other elements; to show under Section 1986 that a particular student's civil rights were impaired by the alleged conspiracy; and to show under the common law of negligence that duties owed to a particular student were breached in a way that caused that student to suffer damages.

This type of "individualized proof" defeats associational standing. "[A]djudication of the claims … would turn on facts specific to each student," and "[e]fficient and successful judicial resolution of the claims would thus require participation and cooperation by numerous students." *Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 35 (1st Cir. 2019); *see also, e.g.*, *Barnett v. Johnson City Sch. Dist.*, No. 3:04-CV-0763, 2005 WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005) (questioning "how such claims of intentional discrimination could be prosecuted without the participation of the individual members"). That is why, in multi-plaintiff suits, courts parse whether each student experienced harassment sufficiently severe and pervasive to interfere with access to education, *see, e.g.*, *Demoret v. Zegarelli*, 451 F.3d 140, 145-47 (2d Cir. 2006); *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017). By contrast, where courts allow associational standing, they rely on circumstances absent here, like a challenge to a

broadly applicable policy and uncontested student-specific facts, which make it "unlikely that any of the students would need to do much, if anything, in the lawsuit." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 55 (1st Cir. 2023).

SCLJ's demand for damages exacerbates its standing problem. "[W]hatever injury may have been suffered" by SCLJ's members "is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975). Under *Warth*, associations like SCLJ lack "standing to sue on behalf of [their] members when seeking monetary relief to compensate for [their] members' injuries." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005); *see also, e.g.*, *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) ("We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members."). This black-letter law dooms SCLJ's attempted participation and claimed damages.

**B.      No Plaintiff Has Standing For The Sweeping Injunctive Relief Sought.**

*First*, Plaintiffs do not allege facts clearly demonstrating future harm. Injunctive relief is an equitable remedy reserved for circumstances where there is a "real or immediate threat that the plaintiff will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Unlike the typical injunctive-relief case, Plaintiffs do not target an allegedly discriminatory policy as the cause of their injury. They claim entitlement to *forward-looking* relief based on *past* incidents of alleged harassment. But "merely invoking the possibility" that past incidents *could* recur "is not enough to show that they are 'certainly impending' or that there is a 'substantial risk' that they will occur." *Roe v. Healey*, 78 F.4th at 21 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 & n.5 (2013)). Possible recurrence hinges on a highly speculative chain of hypothetical events about what students might do and how MIT might respond, which is simply "too

attenuated" to establish standing. *Id*. Moreover, MIT's robust and ongoing response makes the allegation of future harm not just speculative but also implausible. *See supra* at 5-8.

Plaintiffs cannot evade their burden by aggregating the purported experiences of students who are not parties here or by pointing to antisemitism throughout history. AC ¶¶ 150, 152, 176, 248, 365; *see Bingham v. Massachusetts*, 616 F.3d 1, 7 (1st Cir. 2010). For standing, injury must be "particularized," meaning "it must affect the plaintiff[s] in a personal and individual way." *Spokeo*, 578 U.S. at 339. "[A]ggregating the allegations" of various individuals does not suffice. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). The Court's analysis is therefore limited to the allegations about Plaintiffs Boukin and Meyers, which do not permit the inference of a continuing campaign of antisemitism directed at them. MIT recognizes the real and damaging effects that antisemitic incidents can have on its students and is committed to responding to reports regardless of whether they are likely to recur. But for purposes of litigation, "emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Lyons*, 461 U.S. at 107 n.8.

**Second**, Plaintiffs do not allege facts clearly demonstrating that *MIT itself* will cause any future harassment or discrimination. Plaintiffs cannot rely on injuries caused by third parties or off-campus events to establish standing for a suit against MIT. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). *Equal Means Equal v. Ferriero* underscores this point. The plaintiffs in that case lacked standing because they sought "relief from the conduct of a defendant who stands well removed from the person who would directly inflict [the] harm" they alleged. 3 F.4th 24, 28 (1st Cir. 2021). The same is true here. In paragraph after paragraph, the pleading criticizes the words and actions of students and student groups. But MIT is not vicariously liable for their actions, and it is speculative and implausible to assert that MIT will not continue its robust response.

**Third**, Plaintiffs do not allege facts clearly demonstrating that the requested relief is necessary to redress their purported injuries. Their demands are not remotely "limited to the inadequacy that produced [any] injur[ies] in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Indeed, while the allegations about Plaintiffs Boukin and Meyers are limited to ten paragraphs about particular incidents, the prayer for relief addresses virtually every aspect of MIT's campus and operations—education and training, campus communications, policy formulation and application, personnel decisions, student-organization management, and student discipline. AC at 134-35. "The desire to obtain sweeping relief cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221-22 (1974) (alteration omitted). Where, as here, plaintiffs request "broad and all-embracing relief" that is incongruous with their asserted injury, the proper result is dismissal for lack of standing. *Beaudoin v. Healey*, No. 22-CV-11356, __ F. Supp. 3d __, 2023 WL 7116711, at *3 (D. Mass. Oct. 27, 2023).

## CONCLUSION

The Court should dismiss the Amended Complaint in its entirety. In addition, any claims or requests for relief dismissed for failure to state a claim or for lack of standing should be dismissed with prejudice. Despite the benefit of MIT's prior Motion to Dismiss, the 130-page Amended Complaint suffers from numerous deficiencies, and Plaintiffs are not entitled to a third attempt to put forth a cognizable claim. *See LSI Design & Integration Corp. v. Tesaro, Inc.*, No. 18-12352, 2020 WL 1027773, at *1 (D. Mass. Mar. 3, 2020) (no "third bite at the apple").

Dated: June 14, 2024                         Respectfully submitted,

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

*/s/ Ishan K. Bhabha*
Ishan K. Bhabha (*pro hac vice*)
  IBhabha@jenner.com
  202.637.6327
Lauren J. Hartz (*pro hac vice*)
  LHartz@jenner.com
  202.637.6363
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001-4412

        and

Daryl J. Lapp (BBO No. 554980)
  daryl.lapp@lockelord.com
Elizabeth H. Kelly (BBO No. 672277)
  liz.kelly@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199
617.230.0100

## CERTIFICATE OF SERVICE

I certify that a true copy of this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

on June 14, 2024.

*/s/ Ishan K. Bhabha*
Ishan K. Bhabha