# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **StandWithUs Center for Legal Justice, Katerina Boukin, and Marilyn Meyers,** | **Case No. 1:23-cv-10577-RGS** |
| **Plaintiffs,** | |
| **v.** | |
| **Massachusetts Institute of Technology,** | |
| **Defendant.** | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTS ............................................................................................................................... 3

    I.    Available Tools to Combat Antisemitism ................................................ 3
    II.   Antisemitic Harassment at MIT in the 2023-2024 School Year ............................. 4
    III.  Jewish and Israeli Students Pled for Help from MIT ................................. 6
    IV.  Escalation of Antisemitic Harassment at MIT ........................................ 7

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

    I.    Plaintiffs Have Standing ........................................................... 10
        a.   SCLJ Has Associational Standing ........................................... 10
        b.   MIT's Attempted Merits Challenge to Plaintiffs' Claim for Injunctive Relief Does Not
        Defeat Standing ........................................................................ 12
    II.   Plaintiffs Sufficiently Allege Violations of Title VI of the Civil Rights Act. 13
        a.   MIT Has Actual Notice of Antisemitic Harassment in Its Programs ............................. 13
        b.   MIT's Response to the Harassment was Clearly Unreasonable ................................. 15
        c.   The Harassment was Severe, Pervasive and Objectively Offensive ............................. 17
        d.   Responding to Antisemitic Harassment Would Not Violate the First Amendment ....... 20
        e.   Plaintiffs' Claims are Ripe ........................................................ 21
    III.  Plaintiffs Sufficiently Allege Violations of the KKK Act ................................. 24
        a.   Plaintiffs Sufficiently Plead Claims Under § 1985 of the Ku Klux Klan Act ............... 24
        b.   MIT Is Civilly Liable Under § 1986 of the Ku Klux Klan Act ..................................... 31
    IV.  Plaintiffs Sufficiently Plead Their Breach of Contract Claims ....................... 33
    V.   Plaintiffs Sufficiently Plead Negligence .............................................. 35

CONCLUSION ................................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Adams v. Demopolis City School,* 80 F.4th 1259 (11th Cir. 2023)................................................ 22

*Antonio v. Sec. Servs. of Am., LLC*, 701 F. Supp. 2d 749 (D. Md. 2010), *on reconsideration in part*, No. CIV.A. AW-05-2982, 2010 WL 2858252 (D. Md. July 19, 2010, and *aff'd in part sub nom. Antonio v. SSA Sec., Inc.*, 782 F.3d 173 (4th Cir. 2015) .......................................... 28

*Aulson v. Blanchard*, 83 F.3d 1 (1st Cir. 1996) ......................................................................... 24

*Aziz v. FedEx Ground Package Sys., Inc.*, 2019 WL 636972 (E.D. Tex. Feb. 14, 2019)............. 29

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004) ....................................................... 12

*Barkhordar v. Pres. & Fellows of Harv. Coll.*, 544 F. Supp. 3d 203 (D. Mass. 2021) ............... 33

*Barnes v. 3 Rivers Telephone Coop., Inc.*, 2022 WL 3212100 (D. Mont. Aug. 9, 2022) ............ 18

*Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, (N.D.N.Y. Feb. 2, 2005)....................... 12

*Bethany T. v. Raymond Sch. Dist. with Sch. Admin. Unit 33*, 2013 WL 1933756 (D.N.H. May 10, 2013) ............................................................................................................................... 19

*Blackwell v. Issaguena Cnty. Bd. of Educ.*, 363 F.2d 749 (5th Cir. 1966) ................................. 21

*Blouin v. Loyola Univ.*, 506 F.2d 20 (5th Cir. 1975) ................................................................. 20

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.*, 89 F.4th 46 (1st Cir. 2023)......... 11

*Brown v. Suffolk Univ.*, 2021 WL 2785047 (D. Mass. Mar. 31, 2021) ....................................... 33

*Canty v. Old Rochester Regional Sch. Dist.*, 66 F. Supp. 2d 114. 115 (D. Mass. 1999)........ 15, 16

*Chapman v. Higbee Co.*, 319 F.3d 825 (6th Cir. 2003) ............................................................... 29

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013).................................................... 13

*Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, (D. Mass. 2011) ............................... 12

*Czerwienski v. Harvard University,* 666 F. Supp. 3d 49 (D. Mass. 2023) ...................... 22, 34, 35

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999).......................... 15

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)........................................... 12, 17, 18, 19

*Demoret v. Zegarelli*, 451 F.3d 140 (2d Cir. 2006) ..................................................... 12

*Doe v. Brown Univ.*, 327 F. Supp. 3d 397 (D.R.I. 2018)................................................ 22

*Doe v. Pike Sch., Inc.*, 2014 WL 413207 (D. Mass. Feb. 4, 2014).................................. 14

*Doe v. Purdue Univ.*, 464 F. Supp. 3d 989 (N.D. Ind. 2020) ....................................... 23

*Doe v. Sacks*, 2024 WL 402945 (S.D.N.Y. Feb. 2, 2024) ............................................ 16

*Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248 (11th Cir. 2010)............................. 14

*Doe v. School Admin. Dist. No. 19*, 66 F. Supp. 2d 57 (D. Me. 1999) ......................... 14

*Doe v. Trs. of Bos. Coll.*, 892 F.3d 67 (1st Cir. 2018) ................................................. 34

*Doe v. Univ. of Mass.*, 2024 WL 1521758 (D. Mass. April 9, 2024) ........................... 20

*Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788 (M.D. Tenn. 2016) ................................. 13

*Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530 (1st Cir. 1995)............... 23

*Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018) ..................... 16, 22, 24

*Fort Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044 (10th Cir. 2023)........................... 14

*Gay Students Org. of Univ. of New Hampshire v. Bonner*, 509 F.2d 652 (1st Cir. 1974)........... 21

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ..................................... 14

*Grace v. Bd. of Trs., Brooke East Boston*, 85 F.4th 1 (1st Cir. 2023) ..................... 15, 17

*Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366 99 S. Ct. 2345, 60 L. Ed. 2d 957
   (1979)................................................................................................................. 27

*Guckenberger v. Boston Univ.*, 957 F. Supp. 306 (D. Mass. 1997)) ..................... 17, 18, 34

*Hudson v. Teamsters Loc. Union No. 957*, 536 F. Supp. 1138 (S.D. Ohio 1982)........ 27

*I.G. ex rel Grunspan v. Jefferson Cnty. Sch. Dist. through Bd. of Educ.*, 452 F. Supp. 3d 989 (D. Colo. 2020) ..................................................................................................................... 19

*In re: The Home Depot, Inc. Customer Data Sec. Breach Litig.*, 2016 WL 2897520 (N.D. Ga. May 18, 2016) ....................................................................................................................... 23

*J.S.H. v. Newton*, 654 F. Supp. 3d 7 (D. Mass. 2023) .................................................................. 18

*Joseph v. Signal Int'l L.L.C.*, No. 1:13-CV-324, 2015 WL 1262286 (E.D. Tex. Mar. 17, 2015). 28

*L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545 (3d Cir. 2017) ........................................ 12

*L.M. v. Town of Middleborough Mass.*, -- F.4th --, 2024 WL 2887665 (1st Cir. June 9, 2024) .. 20

*Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318 (1st Cir. 2016) ...... 21, 23

*Lawson v. Affirmative Equities Co., L.P.*, 341 F. Supp. 2d 51 (D. Mass. 2004) (Stearns, J.) ........ 9

*Lemelson v. Wang Labs., Inc.*, 874 F. Supp. 430 (D. Mass. 1994) (Stearns, J.) .......................... 10

*Markham v. Town of Chelmsford*, 2019 WL 4016433 (D. Mass. Aug. 26, 2019) ....................... 10

*Mass. Ass'n of Afro. Am. Police, Inc. v. Boston Police Dept.*, 973 F.2d 18 (1st Cir. 1992)......... 23

*McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63 (1st Cir. 2003)............................................... 21

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998).................................. 18

*MSP Recovery Claims Series 44, LLC v. Bunker Hill Ins. Co.*, 683 F. Supp. 3d 172 (D. Mass. 2023) ............................................................................................................................................ 9

*Muniz-Rivera v. United States*, 326 F.3d 8 (1st Cir. 2003)............................................................. 9

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ....................................................... 10

*Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18 (1st Cir. 2007).................................... 12

*Oden v. Northern Marianas College,* 440 F.3d 1085 (9th Cir. 2006) .......................................... 22

*Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13 (1st Cir. 2019)......... 11

*Patricia H. v. Berkely Unified Sch. Dist.*, 830 F. Supp. 1288 (N.D. Cal. 1993).......................... 23

*Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005) ................................................ 12

*Phillip v. Univ. of Rochester*, 316 F.3d 291 (2d Cir. 2003) .................................................... 26, 27

*Plourde v. Sorin Grp. USA, In.*, 23 F.4th 29 (1st Cir. 2022) ....................................................... 35

*Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*, 908 F. Supp. 2d 597 (M.D. Pa. 2012) ..... 12

*Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208 (D. Mass. 2015) .................................... 19

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017) ........................................................................... 23

*Roach v. Green*, 2016 WL 1254236 (D. Mass. Mar. 29, 2016) .................................................... 20

*Roma Constr. Co. v. Russo*, 96 F.3d 566 (1st Cir. 1996) ............................................................ 9

*Ruffino v. State Bank & Tr. Co.*, 908 F. Supp. 1019 (D. Mass. 1995) .......................................... 13

*Sanches v. Carrolton Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156 (5th Cir. 2011) ............ 20

*Santos v. U.S. Bank N.A.*, 54 N.E.3d 548 (Mass. App. 2016) ...................................................... 35

*Schaefer v. Yongjie Fu*, 272 F. Supp. 3d 285 (D. Mass. 2017) .................................................... 35

*Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 324 (D. Mass. 2013) ....................... 11

*Shulse v. W. New Eng. Univ.*, 2020 WL 4474274 (D. Mass, Aug. 4, 2020) ................... 33, 34, 35

*Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018) .................................................. 24, 30, 31

*Sonoiki v. Harvard Univ.*, 37 F.4th 691 (1st Cir. 2022) ............................................................. 33

*Thompson v. Int'l Ass'n of Machinists & Aerospace Workers*, 580 F. Supp. 662 (D.D.C. 1984)  27

*Timothy B. v. Kinsey,* 2024 WL 1350071 (M.D.N.C. Mar. 29, 2024) .................................... 11, 12

*Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 503 (1969) ................................................. 20

*United States v. Brown*, 49 F.3d 1162 (6th Cir. 1995) ............................................................... 30

*United States v. Greer*, 939 F.2d 1076 (5th Cir. 1991), *opinion reinstated in part on reh'g,* 968
  F.2d 433 (5th Cir. 1992) ........................................................................................................ 30

*Walker v. Pointer*, 304 F. Supp. 56 (N.D. Tex. 1969) ................................................................ 30

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................................ 10

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Sagardia De Jesus*, 634 F.3d 3 (1st Cir.

    2011) .......................................................................................................................... 10

*Wells v. Rhodes*, 928 F. Supp. 2d 920 (S.D. Ohio 2013) ............................................ 28

*Wills v. Brown Univ.*, 184 F.3d 20 (1st Cir. 1999) ..................................................... 15

*Withrow v. Clarke*, 2008 WL 8188363 (D. Mass. Aug. 15, 2008), *report and recommendation*

    *adopted*, 2008 WL 8188854 (D. Mass. Sept. 10, 2008) ..................................... 27, 31

*Witten v. A.H. Smith & Co.*, 567 F. Supp. 1063 (D. Md. 1983).................................... 27

*Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012) ...................... passim

## STATUTES

42 U.S.C. § 1981 ........................................................................................... 2, 27, 28, 29

42 U.S.C. § 1982 ................................................................................................. passim

42 U.S.C. § 1985…………………………………………………………………………….passim

42 U.S.C. § 1986…………………………………………………………………………….passim

Title VI ................................................................................................................. passim

## RULES

Fed. R. Civ. P. 8 ....................................................................................................... 13

Fed. R. Civ. P. 12(b)(1)............................................................................................... 9

Fed. R. Civ. P. 12(b)(6)............................................................................................... 9

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. XIII ................................................................................... 2, 28, 30

## INTRODUCTION

Following the October 7, 2023, Hamas terrorist attacks, before bodies of the victims had cooled (or even been identified and families notified), antisemitic harassment exploded at the Massachusetts Institute of Technology ("MIT"). MIT's memorandum in support of its Motion to Dismiss the Amended Complaint ("MTD") highlights several policies and relationships with security personnel it could have utilized to address the rampant antisemitic harassment. MTD at 6. Yet MIT fails to mention that it declined to *enforce* these policies or utilize such relationships to intervene and protect its Jewish and Israeli students. MIT spills a great deal of ink attempting to convince the Court it had a fulsome response to antisemitism, while also claiming that response is ongoing—such as, for example, its creation of the Standing Together Against Hate ("STAH") initiative. MTD at 8. However, like the totality of MIT's "response," STAH was so ineffective at addressing antisemitism that it disbanded. The facts in the Complaint, taken as true, demonstrate MIT failed its Jewish and Israeli students—and violated the law—repeatedly.

One cannot imagine what might happen if college campuses erupted in protests seeking the elimination Mexico, rather than Israel, or the death of Buddhists, rather than Zionists. In those alternate circumstances, no one would claim such conduct was "political," the speech tolerable, or the dismal response anything other than deliberate indifference. Blatant and repeated violations of university policy on MIT's watch are anything but innocent freedom of expression. To the contrary, MIT stood idly by (and in some cases endorsed) legally and morally unacceptable discrimination against Jewish and Israeli students, when under similar circumstances as to other protected classes, it took swift action to protect other minority groups. Compl. ¶¶ 264-72. MIT's arguments in support of dismissal all fail.

*First*, SCLJ satisfies the long-standing jurisprudence permitting associational standing when, like here, the nature of the claim and the relief sought do not make the individual participation of each injured party indispensable to proper resolution of the case. Courts regularly permit associational standing when the action challenges a widespread unlawful pattern and practice and seeks injunctive relief.

*Second*, Plaintiffs sufficiently allege that MIT had actual notice of the antisemitic harassment on its campus, that MIT acted with deliberate indifference when it failed to take suitable measures to stop the discrimination—even fueling continued antisemitism through its dismal response, and that the harassment at MIT was severe, pervasive and objectively offensive. Moreover, no First Amendment concern exists when a private institution regulates non-speech conduct (genocidal chants, encampments), and MIT cannot suggest the encampments and similar protests did not substantially disrupt Plaintiffs' education. Finally, to allow MIT's ripeness arguments to prevail would simply permit institutions to wait out discrimination by starting a response process that drags on indefinitely.

*Third*, Plaintiffs' § 1986 claims survive because Plaintiffs properly plead violations of § 1985 and cited to enforceable rights through the Thirteenth Amendment, as well as §§ 1981 and 1982. Further, Plaintiffs properly allege that the Conspirators conspired and did act to deprive Jews and Israelis, including Plaintiffs, of their rights and privileges under the law, that they acted with the requisite invidiously discriminatory animus, and that they caused damages. Plaintiffs additionally properly plead violations of § 1986 and provided plenty of facts to demonstrate that MIT knew that the violations of § 1985 were going to occur, that they did occur, and yet MIT neglected and refused to act.

**Fourth,** Plaintiffs adequately plead breach of contract where MIT promised to uphold its policies related to free speech, antidiscrimination, harassment and intimidation, in particular insofar as those policies ensure safety and access, yet MIT breached its express written policies.

**Finally,** Plaintiffs adequately allege negligence based on MIT's duty to provide a learning environment free from discrimination—a duty recognized under Massachusetts law. The Court should allow this action to proceed so that MIT can be held accountable for its grave and unprecedented tolerance of antisemitism.

**FACTS**

## I.      Available Tools to Combat Antisemitism

MIT requires compliance with the policies set out in its student handbook. Compl. ¶¶ 40-41. These include, but are not limited to:

- MIT's discrimination and harassment policy, which applies to conduct occurring outside the academic environment. Compl. ¶¶ 45-53.
- MIT's student behavior and integrity policy which demands a "high standard of civility" and "respect" and prohibits misconduct on- or off-campus. Compl., ¶¶ 54-55.
- MIT's policy prohibiting "threats, intimidation, or coercion." Comp. ¶ 57.
- MIT's chalking and poster policies. Compl. ¶¶ 59-60.
- MIT's policy on events and demonstration which provides that such activities cannot, among other things, be used for the purposes of "harassment, discrimination, … threats of violence, targeting of groups or individuals" or disrupt MIT activities or interfere with access to MIT activities or facilities. Compl. ¶¶ 61-66.

Between October 2023 and May 2024, MIT repeatedly acknowledged students were violating its policies. Compl., ¶¶ 180-82, 198, 227. MIT President Kornbluth stated, "the right to free speech does not extend to harassment, discrimination, or incitement to violence in our community. MIT policies are clear on this." Compl. ¶¶ 196-97. Yet over and over again, MIT declined to enforce these very policies. Compl. ¶¶ 180-82, 198, 227, 230. It merely reiterated the existence of policies

3

without enforcing them. *Compare* Ex. 4 to the Decl. of Jaren D. Wilcoxson in Support of Defendant's MTD ("Wilcoxson Decl.")[1] *with* Compl. ¶¶ 180-82, 196-97.

MIT has numerous tools available to combat discrimination in its programs, which it has used in the past to address anti-Black and anti-Asian racism, homophobia and transphobia. Compl. ¶¶ 264-72. MIT has *not* utilized these same tools, including trainings and workshops to address antisemitism. *Id.* Instead, MIT created STAH, an ineffective initiative that later disbanded. After STAH's spring lecture program featured a panelist who endorsed the Hamas terrorist attacks as an act of resistance and described Israelis as "savages." Compl. ¶¶ 38, 201-02, Ex. A.

## II.    Antisemitic Harassment at MIT in the 2023-2024 School Year

Following the October 7, 2023 terrorist attacks, MIT students and student organizations, including MIT Coalition Against Apartheid (MIT CAA) and Palestine@MIT, engaged in a widespread campaign of antisemitic harassment consisting of campus-wide emails on MIT networks, social media content, rallies, class disruptions and a multiweek encampment. Compl. ¶¶ 291-311. They were joined in their efforts by members of other students and, worse, faculty. *See*, *e.g.*, Compl. ¶ 288.   By way of example, they widely distributed to the student body antisemitic and harassing statements, endorsing the October 7, 2023 terrorist attacks and calling for the elimination of Israel or Zionists (like Plaintiffs)—including through violent means. *Id.*

---

[1] MIT highlights "policies and procedures for keeping [its] campus safe" that it declined to use. MTD at 6. For example, MIT identifies "enhanced campus security measures and patrols" that it did not use to disperse protesters. For example, MIT took no action in response to the MIT CAA rally at the MIT Student Center where Plaintiff Meyers was harassed and assaulted. Compl. ¶¶ 153-58. MIT likewise took no action in response to other rallies that occurred in Lobby 7. *See, e.g.*, Compl. ¶ 160. Eventually, MIT began to issue "advisor[ies]" warning students to "avoid" Lobby 7 due to the activities of MIT CAA. *See, e.g.*, Compl. ¶¶ 173. On November 9, 2023, MIT initially threatened to take disciplinary action against participants in these kinds of events only to later rescind these threats. Compl. ¶¶ 177, 182-85.

From October 2023 to Spring 2024, MIT CAA and Palestine@MIT held rallies on MIT's campus, including in Lobby 7, a main thoroughfare on campus,[2] the Student Center, and the Hillel building,[3] including on October 10, 19, 23 and 30; November 2 and 9; December 14; February 12 as well as other dates, during which attendees shouted epithets; called for the destruction of Israel, Zionists and Jews, and restricted Jewish and Israeli students from campus spaces.[4]

MIT CAA held a rally on October 19, 2023, outside the MIT Student Center. Compl. ¶¶ 151-54. Plaintiff Meyers and another Jewish student were assaulted and harassed by an attendee, who raised his bike at them and stated, "Your ancestors [(referring to Holocaust victims)] didn't die to kill more people." Compl. ¶ 156. Rally attendees also chanted slogans that called for violence against Jews, such as "from the river to the sea!" or "[t]here is only one solution! Intifada revolution!" Compl. ¶ 157. Similarly, during one of the Lobby 7 protests, one of the CAA co-presidents prevented Plaintiff Boukin from entering the area because she was a Jewish Israeli, even though other students and faculty were permitted to enter the area. Compl. ¶ 297.

In addition, MIT CAA actively worked to disrupt classes and other activities on campus. For example, on October 23, 2023, MIT CAA planned a walkout and disruptions of classes throughout campus in which participants interrupted other classes by shouting or using megaphones. Compl. ¶ 159. At one point, antisemitic harassment was so pervasive SCLJ Member #3 could not study anywhere on campus without hearing chants calling for the destruction of Israel, impeding her ability to concentrate or study for exams. Compl. ¶ 364.

MIT and its administrators acknowledged that the conduct of the protestors was antisemitic, discriminatory and in violation of MIT policies. *Id.*; Compl. ¶ 180, 198, Ex. A. On

---

[2] Compl. ¶¶ 150-57, 159–60, 170-79.
[3] *Id.*
[4] Compl. ¶¶ 150-57, 159-60 161-62, 170, 186, Ex. A.

November 9, 2023, Professor Kornbluth, Provost Barnhart and Chancellor Nobles stated that "a line ha[d] been crossed" and MIT was "concerned about further escalation" and "violence." Compl. ¶¶ 180, 182. The antisemitism got so out of hand that President Kornbluth was asked to testify in front of Congress and admitted, "I've heard chants, which can be anti-Semitic, depending on the context when calling for the elimination of the Jewish people." Compl. ¶¶ 196-98.

### III.    Jewish and Israeli Students Pled for Help from MIT

Plaintiffs, SCLJ Members, and other Jewish and Israeli students at MIT reported the harassment to MIT administrators, MIT's Institute Discrimination & Harassment Response Office (IDHR) and MIT's Diversity, Equity, and Inclusion Office (DEI). Compl. ¶¶ 205, 354, 363. In addition, MIT faculty and professors documented the harassment they experienced or witnessed. Compl. ¶¶ 208-10; Compl., Ex. A.

Plaintiff Meyers tried to report antisemitism she and peers experienced to IDHR only to be falsely[5] told Jewish students were not members of a protected class and that the harassment she experienced was outside IDHR's scope. Compl. ¶¶ 205, 354. SCLJ Member #3 reported harassment to professors, her head of house, her advisor and student services, among others. Compl. ¶ 363. Several students reported to MIT DEI an offensive statement made by a postdoc accusing Zionists of "organ harvesting," only for the DEI office to refer to that "blood libel" as "confirmed." Compl. ¶¶ 189-91. Other students, similarly, contacted IDHR concerning antisemitic events only to be told that they were confused about the definition of harassment. Compl. ¶ 205.

On January 22, 2024, the MIT Israel Alliance, of which at least one Plaintiff is a member, emailed administration about their experiences with antisemitic harassment at MIT and asked MIT

---

[5]    https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf    (last visited July 11, 2024).

to address it. Compl. ¶¶ 212-14. After the situation deteriorated further and an antisemitic encampment was established, a student emailed MIT administrators, writing: "As students flagrantly break all sorts of MIT rules yet again to spew hatred, harassment, and calls to violence and genocide against Israeli and Jews … I am writing to ask your help." Compl. ¶¶ 221-23. Chancellor Nobles did not identify responsive action and instructed the Jewish students that *they* should not counterprotest. Compl. ¶¶ 224-25.

### IV.    Escalation of Antisemitic Harassment at MIT

On April 21, 2024, approximately thirty MIT students pitched tents on the Kresge Oval, just outside the MIT campus building that houses Hillel, the leading Jewish student organization. Compl. ¶ 221. The encampment was organized by a group calling itself "Scientists Against Genocide" (SAGE), a coalition formed by MIT CAA, Palestine@MIT, the Graduate Student Union (GSU), the Black Graduate Student Association (BGSU) and National Students for Justice in Palestine (SJP) (collectively, "Conspirators"), among others. Compl. ¶¶ 300-01, 312-19, 326.

The Conspirators posted overtly antisemitic signs. Compl. ¶ 222. One proclaimed that Zionists and Zionism, a religious belief of Plaintiffs, needs to be "root[ed] out of the world." *Id.* Within twenty-four hours of the encampment's creation, Jewish and Israeli students reported calls for violence and genocide against them. Compl. ¶ 223. MIT administration did not disperse the encampment upon receiving notice of these threats; instead, administrators advised Jewish and Israeli students that they should not engage in a counter-protest. Compl. ¶ 224.

Jewish MIT students were scheduled to celebrate Passover Seder on April 22, 2024, at Hillel. Compl. ¶ 232. However, the Passover Seder had to be moved to another location because MIT did not stop protesters (including by enforcing MIT policies) from making it unsafe for Jewish students to celebrate Passover at Hillel. Compl. ¶¶ 222, 225 227, 262, 312, 335, 364. In the coming

weeks, Plaintiffs and SCLJ Members were deprived of their ability to participate in religious activities at Hillel. Compl. ¶¶ 222, 225 227, 262, 312, 335, 347, 349, 357, 364. Though SCLJ Member # 3 was an active member of Hillel, she avoided attending because she feared for her safety due to the protests. *Id.* at ¶ 349, 364. SCLJ Member #2 was disturbed that an encampment participant urinated on the Hillel building. *Id.*

In violation of MIT policy, the Conspirators never reserved Kresge Oval for any purpose. Compl. ¶ 241. They also prevented other students from accessing the space. For example, during April 2024, Plaintiff Boukin attempted to cross the Kresge Oval, where the encampment was located, but one of MIT CAA's co-presidents prevented her from entering the area because she was a Jewish Israeli while allowing other students and faculty to enter. Compl. ¶ 301.

As the encampment went on, the harassment of Plaintiffs and SCLJ Members continued unabated. Compl. ¶ 231. It took nearly a week after being erected for President Kornbluth to issue a statement about the encampment. Compl. ¶ 226. Despite acknowledging that the encampment was a "clear violation" of MIT policies "[f]rom the start," President Kornbluth stated that MIT "has not interfered with the encampment." Compl. ¶¶ 227, 229.

As MIT chose not to "interfere[]" with the encampment, it fueled the Conspirators' and participants' ability to call for violence against Jews and Israelis. Compl. ¶ 237. On May 4, 2024, media footage shows Conspirators and participants chanting, "From the River to the Sea" as well as chants in Arabic, translated as "From water to water, Palestine is Arab," "We want to talk about the obvious, we don't want to see Zionists," and "From water to water, death to Zionists." *Id.*

On May 6, MIT stated if students did not leave the encampment, they would face discipline. Compl. ¶ 238. But, as with MIT's previous threats action, *see* Compl. ¶¶ 177, 182-85, MIT did not follow through. Compl. ¶ 238. Instead, the encampment grew. Compl. ¶ 239. On May 7, Hillel

was scheduled to host Israel Day on the Kresge Oval, which SCLJ Member #2 and other Jewish students had reserved months earlier. Compl. ¶¶ 230, 241. Because the encampment occupied the space, they had to relocate to accommodate the antisemitic encampment, even as MIT administrators admitted the encampment violated policy. Compl. ¶¶ 227, 230, 241. While other universities across the country acted, MIT allowed antisemitism to swell. Compl. ¶¶ 234-35, 244-46.

On May 8 and May 9, Conspirators and participants blocked the entrance to the Stat garage, preventing MIT community members from entering and exiting. Compl. ¶¶ 242-43. This required that a public street, Vassar Street, be shut down. *Id.* Finally, on May 10 (conveniently as school was ending for the school year), MIT cleared the encampment.

## LEGAL STANDARD

Granting a motion to dismiss under Fed. R. Civ. P. 12(b)(1) "'is appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." *MSP Recovery Claims Series 44, LLC v. Bunker Hill Ins. Co.*, 683 F. Supp. 3d 172, 177 (D. Mass. 2023) (quoting *Muniz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003). Generally, outside materials may *not* be considered in evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Id.*[6] "A motion to dismiss under Rule 12(b)(6) must be denied 'unless it appears to a certainty that the plaintiff would be unable to recover under any set of fact.'" *Lawson v. Affirmative Equities Co., L.P.*, 341 F. Supp. 2d 51, 62 (D. Mass. 2004) (Stearns, J.) (quoting *Roma Constr. Co. v. Russo*, 96 F.3d 566, 569 (1st Cir. 1996)). In "reviewing a motion to

---

[6] By using materials from outside the Complaint to support its 12(b)(6) motion—not just its 12(b)(1) motion—MIT violates the cardinal rule of Rule 12(b)(6) in that Plaintiffs' allegations must be construed as true. *See*, *e.g.*, MTD at 6-8 (discussing MIT's alleged "response"); MTD at 8 (describing disciplinary procedures it previously alleged to be secret and off limits to Plaintiffs).

dismiss, the court accepts all well-pled factual averments as true and draws all reasonable inferences in the non-movant's favor." *Lemelson v. Wang Labs., Inc.*, 874 F. Supp. 430, 432 (D. Mass. 1994) (Stearns, J.).

**ARGUMENT**

I.    **Plaintiffs Have Standing**

      a.   **SCLJ Has Associational Standing**

SCLJ is a nonprofit educational organization corporation dedicated to combating antisemitism and whose members include Jewish and Israeli students, professors and community members. *See* Compl. ¶¶ 18-23. It is well established that organizations can seek relief for their members, as "the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Associational standing has long allowed injured minorities to band together in organizations equipped to defend their rights. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958); *accord Watchtower Bible & Tract Soc'y of New York, Inc. v. Sagardia De Jesus*, 634 F.3d 3, 8-9 (1st Cir. 2011).

MIT's arguments against associational standing ring hollow. The law does not bar associational standing whenever some "individual participation" by a member of the association is required. *See* MTD at 32. Rather, "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511; *accord Markham v. Town of Chelmsford*, 2019 WL 4016433, at *3 (D. Mass. Aug. 26, 2019).

The SCLJ members are not "indispensable." This action challenges a widespread unlawful pattern and practice and seeks injunctive relief. Courts regularly find that in such cases the kind of

10

participation required from individual members does not give rise to the type of "individualized proof," MTD at 32, that would defeat associational standing. *See Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.*, 89 F.4th 46, 55 (1st Cir. 2023); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 324, 327 (D. Mass. 2013). Indeed, in *Boston Parent Coalition*, the First Circuit cautioned against any approach that would prevent associational standing on the ostensible ground that too much of an individual factual showing of harm by members would be necessary—especially in the context of claims for injunctive relief. *See* 89 F.4th at 55.[7]

None of the cases that MIT cites, including *Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 35 (1st Cir. 2019) ("*Parent/Pro. Advoc. League*")—which preceded the First Circuit's decision in *Boston Parent Coalition*, suggests the relevant inquiries here (MIT's across-the-board allowance of antisemitism), are sufficient to defeat associational standing. In *Timothy B. v. Kinsey*, the court articulated the limitations of the *Parent/Pro. Advoc. League* standard. 2024 WL 1350071, at *11-13 (M.D.N.C. Mar. 29, 2024).[8] The court explained that because the claims in *Parent/Pro. Advoc. League* were based on violations of the IDEA which mandates individual assessments for students, that case's focus was necessarily on each member of the association, and thus associational standing in *Parent/Pro. Advoc. League* was not warranted. *Id.* By contrast, in *Timothy B*, associational standing *was warranted* where the plaintiff

---

[7] *See also Sexual Minorities Uganda*, 960 F. Supp. 2d at 327 (finding "group-based claim" was "well-suited to be brought by a representative association like Plaintiff, even though some of the evidence will come from individual testimony.").

[8] *Timothy B.* involved an association alleging discrimination in violation of the Americans with Disabilities Act (ADA) while *Parent/Pro. Advoc. League* involved an association alleging discrimination in violation of the Individuals with Disabilities Education Act (IDEA). *See* 2024 WL 1350071, at *11-13.

challenged across-the-board discrimination practices in violation of the ADA—similar to the allegations here under Title VI and under MIT's own policies. *See id.* at *13.[9]

   **b.  MIT's Attempted Merits Challenge to Plaintiffs' Claim for Injunctive Relief Does Not Defeat Standing**

   MIT argues Plaintiffs do not sufficiently allege future harm traceable to MIT. *See* MTD at 33. That argument improperly injects merits challenges into the standing analysis and also ignores the fact that Plaintiffs "need not prove with specificity at this stage how every harm" relates to MIT's alleged deliberate indifference and pattern and practice of discrimination; Plaintiffs need only allege a "fairly traceable" connection between their injuries and MIT's conduct, which can be "indirect[]." *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 152 (D. Mass. 2011). When, as here, the environment created by defendant's "policies and practices" has been alleged to cause plaintiffs' injuries, plaintiffs sufficiently plead standing for injunctive relief. *See id.*; *see also Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 26 (1st Cir. 2007).

   *Roe* is readily distinguishable. That case involved speculation about how government entities responsible for public education would respond to the unprecedented COVID-19 pandemic. *See Roe*, 78 F.4th 11. *Roe* is in marked contrast to cases like *Connor B.*, which holds that allegations of an established pattern and practice are sufficient to seek injunctive relief.  *See Connor B.*, 771 F. Supp. 2d at 152.[10] Indeed, even *Roe* explains that "past harm" can "confer

---

[9] In the other, mostly out-of-circuit cases that MIT cites, there were also insufficient allegations that the relief sought would similarly apply to all association members and primarily be injunctive. *See* Def's MTD at 32-33 (citing *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, (N.D.N.Y. Feb. 2, 2005), *Demoret v. Zegarelli*, 451 F.3d 140, 145-47 (2d Cir. 2006); *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017), *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005) and *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004).

[10] *See also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999) (school liable if its conduct "cause[d] students to undergo harassment or ma[de] them liable or vulnerable to it"); *Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*, 908 F. Supp. 2d 597, 615 (M.D. Pa. 2012)

standing to seek forward-looking declaratory or injunctive relief" when, as here, "there is ongoing injury or a sufficient threat that the injury will recur." *Id.* 78 F.4th at 21.[11]

Here, unlike in *Lyons*, *Roe* and *Clapper v. Amnesty International USA*, 568 U.S. 398, 411 (2013), Plaintiffs, who should be protected by Title VI (and MIT's policies and § 1986) remain subject to unlawful antisemitic harassment and discrimination (as alleged as to the specific conduct faced by the student Plaintiffs and as corroborated by other evidence of MIT's pattern and practice toward others) in a regularly recurring pattern of antisemitic activity. *See e.g.*, Compl. ¶¶ 221-46.[12]

## II.   Plaintiffs Sufficiently Allege Violations of Title VI of the Civil Rights Act

### a.   MIT Has Actual Notice of Antisemitic Harassment in Its Programs

Plaintiffs allege MIT had actual notice of antisemitic harassment in its programs. *E.g.*, Compl. ¶ 283. MIT seeks to impose a rule entirely of its own creation, under which schools are insulated from liability absent specifically articulated allegations of complaints by the plaintiffs. *See* MTD at 12.[13] But it is not *Plaintiffs*' reports that are determinative on the issue of notice. The "actual notice standard does not set the bar so high" that schools lack actual notice absent "a clearly credible report" from the plaintiff. *Doe v. School Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 64 (D.

---

("courts have upheld standing for plaintiffs who are not the direct targets of discrimination"); *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 813 (M.D. Tenn. 2016) (injunctive relief appropriate where enrolled plaintiffs allege ongoing deliberate indifference); *Ruffino v. State Bank & Tr. Co.*, 908 F. Supp. 1019, 1038 (D. Mass. 1995) ("[H]ostile environment discrimination typically is not confined to one act, directed at one individual, one time; rather, it is a composite of [] action and inaction . . .when there are multiple incidents and victims, it is the cumulative effect of the offensive behavior that creates the [] environment.").

[11] MIT does not provide a specific citation to support its assertion that "The Court's analysis is therefore limited to the allegations about Plaintiffs Boukin and Meyers." MTD at 34.

[12] MIT claiming that "Plaintiffs cannot rely on injuries caused by third parties" is a red herring. MTD at 34. Plaintiffs challenge *MIT's discrimination and harassment* and *MIT's failure to enforce so as to prevent discrimination and harassment*—the failure to enforce arises from legal obligations MIT has under Title VI and pursuant to its promises.

[13] There is no requirement that Plaintiffs plead with specificity the contents of individual reports, and MIT points to no such requirement. *See* MTD at 12; *see also* Fed. R. Civ. P. 8.

Me. 1999). Instead, schools have actual notice if they receive reports of harassment from—or about—other students. *Id.*; *Fort Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1056 (10th Cir. 2023). "[N]o circuit has interpreted *Gebser*'s actual notice requirement so as to require notice of the prior harassment of the plaintiff … *herself*." *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1257 (11th Cir. 2010) (emphasis original).[14] It is sufficient if a defendant has actual notice of discrimination in "the recipient's program." *Fort Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th at 1056 (quotations omitted).

Plaintiffs allege MIT had notice of the harassment because not only did Plaintiffs and SCLJ Members report specific incidents of antisemitic harassment to MIT, but so did other students and professors. *See, e.g.*, Compl. ¶¶ 189-90, 205, 223, 260, 363, 365; Ex. A. When Jewish and Israeli MIT students *tried* to report harassment, the very administrators tasked with addressing harassment compounded it by telling them they were not a protected class, repeating antisemitic tropes, or dissuading them from exercising their own speech rights. *Id.*; Compl. ¶¶ 189-90, 205, Ex. A. This establishes actual notice of discrimination in "the recipient's programs." *Gebser*, 524 U.S. at 290.

Yet it is not just *students'* reports that provided MIT with notice. Its administrators indisputably had actual notice through their direct observations of the situation on campus. *See, e.g.*, Compl. ¶¶ 180-82, 198, 227. MIT's campus was awash in highly visible occupations of campus buildings and greenspace and calls for genocide and violence against Jews and Israelis. Compl. ¶¶ 3, 159-62, 170-76, 186-88, 220, 225-33, 237-38, 243, 259, 297, 299, 301, 355, 361, 365. MIT administrators repeatedly issued public statements about the ongoing activities, which

---

[14] Neither *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998), nor *Doe v. Pike Sch., Inc.*, 2014 WL 413207, at *4 (D. Mass. Feb. 4, 2014), require that the *plaintiff* make a report to the school. In those cases, actual notice was lacking because the *type* of harassment the school was aware of from reports by others differed from the type of harassment the plaintiffs experienced.

included the administrators' direct and personal observations of the conduct and the ways in which it violated MIT's policies. Compl. ¶¶ 180-82, 198, 227.

### b. MIT's Response to the Harassment was Clearly Unreasonable

A school is liable for harassment when it "acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). MIT asserts that to prevail on a Title VI claim, Plaintiffs must allege it did not take *any* steps to address harassment. *See* MTD at 12-13.[15] That is *not* the standard.

Deliberate indifference "cause[s] the student to undergo harassment or make[s] the student vulnerable to it." *Grace v. Bd. of Trs., Brooke East Boston*, 85 F.4th 1, 11 (1st Cir. 2023). A school is deliberately indifferent if it "had notice of harassment and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Id.* (quotations omitted). If an institution "learns that its measures have proved inadequate, it may be required to take further steps." *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999); *Canty v. Old Rochester Regional Sch. Dist.*, 66 F. Supp. 2d 114. 115, 117 (D. Mass. 1999).

MIT's response was clearly unreasonable because its touted "response" did *nothing* to address the harassment Plaintiffs experienced, "cause[d] the student[s] to undergo the harassment" further and "ma[d]e the student[s] vulnerable" to further harassment by allowing it to escalate. *Grace*, 85 F.4th at 11. MIT argues that liability is precluded when universities "t[ake] action against 'disruptive protestors' and 'engage[d] in an ongoing dialogue with the opposing parties." MTD at 12-13 (quoting *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011)). Notably,

---

[15] MIT asserts: "Plaintiffs do not and cannot claim that MIT 'failed to take *any* action to stem the tide' of the antisemitism they allege." MTD at 12 (quoting *Pawtucket Sch. Dept.*, 969 F.3d 1, 9-10 (1st Cir. 2020) (modifications added by MIT)). In *Pawtucket*, the defendant school did not take "any action" to address the sexual harassment of the minor plaintiff. 969 F.3d at 9-10. The specific facts of that case do not mean that every other plaintiff necessarily must produce the same facts.

the "action" in *Felber* was the arrest of disruptive protestors—which MIT refused to do as protesters continued harassing Plaintiffs for months, by which point the damage had been done. *See*, *e.g.*, Compl. ¶¶ 180, 227-32, 244-45, 312, 345-65.[16]

Contrary to MIT's assertions, ineffective, non-disciplinary or delayed responses do not preclude Title VI liability. In *Vance v. Spencer County Public School District*, the Sixth Circuit rejected the argument that "as long as a school district does something in response to harassment, it has satisfied the standard," because where a school knows "its efforts to remediate are ineffective, and continues to use those same methods to not avail [it] has failed to act reasonably in light of the known circumstances." 231 F.3d 253, 260-61 (6th Cir. 2000).[17] Here, too, MIT "failed to address the more than six-month harassment campaign," 911 F.3d at 690, directed at Jewish and Israeli students in classes, public spaces, MIT-affiliated social media, and housing. Compl. ¶¶ 3, 159-62, 170-76, 186-88, 220, 225-233, 237-38, 243, 259, 297, 299, 301, 355, 361, 365. Everywhere Plaintiffs went, they were targeted by hateful, violent rhetoric and actions. *Id.*[18]

The question is not whether the institution took any measures *at all*, *Canty*, 66 F. Supp. 2d at 115, but whether the measures were "suitable." *Id.*; *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 670 (2d Cir. 2012). In *Grace*, the school failed to offer "suitable remedial measures in

---

[16] MIT's purported efforts to engage in "dialogue," were wholly ineffectual as reflected in the continuation *and escalation* of antisemitic conduct. Compl. ¶¶ 179, 201-03, 211-14, 221-32, 237, 239, 242.

[17] Simply continuing to speak to harassers was deemed to be deliberately indifferent where harassment continued. *Id.* at 262 (citing *Canty*, 66 F. Supp. 2d at 115); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 690 (4th Cir. 2018) (finding university's efforts, including two listening circles, campus-wide emails, and security escorts inadequate because they "failed to address the more than six month harassment campaign" and "listening to students is not a remedy").

[18] Even in *Doe v. Sacks*, on which MIT relies, the court recognized that officials are "not categorically insulate[d]" from liability for unreasonable responses, such as "instances in which long-running inattention, inaction, or deflection by a school can demonstrate deliberate indifference." 2024 WL 402945, at *7 (S.D.N.Y. Feb. 2, 2024)

light of the claimed harassment." 85 F.4th at 12-14 (finding discipline of some, but not all harassers, and failure to take non-disciplinary measures inadequate). The measures were unsuitable, the court explained, because there was no reason to believe they had worked. *Id.* at 13. In *Zeno*, the court held that even where harassers were disciplined, the response was deliberately indifferent where the school "dragged its feet" because "once a school is aware of its ineffective response, a delay before implementing further remedial action is no less problematic." 702 F.3d at 670. The "sufficiency of a response" must be "considered in light of the known circumstances and as the known circumstances change, the … response may also have to evolve." *Id.* at 668.

Here, the antisemitic harassment continued unabated for months despite any purported remedial measures taken by MIT. In fact, it escalated from protests and social media campaigns to an occupation of school grounds and calls for genocide. Compl. ¶¶ 3, 159-62, 170-76, 186-88, 220, 225-33, 237-38, 243, 259, 297, 299, 301, 355, 361, 365. MIT's approach did not change: its "response" was to tell victims to avoid their harassers, call for "dialogue," point students to the IDHR and DEI offices (that also engaged in antisemitic harassment) and walk back threats of discipline. *See*, *e.g.*, Compl. ¶¶ 172-73, 177-85, 190-91, 200, 205, 224-32. MIT "should have done more and its failure to do more effectively caused further harassment." *Zeno*, 702 F.3d at 670 (quotations omitted). Its failure to promptly respond amounts to deliberate indifference.

### c.  The Harassment was Severe, Pervasive and Objectively Offensive

A Title VI claim premised on student-on-student harassment will lie for "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. MIT asserts that Plaintiffs' allegations are "conclusory" and fail to demonstrate the conduct was directed to them specifically. MTD at 15-17 (citing *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 315 (D. Mass. 1997)).

Harassment that is "severe, pervasive, and objectively offensive" is harassment that goes beyond mere teasing and name calling to "den[y] its victims the equal access to education" that Title VI "is designed to protect. *Davis*, 526 U.S. at 652. While MIT suggests that "specific" allegations are required, MTD at 16, it fails to identify any authority requiring Title VI claims to be pled with specificity. MIT's reliance on *Guckenberger* is misplaced and does not create such a requirement. *J.S.H. v. Newton*, 654 F. Supp. 3d 7, 20-21 (D. Mass. 2023) (noting that *Guckenberger* is a Title III case and declining to adopt the same deliberate indifference standard used in Title VI and Title IX cases in Title III cases).[19] In Title VI cases, "racial attacks need not be directed at the complainant in order to create a hostile educational environment." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (finding racial epithets and offensive language on school walls impeded ability to "obtain the same benefit from schooling"); *see also Barnes v. 3 Rivers Telephone Coop., Inc.*, 2022 WL 3212100, at *4 (D. Mont. Aug. 9, 2022) (rejecting argument that Title VI claims must be pleaded with particularity).[20]

---

[19] *Guckenberger* is otherwise distinguishable: the court did *not* hold that claims brought under the federal civil rights statutes must be premised on individualized, personal conduct, but merely that the administrator's conduct in that case, which consisted of academic critiques made at out-of-state conferences were remote in time and place and not a basis for the plaintiff's claim. 957 F. Supp. 2d at 315, 315 n.8.

[20] In any event, Plaintiffs *did* plead this element with particularity. *See* Compl. ¶¶ 155-57, 186, 297, 352, 354-57, 362-64. Plaintiffs alleged each named Plaintiff and SCLJ member received antisemitic emails at their MIT email addresses and provided specific examples of the nature of this content. Comp. ¶ 352. On October 8, 2023, all undergraduate students received by a "Joint Statement" from MIT CAA and Palestine@MIT on their MIT-provided emails, which characterized the October 7, 2023 Hamas terrorist attacks as "a response to an ongoing 75 years of occupation" and "affirm[ed] the right of all occupied peoples to resist oppression and colonization." Compl. ¶¶ 145-49. MIT CAA also used MIT's email system to send emails to all student group members about similar topics. Compl. ¶ 151. Plaintiffs also alleged that each named Plaintiff and SCLJ member was subjected to antisemitic rhetoric at protests on MIT's campus. Compl. ¶ 354-57; *see also* Comp. ¶ 156 ("Your ancestors [(referring to Holocaust victims)] didn't die to kill more people" stated by protester who assaulted Plaintiff Meyers); Compl. ¶ 174 ("intifada," "from the river to the sea" and "resistance is justified" witnessed by or directed to

MIT attempts to analogize this case to *Pollard v. Georgetown School District*, *Felber*, and *HB v. Monroe Woodbury Cent. Sch. Dist.* Those cases are distinguishable, as most conduct described was not actually proper for consideration in assessing the sufficiency of the alleged discrimination.[21] By contrast, Plaintiffs here alleged near constant harassment. *See*, *e.g.*, Compl. ¶ 362. Plaintiffs and SCLJ members were subjected to a barrage of antisemitic—and violent—chants, signs, and imagery when they simply tried to study, cross campus, or worship at Hillel. Compl. ¶¶ 354-57, 362-64. The Supreme Court characterized the "overt, physical deprivation of school resources," such as restricting access to a field—exactly what happened here—as the "most obvious example of harassment triggering a damages claim." *Davis*, 526 U.S. at 650-51. Plaintiffs need only allege that the harassment "undermines and detracts from the victims' educational experience" such that they "are effectively denied equal access to [MIT's] resources and opportunities." *Id.* The environment MIT fostered is exactly what is meant by objectively offensive, severe, and pervasive harassment. Educational benefits "include an academic environment free from racial hostility. *Zeno*, 702 F.3d at 666.[22]

---

Plaintiffs or SCLJ members at a Lobby 7 protest); Compl. ¶ 186 ("There is only one solution: Intifada revolution" chanted at Lobby 7 protest where plaintiffs or SCLJ members present); Compl. ¶¶ 297, 301 (protesters prohibiting Plaintiff Boukin from crossing Lobby 7 and Kresge Oval but allowing non-Jewish students to cross); Compl. ¶ 362 (SCLJ Member #3 could not study anywhere on campus without being exposed to antisemitic rhetoric, as described throughout Complaint).

[21] *See Pollard*, 132 F. Supp. 3d 208, 230-31 (D. Mass. 2015) (sexual orientation harassment could not support Title VI claim); *H.B.*, 2012 WL 4477552, at *1 (S.D.N.Y. Sept. 27, 2012) (only one racial comment was described in complaint); *Felber*, 851 F. Supp. 2d at 1185-88 (bulk of antisemitic incidents occurred over 15 year period, primarily on other campuses and before plaintiff enrolled).

[22] *See also I.G. ex rel Grunspan v. Jefferson Cnty. Sch. Dist. through Bd. of Educ.*, 452 F. Supp. 3d 989 (D. Colo. 2020) (holding Jewish student sufficiently alleged a hostile environment where students gave Nazi salutes, wore  swastikas, and referenced gas chambers); *Bethany T. v. Raymond Sch. Dist. with Sch. Admin. Unit 33*, 2013 WL 1933756, at *1 n.1 (D.N.H. May 10, 2013) ("A reasonable jury could conclude… a cross-burning threat and direct references to the infamous Ku

### d. Responding to Antisemitic Harassment Would Not Violate the First Amendment

"Words matter and have consequences," MIT Department Head Robert van der Hilst said of MIT's right to make content-based restrictions of speech in 2021. Compl. ¶ 250. In fact, MIT's Freedom of Expression Policy provides that MIT can restrict "protests … so as not to disrupt the essential activities" of the university, including through time, place, and manner restrictions. Compl. ¶ 251. MIT claims the harassment here is "protected speech" and, therefore, its response was limited by First Amendment constraints. *See* MTD at 17-18. Not so.

First, as a private institution, MIT's restrictions on student conduct—even if it *were* "speech"[23] would not run afoul of the First Amendment. *See e.g., Blouin v. Loyola Univ.*, 506 F.2d 20, 22 (5th Cir. 1975). Second, even if MIT *was* subject to the First Amendment *and* the challenged conduct was speech—which MIT has not demonstrated—MIT would be justified in restricting it. Schools can "restrict" speech "when (1) actual disturbances or disorders on the school premises in fact occur; (2) the record demonstrates facts which might reasonably have led school officials to forecast substantial disruption or material interference with school activities; or (3) the speech invades the rights of others." *Doe v. Univ. of Mass.*, 2024 WL 1521758, at *10 (D. Mass. April 9, 2024) (cleaned up).[24] Plaintiffs allege MIT students engaged in non-speech conduct, (*i.e.*

---

Klux Klan, was 'more than the sort of teasing and bullying that generally takes place at schools.'") (quoting *Sanches v. Carrolton Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011)).

[23] The at issue conduct is *not* speech. Excluding others from public spaces, epithets, and genocidal chants fall outside the First Amendment's protections. *Roach v. Green*, 2016 WL 1254236, at *2 (D. Mass. Mar. 29, 2016) ("The First Amendment does not protect violence, threats, speech consisting of epithets, and personal abuse. Nor do assaultive behavior, threats, and 'fighting words' come under the protection of the First Amendment simply because they are blended with elements of protected speech or expressive conduct.") (Stearns, J.) (quotations and citations omitted).

[24] *See also L.M. v. Town of Middleborough Mass.*, -- F.4th --, 2024 WL 2887665, at *1 (1st Cir. June 9, 2024) (quoting *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 503, 513 (1969))

occupying campus spaces and assaults) as well as non-protected verbal conduct that materially and substantially disrupts the work and discipline of the school, including Plaintiffs. Compl. ¶¶ 155-57, 159-60, 236-45, 346-65; Compl, Ex. A. Indeed, MIT recognized it had exactly this authority—though far too late—when it stated in its press release about the encampments that "freedom of expression…does not protect the continued use of a shared Institute resource in violation of long-established rules." Compl. ¶ 245. Plaintiffs allege exactly these kinds of unprotected disruptions.

### e. Plaintiffs' Claims are Ripe

Plaintiffs' claims are ripe because they alleged a "'substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality.'" *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (quotations omitted). Ripeness has two prongs: (1) fitness and (2) hardship. *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003).

MIT's sole argument is that its alleged need for "institutional flexibility" in carrying out a *post hoc* "complaint resolution process,"[25] weeks after the harassment let up somehow renders claims about *past events* unripe. *See* MTD at 21. But courts evaluating Title VI claims are not restricted to considering only disciplinary proceedings; instead, schools have a duty to take

---

(upholding decision of school to prohibit student from wearing shirt stating "There Are Only Two Genders," though a passive act, because of potential impact on transgender students); *Gay Students Org. of Univ. of New Hampshire v. Bonner*, 509 F.2d 652, 663 (1st Cir. 1974) (recognizing that, under *Tinker*, universities have the power to prohibit actions which "materially and substantially disrupt the work and the discipline of the school.") (internal quotations omitted); *see also Blackwell v. Issaguena Cnty. Bd. of Educ.*, 363 F.2d 749, 745 (5th Cir. 1966) (finding that distribution of buttons, as opposed to simply wearing buttons, ran afoul of the rights-of-others limitation in *Tinker*).

[25] MIT improperly points to a group of "complaints" that are subject to a "complaint resolution process," which includes duplicates and complaints that have already been resolved. *See* MTD Ex. 10. MIT does not identify whether any of the complaints in the so-called "complaint resolution process" concern any of the conduct that is the subject of the Complaint, which is just one reason why such evidence outside of the Complaint cannot be considered.

whatever measures are "reasonably calculated" to end discrimination." *Zeno*, 702 F.3d at 670. Additionally, Plaintiffs' Title VI claims arise out of the near constant harassment experienced from at least October 2023 through May 2024. The harm done, including the loss of instructional time, inability to participate in extracurricular, social, and worship activities, and restrictions use of campus facilities has already occurred, and cannot be undone regardless of what—if any— disciplinary action MIT takes in the future. Compl. ¶¶ 155-57, 237, 241, 346-65.

MIT's argument that Plaintiffs' deliberate indifference claims are not ripe is meritless.[26] MIT argues Title VI claims are unripe until the conclusion of disciplinary proceedings because, sometimes, plaintiffs wait to file until this happens. MTD at 21.[27] But if plaintiffs were *forced* to wait until an institution concludes a disciplinary process it controls, potential defendants who have actual notice of discrimination in their programs need only "wait out" potential discrimination claims by starting a "response" process but allow it to drag on indefinitely. This is contrary to the policy behind Title VI.[28] The failure to utilize non-disciplinary methods of combatting harassment has been deemed deliberate indifference. *Zeno*, 702 F.3d at 668-69; *see* Compl. ¶¶ 233–36, 215-16, 252-54, 261, 430-32. MIT's eventual decision to commence disciplinary proceedings does not mitigate its duty to take steps "reasonably calculated" to end the harassment, which it failed to do. *Zeno*, 702 F.3d at 669; *Feminist Majority Found.*, 911 F.3d at 689.

---

[26] The cases on which MIT relies are inapposite. In *Adams v. Demopolis City School*, the delay at issue was not a delay in responding to the harassment, but rather in instituting a statutorily-required bullying policy. 80 F.4th 1259, 1272 (11th Cir. 2023). In *Oden v. Northern Marianas College*, the claim was not premised on a delay in responding to the harassment but a delay in instituting proceedings occasioned by the plaintiff's own cross-country move. 440 F.3d 1085, 1089 (9th Cir. 2006).

[27] In the two MIT-selected examples, the courts did not hold other plaintiffs were precluded—for any reason, including ripeness—from filing until the institution concludes its disciplinary process. *Czerwienski v. Harv. Univ.*, 666 F. Supp. 3d 49 (D. Mass. 2023); *Doe v. Brown Univ.*, 327 F. Supp. 3d 397 (D.R.I. 2018).

[28] https://www2.ed.gov/about/offices/list/ocr/docs/antisemitism-dcl.pdf

Plaintiffs' claims are fit for adjudication. On the prudential component, Plaintiffs' claims are not the type that would render the court's decisions "advisory" only. *Reddy v. Foster*, 845 F.3d 493, 50 (1st Cir. 2017). As for the jurisdictional component, Plaintiffs' claims are final, definite, and do not involve "contingent events that may not occur as anticipated or may not occur at all." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995). MIT may well choose to discipline Plaintiffs' harassers—but doing so now has no bearing on whether MIT was deliberately indifferent in allowing Plaintiffs' harassment in the previous school year, and it will not restore the educational experience to which they were entitled. When courts speak of "contingent events" in the ripeness context, they refer to injuries that have *yet* to occur. *See Mass. Ass'n of Afro. Am. Police, Inc. v. Boston Police Dept.*, 973 F.2d 18, 20 (1st Cir. 1992). Plaintiffs and SCLJ Members, however, have already *been* harassed, and their claims are therefore ripe. Compl. ¶¶ 155-57, 186, 297, 352, 354-57, 362-64; *see*, *e.g.*, *Patricia H. v. Berkely Unified Sch. Dist.*, 830 F. Supp. 1288, 1288-89 (N.D. Cal. 1993).[29]

Plaintiffs will experience hardship if forced to wait for court consideration. MIT's attempt to paint the ripeness standard as requiring "undue" hardship in Title VI cases, MTD at 21, is simply incorrect. *Undue* hardship is not the standard. Plaintiffs need only show that their claims are sufficiently immediate such that they would suffer hardship if the court delayed its decision. *Lab. Rels.*, 844 F.3d at 326. Plaintiffs' Title VI claim satisfies this standard because Plaintiffs experienced months of harassment while simply trying to attend school, and additional wait time

---

[29] *See also Doe v. Purdue Univ.*, 464 F. Supp. 3d 989, 1000 (N.D. Ind. 2020) (finding plaintiff had already incurred damages as a result of suspension such that waiting for additional proceedings to occur would not change the fact of his past damages); *see also In re: The Home Depot, Inc. Customer Data Sec. Breach Litig.*, 2016 WL 2897520, at *7 (N.D. Ga. May 18, 2016).

will add nothing to their claims—it will merely delay vindication of Plaintiffs' rights. *Feminist Majority Found.*, 911 F.3d at 689 (citing *Zeno*, 702 F.3d at 669).

### III.  Plaintiffs Sufficiently Allege Violations of the KKK Act

Plaintiffs discuss claims under § 1985 of the Ku Klux Klan Act only insofar as the violation of § 1985 is the hook for a § 1986 violation. *Sines v. Kessler*, 324 F. Supp. 3d 765, 798 (W.D. Va. 2018) ("A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985."); Compl. ¶ 279.

#### a.  Plaintiffs Sufficiently Plead Claims Under § 1985 of the Ku Klux Klan Act

In relevant part, §1985(3) states:

> If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one          or          more          of          the          conspirators.

42 U.S.C.A. § 1985.

"To state a claim under § 1985(3) a plaintiff must allege the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996), (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971)). "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal

enjoyment of rights secured by the law to all." *Griffin*, 403 U.S. 88, 102, (1971) (internal citations omitted). The *Griffin* court clarified, "The motivation aspect of § 1985(3) focuses not on scienter in relation to deprivation of rights but on invidiously discriminatory animus." *Id.* n.10.

> ### i.   *Plaintiffs Plausibly Allege a Conspiracy of Two or More Persons at MIT*

Plaintiffs plead far more than conclusory allegations showing the Conspirators had a meeting of the minds to disrupt life at MIT such that the rights of Jews and Israelis were violated. While in some cases, a meeting of the minds must be inferred, here, the groups announced their plans to host rallies, disrupt classes, and set up the encampment (among other things), and classes, and put their official logos on those announcements. Compl. ¶¶ 279-365. These posts were announcements to the world that these groups intended and did coordinate, plan, organize and attend these events together. *See e.g.*, Compl. ¶¶ 133, 211, 288. The groups also had overlapping members, created coalitions of their individual groups, and jointly organized, recruited participants for, attended and participated in the encampment under the name "SAGE," formed for the express purpose of setting up the encampment, and engaging in activities which formed the basis for this action. Compl. ¶¶ 221-43, 289. These events went just as the groups planned and advertised: the conspirators organized walkouts, disrupted classes, defaced MIT's campus with posters and chalk and ultimately participated in the encampment, which violated MIT's policies by occupying campus without permission and depriving Jewish and Israeli students of access to their classes, the use of their places of worship and the use of campus for events Jewish groups had obtained permission to host. Compl. ¶¶ 136-62, 169-93, 200-32, 237-44, 261-362, 279-330. This more than sufficiently alleges a meeting of the minds of the Conspirators to impede the rights of MIT's Jewish and Israeli students.

ii.   *Plaintiffs Plausibly Allege the Purpose of the Conspiracy Was to Deprive Jews and Israelis of Their Rights, and It Was Done with Discriminatory Animus*

MIT alleges that Plaintiffs failed to allege a discriminatory animus and instead insists that these protests were only about "political positions related to Israel and Palestine." MTD at 26. But MIT is wrong. Plaintiffs plainly alleged that the protests went beyond politics, particularly when the conspirators targeted Zionism, which the Complaint explains in detail is an antisemitic dog whistle. Compl. ¶¶ 95-111. Moreover, even though conspirators might aver that their intentions are benign, this "misses the trees for the forest." *Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995). MIT's reasoning is "akin to saying that a bank robber lacks *mens rea* and thus cannot be convicted because his ultimate objective was to make money, not to commit robbery." *Libertad*, 53 F.3d at 446. While the Conspirators claimed to be there to express their views on Israel, the clear practical effect was to impede the rights of Jewish and Israeli students on campus, including Plaintiffs. *See Libertad*, 53 F.3d at 446.

Plaintiffs detailed how the conspirators' actions had the practical effect of impeding the rights of Jewish and Israeli students, including Plaintiffs. *See e.g.*, Compl. ¶¶ 136-62, 169-93, 200-32, 237-44, 261-362, 279-30. Moreover, the Complaint is replete with examples of actions which plainly do nothing to advocate for Palestinians or Palestine and solely discriminate against and curtail the rights of Jews and Israelis on campus. *See e.g.*, Compl. ¶¶ 144-54, 162, 179, 189, 192, 220, 222. Other courts have similarly determined that the racial animus element may be satisfied even in complaints with less detail than this one. For example, in *Phillip v. University of Rochester*, the Second Circuit determined that the racial animus element had been satisfied even where "plaintiffs plead few facts relevant to discriminatory intent" and where the complaint "does not contain many evidentiary allegations relevant to intent, it does allege that the plaintiffs were

singled out of a group that apparently also contained non-minority students." 316 F.3d 291, 298-99 (2d Cir. 2003).

### iii.    Plaintiffs Plausibly Allege that the Conspirators Deprived Plaintiffs of the Equal Enjoyment of their Rights

On its own, § 1985 does not enumerate the specific rights that may be enforced through civil actions, and courts have previously determined that the sources of those rights can be found in other statutes. *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372, 99 S. Ct. 2345, 2349, 60 L. Ed. 2d 957 (1979). Plaintiffs assert that their rights, which exist under the Thirteenth Amendment and corresponding statutes enacted by Congress, were violated by the Conspirators' actions. Compl. ¶¶ 279-349. Plaintiffs also specifically cite 42 U.S.C. §§ 1981 and 1982, which protect the rights to make and enforce contracts (42 U.S.C. § 1981) and the right to "purchase, lease, sell, hold, and convey real and personal property" (42 U.S.C. § 1982).[30]

Despite MIT's contention that §§ 1981 and 1982 cannot form the bases for claims under § 1985, this is simply untrue. Courts dating back decades unequivocally recognized that "42 U.S.C. § 1981 is a proper substantive basis for a claim of redress under § 1985(3)." *Witten v. A.H. Smith & Co.*, 567 F. Supp. 1063, 1072 (D. Md. 1983) (reviewing the legislative history of the KKK Act and the Civil Rights Act).[31] The same can be said of § 1982 claims. *See Wells v. Rhodes*, 928 F.

---

[30] Plaintiffs withdraw §§ 1985 and 1986 claims premised on Title VI and Title VII.

[31] Massachusetts courts previously determined that § 1981 "protects individuals from both governmental and private interference of their rights explained in subsection (a)." *See Withrow v. Clarke*, No. CIV.A. 06-11597-RCL, 2008 WL 8188363, at *7 (D. Mass. Aug. 15, 2008), *report and recommendation adopted*, No. 1:06-CV-11597, 2008 WL 8188854 (D. Mass. Sept. 10, 2008), citing *Phillip v. Univ. of Rochester*, 316 F. 291, 297 (2d Cir. 2003) and *Garrett v. Tandy Co.*, 295 F.3d 94, 98 (1st Cir. 2002). *See also Hudson v. Teamsters Loc. Union No. 957*, 536 F. Supp. 1138, 1147 (S.D. Ohio 1982) ("[T]his Court must hold that Plaintiff's rights created by s 1981 are cognizable under s 1985(3)."); *Thompson v. Int'l Ass'n of Machinists & Aerospace Workers*, 580 F. Supp. 662, 668 (D.D.C. 1984) ("The obstacles discussed above barring plaintiff's use of § 1985(3) remedies are not present here, as § 1981 is clearly a federal source of rights…").

Supp. 2d 920, 930-31 (S.D. Ohio 2013) ("The Court concludes that § 1982 provides an adequate basis for a private conspiracy claim under § 1985(3).")[32] Plaintiffs do indeed plead colorable violations of §§ 1981and 1982 and under the Thirteenth Amendment.

a. <u>Plaintiffs Sufficiently Allege a Violation of 42 USC § 1981</u>

Section 1981 provides two important sets of rights: the right to make, enforce, and benefit from contracts, and the right to be protected against discrimination. Plaintiffs have colorable claims under both. "To state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute." *Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir. 2002). As Jews and Israelis, Plaintiffs are members of a minority and a protected class. Compl. ¶ 205. Plaintiffs described the way MIT discriminated against them, particularly by treating Jews and Israelis differently than other minorities and by failing to enforce their policies. Compl. ¶¶ 264-72. Element three is broken down by clause below.

1. <u>Contract Clause</u>

Section 1981 provides protection for "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b); *Garrett*, 295 F.3d at 98. There are two types of

---

[32] Massachusetts courts agree. *Withrow v. Clarke*, No. CIV.A. 06-11597-RCL, 2008 WL 8188363, at *7 (D. Mass. Aug. 15, 2008), *report and recommendation adopted*, No. 1:06-CV-11597, 2008 WL 8188854 (D. Mass. Sept. 10, 2008) ("Moreover, the Supreme Court has found no state action requirement in section 1982 and has noted the absence of a state action requirement in the Thirteenth Amendment and section 1981."); *see also Antonio v. Sec. Servs. of Am., LLC*, 701 F. Supp. 2d 749, 778 (D. Md. 2010), *on reconsideration in part*, No. CIV.A. AW-05-2982, 2010 WL 2858252 (D. Md. July 19, 2010, and *aff'd in part sub nom. Antonio v. SSA Sec., Inc.*, 782 F.3d 173 (4th Cir. 2015) ("Additionally, the unique status of §§ 1981 and 1982 as enabling statutes of the Thirteenth Amendment, the Court concludes that § 1985(3) violations may be based on them."); *Joseph v. Signal Int'l L.L.C.*, No. 1:13-CV-324, 2015 WL 1262286, at *16 (E.D. Tex. Mar. 17, 2015) (citing *Wells v. Rhodes* with approval).

contracts which have been interfered with by the Conspirators' actions and MIT's subsequent failure to prevent these violations. Plaintiffs outlined in detail how the Conspirators impaired their contractual rights, including violations of the student handbook, MIT's policies and procedures Compl. ¶¶ 41-67, 118-24, 136-62, 169-93, 200-32, 237-44, 261-362, 279-330, as well as contracts that Jewish and Israeli groups had with MIT to host events like the Israel Day celebration, which had to be relocated due to the encampment. *See e.g.*, Compl. ¶¶ 318, 357, 372(b), 419-35. Plaintiffs also detailed how these policy violations were both known to MIT and reported to MIT (Compl. ¶¶ 178-79, 205, 208, 212-14, 223), and yet MIT neglected or refused to prevent these actions from occurring. Compl. ¶¶ 169, 172, 182-84, 189-93, 200-20, 223-30, 243-53, 343-49.

## 2.   The Equal Benefit Clause

To prove a claim under § 1981's equal benefit clause, "[a] litigant must demonstrate the denial of the benefit of a law or proceeding protecting his or her personal security or a cognizable property right." *Chapman v. Higbee Co*., 319 F.3d 825, 832 (6th Cir. 2003).

Plaintiffs, as members of Hillel, were unable to fully utilize their property when they were forced to move their Passover seder to an alternate location. Compl. ¶¶ 261-63, 335. Jewish and Israeli students, including Plaintiffs, were deprived of their right to use the Kresge lawn to host their Israel Day celebration, which they properly reserved. Compl. ¶ 241. Moreover, the harassment of Jewish and Israeli students, including Plaintiffs, violated their security of person. *See Aziz v. FedEx Ground Package Sys., Inc.*, 2019 WL 636972, at *7 (E.D. Tex. Feb. 14, 2019); *see also* Compl. ¶¶ 136-62, 169-93, 200-32, 237-44, 261-362, 279-330.

## b.   Plaintiffs Sufficiently Allege a Violation of 42 USC § 1982

Section 1982 provides, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold,

and convey real and personal property." 42 U.S.C.A. § 1982. "[T]he phrase 'to hold' property under the statute can also mean 'to use' property." *United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir. 1991), *opinion reinstated in part on reh'g,* 968 F.2d 433 (5th Cir. 1992).[33]

Here, Plaintiffs' property rights were violated when they were prevented from using Hillel to host their Passover seder and when protesters urinated on Hillel. Compl. ¶ 357. As members of Hillel, Plaintiffs, and specifically, Plaintiff SCLJ Member #2 may enforce Hillel's property rights. *See Greer*, 939 F.2d at 1091 ("members and non-members of the temple and community center, such as guests, could claim that the acts of defendants violated their right to use this property.").[34] What transpired at MIT goes well beyond what occurred in *Sines*, where rally attendees marched past Hillel and made antisemitic remarks outside of it. 324 F. Supp. 3d at 782-83. Here, the interference with the ability to hold and enjoy Hillel's property resulted in a complete inability to enter the property during the time of worship, as well as physical contact with the property, which has been found to be sufficient to sustain a claim even though no individual has been physically harmed. *Greer*, 939 F.2d at 1082-83. Indeed, the Sixth Circuit specifically held that the "right to 'go and come at pleasure' to one's place of worship" is a protected interest under § 1982. *United States v. Brown*, 49 F.3d 1162, 1167 (6th Cir. 1995).

      c.  <u>Plaintiffs Sufficiently Allege a Violation of the Thirteenth Amendment</u>

MIT concedes that the Thirteenth Amendment is a proper source for the rights which may be enforced under § 1985. MTD at 23. The *Sines* court examined the reach of the Thirteenth Amendment in § 1985 claims and held, "[t]he repeated Supreme Court and Fourth Circuit

---

[33] *See also United States v. Brown,* 49 F.3d 1162, 1166 (6th Cir. 1995) ("The legislative history therefore supports the proposition that a Jewish person's 'use' of property is protected under Section 1982.")

[34] *See also Walker v. Pointer*, 304 F. Supp. 56, 61-62 (N.D. Tex. 1969).

interpretations of *Griffin* provide very persuasive guidance, even if found in *dicta*, that the Thirteenth Amendment does provide an underlying right to be free from racial violence that can sustain a Section 1985(3) claim." *Sines*, 324 F. Supp. 3d at 782 (citing *Griffin*, 403 U.S. at 90).

MIT further minimizes Plaintiffs' experiences in claiming the KKK Act is not intended to be used for circumstances like these. This just is not true. For example, in *Winthrow v. Clarke*, the plaintiff was a student whose door was graffitied with racist language and symbols, but the student was not physically harmed. 2008 WL 8188363, at *3 (D. Mass. Aug. 15, 2008), *report and recommendation adopted*, 2008 WL 8188854 (D. Mass. Sept. 10, 2008). Nonetheless, claims under the KKK Act were permitted to proceed after the court denied the defendants' motion for summary judgment. Sections 1985 and 1986 merely require that a plaintiff suffer damages. *See* 42 U.S.C., §§ 1985, 1986. Plaintiffs have therefore identified three viable sources of rights which may be enforced through claims under § 1985.

### b.  MIT Is Civilly Liable Under § 1986 of the Ku Klux Klan Act

Section 1986 provides, in relevant part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented[.]

42 U.S.C.A. § 1986.

It is telling that MIT devotes six pages to defending its conduct against the KKK Act Claims but spends only a single paragraph on § 1986 itself. MTD at 27. First, Plaintiffs alleged that MIT had knowledge of the wrongs being committed. This knowledge came from MIT's own monitoring of the situation, as evidenced by letters, emails, and videos posted by its administration, Compl. ¶¶ 180-82, 198, 227-29, emails from students and faculty, Compl. ¶¶ 189-90, 205, 223,

260, 363, 365; Ex. A, and MIT's President being invited to testify before Congress regarding the events taking place on campus. Compl. ¶¶ 194-99. Plaintiffs established that the violations of § 1985 did occur. *See supra,* § III(1). Finally, Plaintiffs sufficiently plead that MIT neglected or refused to prevent the violations of § 1985, Compl. ¶¶ 279-349, even when students, faculty, and even Congress begged it to act. *Id.*

It is impossible that MIT *did not, at a minimum, know* that violations of § 1985 were occurring during the encampments because while they were ongoing, MIT issued a statement to the entire student body, indicating they violated MIT's policies from the start. Compl. ¶ 227. But the conduct went further than simply violating MIT's policies. Instead, the encampments also prevented Hillel from using its building as both the Passover seder and the Israel Day celebrations had to be moved, and MIT knew that this would be the case. Compl. ¶¶ 241, 318, 357.

As noted above, MIT seeks to minimize the Conspirators' social media pots as if these were not an announcement of what was to come, but there was nothing ambiguous about the purpose of these protests. Understanding that most Jews are Zionists, the use of calls against Zionism as a dog whistle in the announcements clearly conveyed the intent of the groups' announcements. The goal was to disrupt the lives of Plaintiffs and other Jewish and Israeli students on campus.[35] One of the final nails in its coffin is MIT's admission that it was "responding to reports." MTD at 27. Significantly, however, there are two things that these "responses" were not: proactive or effective. At all times, MIT was aware of the encampments and rallies, their impact on Jewish students, and their violation of MIT policies—and, because the Conspirators repeatedly *said so*, MIT was aware that the encampments would not stop without stronger measures. Compl.

---

[35] *See*, *e.g.*, Compl. Ex. A, Compl. ¶ 157 ("There is only one solution! Intifada revolution!"); ¶ 188 ("we won't back down") ¶ 316 ("We will not stop, we will not rest"); ¶ 317 ("death to Zionism"); *see also* Compl. ¶¶ 231-46.

¶¶ 180, 186, 227-29, 316, Ex. A. MIT's knowledge and subsequent deliberate refusal to act meet the requirements of § 1986.

### IV.    Plaintiffs Sufficiently Plead Their Breach of Contract Claims

MIT is correct that "Massachusetts law recognizes a contractual relationship between a private university and its students." MTD at 28 (citing *Brown v. Suffolk Univ.*, 2021 WL 2785047, at *6 (D. Mass. Mar. 31, 2021)). Plaintiffs sufficiently allege the formation and breach of such a contract under which MIT promised to uphold its policies related to "free speech, antidiscrimination, harassment, and intimidation"—in particular insofar as those policies ensure safety and access as reflected in MIT's "student handbooks, university bulletins, regulations, codes, policies, and procedures." Compl. ¶¶ 372, 420, 422, 426-28.[36] MIT ignores the plain text of the Complaint, which cites MIT's express written policies. Contrary to MIT's argument, Plaintiffs *do* "point to [] language [] in [multiple] MIT document[s]" as bases for their breach of contract claims. *Cf.* MTD at 28-29 (citing *Brown*, 2021 WL 2785047, *G. v. Fay Sch.*, 931 F.3d 1 (1st Cir. 2019) and *Barkhordar v. Pres. & Fellows of Harv. Coll.*, 544 F. Supp. 3d 203 (D. Mass. 2021)). Plaintiffs sufficiently cite "the express terms of the contract." *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 709 (1st Cir. 2022). So, MIT's reliance on *Brown* and *G. v. Fay Sch.* and *Barkhordar* is wholly misplaced. *See* Compl. ¶¶ 41-67.

As here, "a valid contract can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials." *Shulse v. W. New Eng. Univ.*, 2020 WL 4474274, at *9 (D. Mass, Aug. 4, 2020). On a motion to dismiss, courts focus on the student's "reasonable expectation...of the contract's terms." *Sonoiki*, 37 F.4th at 709, 711.

---

[36] *See also id.* ¶¶ 41-58 (Code of Conduct), 59-60 (Chalking and Poster Policy), 61-67 (Policies on Events, Vigils, Protests, and Demonstrations).

Those expectations included MIT's promise to enforce those terms, and Plaintiffs' claim of breach when MIT failed to enforce. *See id.*

Plaintiffs identify several MIT policies which contain obligations, *i.e.* explicit and implicit promises, that give rise to Plaintiffs' reasonable expectations. *See* Compl. ¶¶ 41-67. And Plaintiffs' allegations of MIT's failure to provide a safe educational environment and access to the university due to MIT's failure to enforce policies are exactly the type of allegations that courts have held to state a breach of contract claim. *See* Compl. ¶¶ 7, 13-14, 38-39, 67, 117, 135-62, 169-278, 351, 353, 429.[37] In *Shulse*, this Court held that a "Student Handbook" and "Parent's Guide," "plausibly support[ed] Plaintiff's reasonable expectation that [the university] would provide an environment free from... discrimination." 2020 WL 4474274, at *9. And in *Czerwienski*, this Court upheld a breach of contract claim against a university based on promises in its "Sexual and Gender-Based Harassment Policy" and "Whistleblowing Policy." 666 F. Supp. 3d 49, 100 (D. Mass. 2023).

MIT cannot dispute that, at a minimum, it must adhere to and enforce its policies that prohibit specific acts. *See, e.g.*, MTD at 29 (acknowledging that courts enforce "promises about matters like adherence to disciplinary procedures or provision of specified services." (citing *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 80-87 (1st Cir. 2018); *Guckenberger*, 957 F. Supp. at 317).[38] Similarly, Plaintiffs' allegations make clear that MIT promised to enforce such policies when violated. Compl. ¶¶ 48, 65. Plaintiffs sufficiently identified both specific policy violations and

---

[37] Plaintiffs also rely on MIT's representations that it would enforce its policies aimed at providing a safe educational environment and access to the university, only to have MIT then walk back those statements. *See, e.g.*, Compl. ¶¶ 182-84.

[38] Plaintiffs rely precisely on such policies, including policies regarding (i) threats to Community Well-Being, (ii) prevention of discrimination and harassment, (iii) posters, (iv) flags, and (vi) and events. *See* Compl. ¶¶ 41-67.

MIT's failure to respond to such violations. *See, e.g.*, *Czerwienski*, 666 F. Supp. 3d at 100–01; *accord Shulse*, 2020 WL 4474274, at *9.[39]

### V.    Plaintiffs Sufficiently Plead Negligence

MIT's negligence arguments demonstrate a fundamental misunderstanding of how negligence claims work. For their negligence claim, Plaintiffs had to plead (1) MIT had a duty of care; (2) MIT breached that duty; (3) damage; and (4) causation. *Santos v. U.S. Bank N.A.*, 54 N.E.3d 548, 558 (Mass. App. 2016).[40] MIT argues that there is no duty to provide a learning environment free from harassment. MTD at 31. This is simply false. Under Massachusetts law, courts have recognized a duty to protect students from foreseeable harm, including harassment in "the university context." *Schaefer v. Yongjie Fu*, 272 F. Supp. 3d 285, 288 (D. Mass. 2017).[41] MIT's preemption argument is also inconsistent with the law. While Plaintiffs have a separate Title VI claim, federal law can serve as the basis for a duty of care. *See*, *e.g.*, *Plourde v. Sorin Grp. USA, In.*, 23 F.4th 29, 33 (1st Cir. 2022) (explaining remedies for violations of common law duties are available where they parallel federal requirements).

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss the First Amended Complaint. To the extent the Court deems any of Plaintiffs' allegations inadequate, Plaintiffs request permission to amend their Complaint.

---

[39] MIT's reliance on *Wu v. Ma*, No. 22-CV-30033, 2023 WL 6318831, at *9 (D. Mass. Sept. 28, 2023) is also misplaced. As MIT recognizes, the students in *Wu v. Ma* based their claims on promises of a "welcoming" or "inclusive" environment. *See* MTD at 29.

[40] MIT addresses only the duty element, implicitly conceding breach, damages, and causation. *See* MTD at 30-31. In any event, Plaintiffs plead all four. Compl. ¶¶ 403-18.

[41] Universities can also voluntarily *assume* duties to students to provide learning environments free from, among other things, wrongful conduct. *See*, *e.g.*, *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331, 336 (Mass. 1983). MIT did so here when it committed to upholding antidiscrimination and anti-harassment policies. *See* Compl. ¶¶ 40-66.

Dated: <u>July 12, 2024</u>                                    Respectfully submitted,


<u>/s/ Marlene J. Goldenberg</u>
Marlene J. Goldenberg *(pro hac vice)*                Melissa S. Weiner *(pro hac vice)*
**NIGH GOLDENBERG RASO &**                    **PEARSON WARSHAW, LLP**
**VAUGHN PLLC**                               328 Barry Avenue S., Suite 200
14 Ridge Square NW, 3rd Floor                 Wayzata, MN 55391
Washington DC 20016                           Tel: 612-389-0600
Telephone: (202) 792-7927                     Fax: 612-389-0610
Fax: (202) 792-7927                           mweiner@pwfirm.com
mgoldenberg@nighgoldenberg.com


David Abrams (Mass BBO  639250)               Neil Swartzberg *(pro hac vice)*
**DAVID ABRAMS, ATTORNEY AT**                 **PEARSON WARSHAW, LLP**
**LAW**                                       555 Montgomery St., Suite 1205
PO Box 3353 Church Street Station             San Francisco, CA 94111
New York, NY 10008                            Telephone: 415-433-9000
Telephone: (212) 897-5821                     nswartzberg@pwfirm.com
Fax: (212) 897-5811
dnabrams@wjlf.org


Jason P. Sultzer *(pro hac vice)*             Janet Varnell *(pro hac vice)*
Jeremy Francis *(pro hac vice)*               **VARNELL & WARWICK, P.A.**
**SULTZER & LIPARI, PLLC**                    400 N Ashley Drive, Suite 1900
85 Civic Center Plaza, Ste 200                Tampa, FL 33602
Poughkeepsie, NY 12601                        Telephone: 352-753-8600
Telephone: 845-244-5595                       jvarnell@vandwlaw.com
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
jfrancis@thesultzerlawgroup.com


***Counsel for Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of this electronic filing to all counsel of record.

*/s/ Marlene Goldenberg*